# Exhibit A

The Law Office of Paul B. Weitz & Associates
Paul B. Weitz, Esq. (PW-0025)
233 Broadway, 5th Floor
New York, New York 10279

Co-Counsel for Plaintiffs:
Jeffrey M. Gottlieb, Esq. (JG-7905)
150 East 18th Street
Suite PHR
New York, New York 10003



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

ERIC EDWARDS, Individually and on Behalf
of All Other Persons Similarly Situated,

                              Plaintiffs,

               -against-

THE DEPARTMENT OF CORRECTIONS OF
THE CITY OF NEW YORK and THE CITY
OF NEW YORK,

                              Defendants.
-------------------------------------------------------------X

ECF 2008 Civ:

**Collective
Action Complaint
Demand for Jury Trial**

Plaintiff, through his attorneys, complaining of Defendants, alleges as follows:

## INTRODUCTION

Plaintiff, and the putative members of the collective action are Correction Officers

("COs") employed by the Department of Corrections ("DOC"), an agency of the City of

New York ("NYC"). This action is brought pursuant to the Fair Labor Standards Act

("FLSA") seeking to compensate them for the time spent putting on their required

uniforms and equipment and the time spent changing back into their street clothes at the

end of their tour of duty ("Donning and Doffing") as well as the time for their meal

{00008806:}

breaks since they are required to be in uniform and remain in the facility during meal
breaks for emergencies that might arise.

## NATURE OF ACTION

1. Plaintiff alleges on behalf of himself and other similarly situated current and
former employees, classified by Defendants as correction officers, who elect to opt into
this action pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§216 (b), that
they are: (i) entitled to unpaid wages from Defendants for work performed for which they
received no compensation at all, as well as for overtime work for which they did not
receive overtime premium pay, as required by law, and (ii) entitled to liquidated damages
pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§201 et seq.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over the claims in this action
pursuant to the provisions of 28 U.S.C. §§1331 and 1337. In addition, the Court has
jurisdiction over Plaintiff's claims under the FLSA pursuant to 29 U.S.C. §216(b).

3. Venue is proper in this district pursuant to 29 U.S.C. §1391 as Defendants'
principal places of businesses are in this district and a substantial part of the events or
omissions giving rise to the claims occurred in this district.

4. This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C.
§§2201 and 2202.

## PARTIES

5. Plaintiff at all relevant times is and was a resident of Rosedale in the County of
Queens in the State of New York.

6. Defendant, NYC, is a municipality organized and existing pursuant to the laws of the State of New York and maintains its principal place of business in the City, County and State of New York

7. Defendants DOC and NYC are, and at all times material hereto, were public agencies within the meaning of FLSA Sec. 3(x), 29 U.S.C. 203 (x).

8. Defendants DOC and NYC are, and at all times material hereto, political subdivisions of the State of New York and a local government "employer" within the meaning of 29 U.S.C. 203 (r) and (s).

## COLLECTIVE ACTION ALLEGATIONS

9. Pursuant to 29 U.S.C. §207, Plaintiff seeks to prosecute his FLSA claims as a collective action on behalf of all persons who are or were formerly employed by Defendants at any time since March 27, 2005 to the entry of judgment in this case (the "Collective Action Period"), as COs and who were not paid for all of the hours that they worked and received no compensation for overtime rates not less than one-half times the regular rate of pay for hours worked in excess of forty hours per workweek (the "Collective Action Members") .

10. This collective action class is so numerous that joinder of all members is impracticable. Although the precise number of such persons is unknown, and the facts on which the calculation of that number are presently within the sole control of the Defendants, upon information and belief, there are approximately 10,000 members of the Class during the Collective Action Period, most of whom would not be likely to file individual suits because they lack adequate financial resources, access to attorneys or knowledge of their claims.

{00008806:}- 3 -

11. Plaintiff will fairly and adequately protect the interests of the Collective Action Members and has retained counsel that is experienced and competent in the fields of employment law and class action litigation. Plaintiff has no interest that is contrary to or in conflict with those members of this collective action.

12. A collective action is superior to other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, inasmuch as the damages suffered by individual Collective Action Members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the members of the collective action to individually seek redress for the wrongs done to them. There will be no difficulty in the management of this action as a collective action.

13. Questions of law and fact common to the members of the collective action predominate over questions that may affect only individual members because Defendants have acted on grounds generally applicable to all members. Among the common questions of law and fact common to Plaintiff and other Collective Action Members are:

   a. whether the Defendants employed the Collective Action Members within the meaning of the FLSA;

   b. what proof of hours worked is sufficient where the employer fails in its duty to maintain time records;

   c. whether Defendants failed to pay the Collective Action Members for all hours worked by them as well as overtime compensation for all of the hours worked in excess of forty hours per workweek, in violation of the FLSA and the regulations promulgated thereunder;

d. whether the time spent by the Collective Action Members donning
   their required uniform and equipment at the beginning of their work
   shift and the time spent doffing same at the end of the shift were done
   primarily for the benefit of Defendants and were integral and
   indispensable to Defendants' business operations and constitute
   compensable work time;

e. whether the restrictions by Defendants placed on the meal breaks of
   the Collective Action Members deem such time as compensable work
   time;

f. whether the Defendants have failed to compensate the Collective
   Action Members in connection with interruptions to their meal breaks;

g. whether Defendants' violations of the FLSA are willful as that term is
   used within the context of the FLSA;

h. whether Defendants are liable for all damages claimed hereunder,
   including but not limited to compensatory, punitive and statutory
   damages, interest, costs and disbursements and attorneys' fees; and

i. whether Defendants should be enjoined from such violations of the
   FLSA in the future.

14. Plaintiff knows of no difficulty that will be encountered in the management of
this litigation that would preclude its maintenance as a collective action.

## STATEMENT OF THE FACTS

15. Plaintiff was a CO employed by Defendants at their facility on Rikers Island, Bronx County, New York from on or about May, 1991 until the present (the "time period").

16. Plaintiff's work was performed in the normal course of the Defendants' business and was integrated into the business of Defendants.

17. The work performed by Plaintiff required little skill and no capital investment. His duties did not include managerial responsibilities or the exercise of independent judgment.

18. Plaintiff often worked in excess of 40 hours a week, yet the Defendants willfully failed to pay Plaintiff (and all other COs) compensation for all hours worked by him as well as overtime compensation of one and one-half times his regular hourly rate. Specifically, Defendants have failed to pay Plaintiff and the Class Action Members for the time spent donning and doffing their uniforms and equipment as well as the time for their meal breaks.

19. In addition to Plaintiff, during the time period, Defendants usually employed al least 8,000 other CO employees simultaneously.

20. Throughout that time and, upon information and belief, both before that time (throughout the Class Period) and continuing until today, the Defendants have likewise employed other individuals, like the Plaintiff (the Collective Action Members) in positions that required little skill and no capital investment and their duties and responsibilities did not include any managerial responsibilities or the exercise of

independent judgment. They do not have the authority to hire and fire other employees, and they are not responsible for making hiring and firing recommendations.

21. Such individuals have worked in excess of 40 hours a week, yet Defendants have likewise willfully failed to pay them any compensation for all of the hours worked by them as well as overtime compensation of one and one-half times their regular hourly rate.

22. As stated, the exact number of such individuals is presently unknown, but within the sole knowledge of the Defendants and can be ascertained through appropriate discovery.

23. Throughout all relevant time periods, upon information and belief, and during the course of Plaintiff's own employment and the course of the Collective Action Period, the Defendants failed to maintain accurate and sufficient time records.

24. Upon information and belief, Defendants failed to post or keep posted a notice explaining the minimum wages and overtime pay rights provided by the FLSA in any area where Plaintiffs are employed, in violation of 29 C.F.R. § 516.4;

### FIRST CLAIM FOR RELIEF
### FAIR LABOR STANDARDS ACT

25. Plaintiff repeats and realleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

26. At all relevant times, Defendants have been and continue to be an employer within the meaning of FLSA, 29 U.S.C. §§203(s).

27. At all relevant times, Defendants employed and/or continued to employ, Plaintiffs within the meaning of the FLSA.

28. Plaintiff consents in writing to be a party to this action, pursuant to 29 U.S.C.
§216 (b). Plaintiff's written consent is attached hereto and incorporated by reference.

29. At all relevant times, the Defendants had a policy and practice of refusing to
pay the COs for all of the hours worked by them as well as overtime compensation for
their hours worked in excess of forty hours per workweek.

30. As a result of the Defendants' willful failure to compensate its employees,
including Plaintiff and the Collective Action Members, for all hours worked by them as
well as for overtime at a rate not less than one and one-half times the regular rate of pay
for work performed in excess of forty hours in a workweek, Defendants have violated
and continue to violate, the FLSA, 29 U.S.C. §§201 *et seq.*, including 29 U.S.C.
§§207(a)(1) and 215 (a).

31. As a result of Defendants' failure to record, report, credit, and/or compensate
its employees, including Plaintiff and the Collective Action Members, Defendants have
failed to make, keep and preserve records with respect to each of its employees sufficient
to determine the wages, hours, and other conditions and practices of employment in
violation of the FLSA, 29 U.S.C. §§201, *et seq.*, including 29 U.S.C. §§207(a)(1) and
215(a).

32. The foregoing conduct, as alleged, constitutes a willful violation of the FLSA
within the meaning of 29 U.S.C. §255(a).

33. Due to Defendants' FLSA violations, Plaintiff, on behalf of himself and the
Collective Action Members, are entitled to recover from Defendants their unpaid wages,
their unpaid overtime compensation, an additional amount equal as liquidated damages,
additional liquidated damages for unreasonably delayed payment of wages, reasonable

attorneys' fees, and costs and disbursements of this action, pursuant to 29 U.S.C.
§216(b).

## PRAYER FOR RELIEF

WHEREFORE Plaintiff on behalf of himself and all other similarly situated
Collective Action Members respectfully request that this Court grant the following relief:

    a.    Designation of this action as a collective action on behalf of the Collective
Action Members and prompt issuance of notice pursuant to 29 U.S.C.
§216(b) to all similarly situated members of an FLSA Opt-In Class,
apprising them of the pendency of this action, permitting them to assert
timely FLSA claims in this action by filing individual Consents to Sue
pursuant to 29 U.S.C. §216(b) and appointing Plaintiff and his counsel to
represent the Collective Action Members and tolling of the statue of
limitations;

    b.    A declaratory judgment that the practices complained of herein are
unlawful under the FLSA;

    c.    An injunction against Defendants and its officers, agents, successors,
employees, representatives and any and all persons acting in concert with
it, as provided by law, from engaging in each of the unlawful practices,
policies and patterns set forth herein;

    d.    An order equitably tolling the Statute of Limitations for a period of 6 years
prior to the commencement of this action;

    e.    An award of unpaid wages and overtime compensation due under the
FLSA;

f.     An award of liquidated damages as a result of the Defendants' willful

failure to pay wages and overtime compensation pursuant to 29 U.S.C. §

216;

g.     An award of prejudgment and post-judgment interest;

h.     An award of costs and expenses of this action together with reasonable

attorneys' and expert fees; and

i.     Such other and further relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands

a trial by jury on all questions of fact raised by the Complaint.

Dated: New York, New York
March 27, 2008

THE LAW OFFICE OF PAUL B. WEITZ
Paul B. Weitz, Esq. (PW-0025)
Attorneys for Plaintiff, Individually and on
Behalf of All Other Persons Similarly Situated
233 Broadway, 5th Floor
New York, New York 10279
Tel: (212)346-0045
Fax: (212)346-0876

Co-Counsel
Jeffrey M. Gottlieb, Esq. (JG-7905)
150 East 18th Street, Suite PHR
New York, New York 10003
Tel: (212)228-9795
Fax: (212)982-6284

Exhibit A

50000 SERIES
30% P.C.W.
RECYCLED

## CONSENT TO BECOME PARTY PLAINTIFF

By my signature below, I hereby authorize the filing and prosecution of claims in my name and on my behalf to contest the failure of _The City of New York_ to pay me overtime wages as required under state and/or federal law and also authorize the filing of this consent in the action(s) challenging such conduct. I authorize the representative plaintiffs and designate them class representatives as my agents to make decisions on my behalf concerning the litigation, the method and manner of conducting this litigation, the entering of an agreement with Plaintiffs' counsel concerning attorneys' fees and costs, and all other matters pertaining to this lawsuit.

_____     1/16/08     ERic   EDwARDS
Signature                   Date        Print Name

UNITED STATED DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORIK

ERIC EDWARDS, Individually and on Behalf of
All Other Persons Similarly Situated,

                    Plaintiffs,

        -against-

THE DEPARTMENT OF CORRECTIONS OF
THE CNY and THE CITY OF NEW YORK,

                    Defendants.

## COMPLAINT

**PAUL B. WEITZ & ASSOCIATES PC**
Paul B. Weitz, Esq., PW-0025
*Attorneys for Plaintiffs*
233 Broadway, 5th Floor
New York, New York 10279-0003
(212) 346-0045

*CO-COUNSEL:*
Jeffrey M. Gottlieb, Esq. JG-7905
*Attorneys for Plaintiffs*
150 E. 18th Street, Suite PHR
New York, New York 10003
(212) 228-9795

*Service of copy of the within*          *is hereby admitted.*

*Dated:*

                ...........................
                *Attorneys for*

**PAUL B. WEITZ & ASSOCIATES PC**
Paul B. Weitz, Esq., PW-0025
*Attorneys for Plaintiffs*
233 Broadway, 5th Floor
New York, New York 10279-0003
(212) 346-0045

*CO-COUNSEL:*
Jeffrey M. Gottlieb, Esq. JG-7905
*Attorneys for Plaintiffs*
150 E. 18th Street, Suite PHR
New York, New York 10003
(212) 228-9795

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

| Southern | District of | New York |
| --- | --- | --- |

ERIC EDWARDS, Individually and on Behalf of
All Other Persons Similarly Situated,

V.

THE DEPARTMENT OF CORRECTIONS OF
THE CNY and THE CITY OF NEW YORK,

**SUMMONS IN A CIVIL ACTION**

CASE NUMBER:

08 CV 3134

TO: (Name and address of Defendant)

Dept. of Corrections of the CNY, 60 Hudson St., 6th Floor, NY NY 10013
City of New York Law Dept., 100 Church St., NY NY 10007

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

PAUL B. WEITZ & ASSOCIATES, PC
233 Broadway, 5th Floor
New York, New York 10279
(212) 346-0045

Co-Counsel:
JEFFREY M. GOTTLIEB, ESQ.
150 East 18th Street, Suite PHR
New York, New YOrk 10003
(212) 228-9795

an answer to the complaint which is served on you with this summons, within _____ days after service
of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you
for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the
Clerk of this Court within a reasonable period of time after service.

## J. MICHAEL McMAHON

MAR 2 7 2008

| CLERK | DATE |
| --- | --- |

(By) DEPUTY CLERK

%AO 440 (Rev. 8/01) Summons in a Civil Action

| RETURN OF SERVICE | |
|---|---|
| Service of the Summons and complaint was made by me[1] | DATE |
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served:

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

  Name of person with whom the summons and complaint were left:

☐ Returned unexecuted:

☐ Other (specify):

| STATEMENT OF SERVICE FEES | | |
|---|---|---|
| TRAVEL | SERVICES | TOTAL  $0.00 |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____
             Date                    *Signature of Server*


                                     *Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

ECF 2008 CIV: _____

UNITED STATED DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ERIC EDWARDS, Individually and on Behalf of
All Other Persons Similarly Situated,

                                    Plaintiffs,

          -against-

THE DEPARTMENT OF CORRECTIONS OF
THE CNY and THE CITY OF NEW YORK,

                                    Defendants.

## SUMMONS

PAUL B. WEITZ  & ASSOCIATES PC
Paul B. Weitz, Esq., PW-0025
*Attorneys for Plaintiffs*
233 Broadway, 5th Floor
New York, New York  10279-0003
(212) 346-0045

*CO-COUNSEL:*
Jeffrey M. Gottlieb, Esq. JG-7905
*Attorneys for Plaintiffs*
150 E. 18th Street, Suite PHR
New York, New York 10003
(212) 228-9795

*Service of copy of the within*          *is hereby admitted.*

*Dated:*

                    ..............................
                        *Attorneys for*

PAUL B. WEITZ  & ASSOCIATES PC
Paul B. Weitz, Esq., PW-0025
*Attorneys for Plaintiffs*
233 Broadway, 5th Floor
New York, New York  10279-0003
(212) 346-0045

*CO-COUNSEL:*
Jeffrey M. Gottlieb, Esq. JG-7905
*Attorneys for Plaintiffs*
150 E. 18th Street, Suite PHR
New York, New York 10003
(212) 228-9795

# Exhibit B

```
┌─────────────────────────────┐
│ USDC SDNY                   │
│ DOCUMENT                    │
│ ELECTRONICALLY FILED        │
│ DOC #: _____           │
│ DATE FILED:  3/15/10        │
└─────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X

ERIC EDWARDS, Individually and on Behalf
of All Other Persons Similarly Situated,                    **STIPULATION**

                                            Plaintiff,

                        -against-
                                                    08 Civ. 3134
THE CITY OF NEW YORK,                               (DLC) (GWG)

                                            Defendant.

-------------------------------------------------------------------- X


        **WHEREAS**, the Court SO ORDERED on May 27, 2009 a stipulation dated May

15, 2009 (the "May 27 Stipulation") (attached as Exhibit "A") which set forth the parameters for

selecting a group of test plaintiffs and which bifurcated the case into a trial on liability and a trial

regarding damages; and

        **WHEREAS**, the parties have been working together to select a group of

representative test plaintiffs and have been able to select representative test plaintiffs for a

majority of the New York City Department of Correction ("DOC") facilities operated by

defendant; and

        **WHEREAS**, the parties now wish to amend the stipulation dated May 15, 2009

and so ordered May 27, 2009 as follows:

        **NOW, THEREFORE, IT IS HEREBY AGREED**, by and between the

attorneys for plaintiffs and defendant, as follows:

- 1 -

1.     Paragraph 1 of the May 15, 2009 Stipulated Order will be amended to state as follows:

"1.     For purposes of discovery, summary judgment, and trial on the issue of liability, the parties have selected a group of Test Plaintiffs from all opt-in plaintiffs which consist of agreed upon representative test plaintiffs from a majority of DOC facilities which are among the facilities subject to the instant action (the "Test Plaintiffs"). The Test Plaintiffs shall consist of the persons listed on Exhibit "B," subject to addition and/or substitution if deemed necessary by the parties."

2.      Paragraph 7 will be amended to state:

      "7. If there is a verdict at trial in favor of the defendant against the Test

Plaintiffs on the issue of liability it shall be binding upon all opt-in plaintiffs.

If there is a verdict at trial in favor of the Test Plaintiffs against defendant on

the issue of liability, it shall be deemed a verdict at trial in favor of all Opt-in

plaintiffs against defendant, and this matter shall continue in the manner set

forth in paragraphs "8," "9," and "10.""

Dated:      New York, New York
       March 12, 2010

William C. Rand, Esq.                          Michael A. Cardozo
Law Office of William Coudert Rand             Corporation Counsel of the City of New York
Attorney for Plaintiffs                        Attorney for Defendant
711 Third Avenue, Suite 1505                   100 Church Street, Room 2-143
New York, New York 10017                       New York, New York 10007
(212) 286-1425                                 (212) 788-0879
wcrand@wcrand.com                              bsitaras@law.nyc.gov

By: _____                    By: _____
     William C. Rand, Esq.                          Basil C. Sitaras
                                 Assistant Corporation Counsel

SO ORDERED:

_____
U.S.D.J.
   March 15, 2010

- 3 -

# EXHIBIT A

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:  5/27/09
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x

ERIC EDWARDS, Individually and on Behalf
of All Other Persons Similarly Situated,

                                   Plaintiff,

                    -against-

THE CITY OF NEW YORK,

                                Defendant.

------------------------------------------------------------------ x

**STIPULATION**

08 Civ. 3134
(DLC) (GWG)

       WHEREAS, the Court and the parties conferred regarding a proposed discovery plan with respect to this collective action; and

       WHEREAS, the Court and the parties conferred regarding the defendant's intended motion for summary judgment with respect to this collective action; and

       WHEREAS, the Court and the parties conferred regarding the bifurcation of a possible trial in this collective action:

       NOW, THEREFORE, IT IS HEREBY AGREED, by and between the attorneys for plaintiff and defendant, as follows:

       1.     For the purposes of discovery, summary judgment, and trial, the parties shall select a group of Test Plaintiffs from all opt-in plaintiffs, which will approximately consist of one individual from each shift (days, nights, overnights) from each New York City Department of Correction facility which is subject to the instant action (the "Test Plaintiffs").

       2.     Discovery regarding individual plaintiffs in this action, both in the form of documents and deposition testimony, shall be limited to Test Plaintiffs.

- 1 -

3.    For the purposes of dispositive motions, any evidence introduced regarding individual plaintiffs shall be limited to the discovery described in paragraph 2 for the Test Plaintiffs

4.    For the purposes of dispositive motions, any decision reached with respect to the Test Plaintiffs shall be binding upon all opt-in plaintiffs.

5.    Should this action proceed to trial, any admissible evidence, with respect to individual plaintiffs, shall be limited to the Test Plaintiffs

6.    Should this action proceed to trial, said trial shall be bifurcated between liability and damages.

7.    If there is a verdict at trial in favor of the defendant on the issue of liability, it shall be binding upon all opt-in plaintiffs.

8.    If there is a verdict at trial in favor of the Test Plaintiffs on the issue of liability, a bench trial shall commence on the issue of whether plaintiffs' are entitled to an equitable tolling of the Fair Labor Standards Act's three-year statute of limitations.

9.    Following the bench trial on the issue of equitable tolling, the parties shall engage in settlement discussions and complete discovery on the issue of damages with respect to all opt-in plaintiffs.

- 2 -

     10.    If no settlement is reached, a jury trial solely on the issue of damages shall

be held for all opt-in plaintiffs.

Dated:    New York, New York
          May 19, 2009

William C. Rand, Esq.
Law Office of William Coudert Rand
Attorney for Plaintiffs
711 Third Avenue, Suite 1505
New York, New York 10017
(212) 286-1425
wcrand@wcrand.com

By:    _____

       William C. Rand, Esq.

Michael A. Cardozo
Corporation Counsel of the City of New York
Attorney for Defendant
100 Church Street, Room 2-143
New York, New York 10007
(212) 788-0879
bsitaras@law.nyc.gov

By:    _____

       Basil C. Sitaras
       Assistant Corporation Counsel

SO ORDERED:

_____
   U.S.D.J.

   May 27, 2009

- 3 -

## EXHIBIT B

REPRESENTATIBE PLAINTIFFS

1.      **Anna M. Kross Center (AMKC)**
        **18-18 Hazen Street**
        **East Elmhurst, NY  11370**
        **(Houses detained male adults)**

Kevin Balarni
Reinaldo Colon
Immanuel Washington
Michael Crivera

2.      **Eric M. Taylor Center (EMTC) Formerly known as CIFM**
        **10-10 Hazen Street**
        **East Elmhurst, NY  11370**
        **(Houses sentenced male adults and adolescents)**

Derreck Ross
William Serrano

3.      **George Motchan Detention Center (GMDC)**
        **15-15 Hazen Street**
        **East Elmhurst, NY  11370**
        **(Houses detained male adults)**

**<u>NO REPRESENTATIVE PLAINTIFFS SELECTED</u>**

4.      **George R. Vierno Center (GRVC)**
        **09-09 Hazen Street**
        **East Elmhurst, NY  11370**
        **(Houses detained male adults.)**

Steven Rentas Jr
Theodore Allbright
Derrick P. Been

5.      **James A. Thomas Center (JATC)**

**14-14 Hazen Street**
**East Elmhurst, NY  1137**

## NO REPRESENTATIVE PLAINTIFFS SELECTED

6.   **North Infirmary Command (NIC)**
     **15-00 Hazen Street**
     **East Elmhurst, NY  11370**
     **(Primarily houses inmates requiring infirmary care)**

Bernett Shaw
Warren Swain
Paul LaFranca
Alethea Miller

7.   **Otis Bantum Correctional Center (OBCC)**
     **16-00 Hazen Street**
     **East Elmhurst, NY  11370**
     **(Houses detained male adults)**

Vandoran Latson
Julio Contreras
Eric A. Taylor

8.   **Robert N. Davoren Complex (RNDC) Formerly known as ARDC**
     **11-11 Hazen Street**
     **East Elmhurst, NY  11370**
     **(Primarily houses detained male adolescents (16 to 18 years of age))**

Jacqueline Miranda
Dariene Sanders
Jerome Hall
Joseph Franco

9.   **Rose M. Singer Center (RMSC)**
     **19-19 Hazen Street**
     **East Elmhurst, NY  11370**
     **(Houses detained and sentenced female adults and adolescents)**

Trina Jackson-Gaspard
Vincent Selvaggi
Paul Arrabito
Sharon White
John C. Tietjen

- 5 -

10.   **West Facility (WF)**
      **16-06 Hazen Street**
      **East Elmhurst, NY 11370**
      **(Houses inmates with contagious diseases)**

## NO REPRESENTATIVE PLAINTIFFS SELECTED

      .

BOROUGH FACILITIES

11.   **Bellevue Hospital Prison Ward (BHPW)**
      **462 1st Avenue**
      **New York, NY 10016**
      **(Houses males requiring psychiatric or medical treatment)**

Salvatore Vetvi

12.   **Brooklyn Detention Complex (BKDC)**
      **275 Atlantic Avenue**
      **Brooklyn, NY 11201**

Phyllis Smith

13.   **Elmhurst Hospital Prison Ward (EHPW)**
      **79-01 Broadway**
      **Queens, NY 11370**
      **(Houses females requiring acute psychiatric care)**

Bruce Robertson

14.   **Manhattan Detention Complex (MDC)**
      **125 White Street**
      **New York, NY 10013**
      **(Houses detained male adults)**

Lance Ford
Noel Geshonowitz
Harry Bass
Helene Vitale
Alma Acevedo
Celestino P. Monclova

15.   **Queens Detention Complex (QDC)**

- 6 -

**126-01 82nd Street**
**Kew Gardens, NY 11415**

Marilyn Steele

16.    **Vernon C. Bain Center (VCBC)**
       **1 Halleck Street**
       **Bronx, NY 10474**
       **(Houses detained male adults)**

Rafael Crespo
Augustin Rivera
Philip Kinard
Brian A. Parris
Mr Eric Sanders

17.    **Manhattan Courts**
       100 Centre Street
       (sometimes combined with White Street)

John N. Shaw

       **18.    Adolescent Reception and Detention Center (ARDC)**
               **Rykers Island**

Michael Munoz

       **19.    Brooklyn Supreme Court**

Edie C. Harris

       20.    Special Operations Division

Brenda Person
Celestino P. Monclova
Daphne Mariner

       21.    Manhattan North Harlem Precinct

       Michelle Cruz

       **22.    TRANSPORTATION**

Alphonso Purse

- 7 -

Crossland Raymond
Kenneth Black

### 23.   Bronx Courts

John C. Tietjen

### 24.   Queens Courts

Yvete Bonds
William G. Woodley

# Exhibit C

1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ----------------------------------------X
      ERIC EDWARDS, Individually and On
 3    Behalf of All Other Persons Similarly
      Situated,
 4
                                   PLAINTIFF,
 5

 6                      -against-      Case No:
                                       08-civ-3134
 7

 8    THE DEPARTMENT OF CORRECTION OF THE CITY
      OF NEW YORK and CITY OF NEW YORK,
 9
                                   DEFENDANT.
10    ----------------------------------------X

11

12                    DATE:  January 25, 2011

13                    TIME:  4:10 p.m.

14

15

16                    DEPOSITION of the Plaintiff, DERRICK BEEN,

17    taken by the Defendant, pursuant to a Notice and to the

18    Federal Rules of Civil Procedure, held at the offices of

19    the New York City Law Department, 100 Church Street, New

20    York , New York 10007, before Ephraim Jacobson, a Notary

21    Public of the State of New York.

22

23

24

25
```

| 1 | Q. | How long were you on that tour? |
| 2 | A. | For about maybe three years. |
| 3 | Q. | Do you have regular days off now? |
| 4 | A. | Yes. |
| 5 | Q. | What are those? |
| 6 | A. | Saturday and Sunday. |
| 7 | Q. | Do you have a steady post? |
| 8 | A. | Yes. |
| 9 | Q. | What's that? |
| 10 | A. | Commissary. |
| 11 | Q. | How long have you had that post for? |
| 12 | A. | About three years. |
| 13 | Q. | Has it been since you're on the 5:30 -- |
| 14 | A. | Yes. |
| 15 | Q. | -- to 2? |
| 16 | A. | Yes.  Three to four years. |
| 17 | Q. | Did you request that post? |
| 18 | A. | Yes, I did. |
| 19 | Q. | Have you taken any type of extended leave while |
| 20 | | employed by DOC; meaning, beyond a scheduled vacation? |
| 21 | A. | Yes. |
| 22 | Q. | When was that -- |
| 23 | A. | But it wasn't through my request.  What happened |
| 24 | | was, during the time I was assaulted when I had the black |
| 25 | | eye I was out for, like, maybe six months. |

 1    around your body to see where the actual metal is ringing.

 2        Q.    What do you do after you clear the magnometer?

 3        A.    You have to go to your locker, and then once you

 4    get to your locker room then you have to get your uniform

 5    out, set up all your gear.  There's straps that we have

 6    strapped to our belts from other equipment that we carry.

 7        Q.    I'm just going to back up for one second.  What

 8    time do you arrive in the morning at the facility gates?

 9    What time do you get there in the morning?

10        A.    With this particular --

11        Q.    With this tour?

12        A.    I get there sometimes around 4, 4:30.  I try to

13    get there early.

14        Q.    When you say 4:00, 4:30, do you mean between 4

15    and 4:30?

16        A.    Yes.  Most of the time it's 4:30.

17        Q.    Your tour starts at 5?

18        A.    5:30.

19        Q.    How long does it take you to, would you say, on

20    average to clear the magnometer?

21        A.    When you first enter the building?

22        Q.    Yes.

23        A.    I'd say maybe about no more than ten minutes, the

24    most.

25        Q.    What's the average amount of time in minutes is

D. BEEN

1   to slide, so you just take it off and just sit it there.
2   My locker had two different compartments, so I just sit it
3   on there, and then every day, because you have to -- you
4   have those -- those items that I mentioned to you, you have
5   to line them straight up on you -- you would want your
6   handcuffs straight to the back and then you would want your
7   flashlight, depending on what hand you are, left or right,
8   if you're right-handed on your right, and then you have
9   your 911 knife.  You can use that on either side.  Your
10  penholder and your memo book is in your pocket.
11       Q.   Every day when you're done with your tour you
12  take all those things off?
13       A.   Correct.
14       Q.   Then every day when you come in, you put them
15  back on?
16       A.   Then line it up with the straps that you take
17  off, also, because you're going to take off your straps.
18       Q.   I'm assuming you're vest stays in your locker as
19  well?
20       A.   Yes.  Only on days that I take it and wash it.
21       Q.   When you arrive to work in the morning, are you
22  in civilian clothing?
23       A.   Yes.
24       Q.   Do you ever wear any part of your uniform to
25  work?

28

D. BEEN

1     A.    No.

2     Q.    Why not?

3     A.    It's kind of dangerous to wear your uniform to
4     work because, number one, you see inmates in the street all
5     the time and they might recognize you quicker with a
6     uniform on than without.  It can be a problem, as far as
7     you being assaulted.

8     Q.    Has this ever happened to you where you have been
9     identified as a correction officer on the street?

10    A.    Yes.

11    Q.    Just from somebody recognizing your face?

12    A.    Yes, from recognizing my face.  I have also been
13    cut in the face by an inmate with a razor.  He was an
14    inmate, but not in my jail -- in the street.

15    Q.    He just recognized you by face?

16    A.    No, he didn't recognize me at all.  It was a
17    verbal thing with him.  He was smoking marijuana while I
18    was standing with my daughter, and the individual took and
19    I asked him to move out of the way, and I thought he
20    punched me at first, and my daughter started screaming.  I
21    was bleeding profusely from a cut that he put right on -- I
22    don't know if you can see it.

23    Q.    Yes.

24    A.    It was a slash.

25    Q.    Was he an inmate that you had?

```
 1    Q.   When did you work as an escort officer?
 2    A.   Let me think now.  I'd say about maybe a year and
 3  a half ago.
 4    Q.   How long were you an escort officer for?
 5    A.   Maybe about six months.
 6    Q.   Just backing up for a second.  Is there a place
 7  at this facility where you sign in?
 8    A.   Yes.  I forgot to mention that.  I'm sorry.
 9    Q.   Where is that located?
10    A.   That's before -- after you clear yourself to come
11  into the building and once you're clear, you go a short
12  distance and the sign-out sheet or the sign-in sheet is
13  right there.
14    Q.   You would sign in before you got to the locker
15  room?
16    A.   Correct.
17    Q.   When you sign in, do you sign in the time that
18  your tour starts or do you sign in the actual time that
19  you're arriving?
20    A.   They don't want you to put what time you arrive.
21  They want you to put the time that your tour starts.
22    Q.   You said they don't want you.  Who's "they"?
23    A.   The administration.
24    Q.   Did someone tell you that?
25    A.   Yes.
```

1    Q.    I'm saying earlier you testified that you worked

2    past the scheduled end time of your tour, but it was less

3    than forty minutes, you wouldn't turn in an overtime slip?

4    A.    Correct.

5    Q.    Was that the same when you were on the wheel?

6    A.    Yes.

7    Q.    Was there ever a time when you turned in a

8    overtime slip for less than forty minutes?

9    A.    No.

10   Q.    Again, I'm assuming that was because you said

11   you'd heard from --

12   A.    Right.

13   Q.    -- staff members that that wouldn't be approved?

14   A.    Correct.

15   Q.    When you were working the wheel, did you ever

16   turn in an overtime slip that then you ultimately were not

17   paid overtime for?

18   A.    When I was on the wheel?

19   Q.    Yes.

20   A.    Not that I can think of.

21   Q.    Do you now or did you ever keep track yourself of

22   the overtime you worked?

23   A.    I had a calendar that the union gives you with

24   your actual hours.  It says "overtime" on it and it says

25   the date, the hours.  Yes.

Exhibit D

1

```
 1     UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF NEW YORK
 2     -----------------------------------------X
       ERIC EDWARDS, Individually and On
 3     Behalf of All Other Persons Similarly
       Situated,
 4
                                PLAINTIFF,
 5

 6                    -against-      Case No:
                                     08-civ-134
 7

 8     THE DEPARTMENT OF CORRECTION OF THE CITY
       OF NEW YORK and CITY OF NEW YORK,
 9
                                DEFENDANT.
10     -----------------------------------------X

11

12                    DATE:   January 25, 2011

13                    TIME:   10:15 a.m.

14

15

16                  DEPOSITION of the Plaintiff, MICHAEL

17     CRIVERA, taken by the Defendant, pursuant to a Notice and

18     to the Federal Rules of Civil Procedure, held at the

19     offices of the New York City Law Department, 100 Church

20     Street, New York, New York 10007, before Ephraim Jacobson,

21     a Notary Public of the State of New York.

22

23

24

25
```

M. CRIVERA

1    Q.    Any facility-level discipline like a warning or

2    admonishment, anything in writing?

3    A.    No.

4    Q.    When did you first become employed with the DOC?

5    A.    February 28, 2008.

6    Q.    Who were you employed with immediately prior to

7    that?

8    A.    Circuit City.

9    Q.    How long were you employed there?

10   A.    Two and a half years.

11   Q.    When I say "DOC," do you understand that to mean

12   Department of Correction?

13   A.    Yes.

14   Q.    Other than DOC, have you ever been employed with

15   any other City agency?

16   A.    No.

17   Q.    What facility are you currently assigned to?

18   A.    AMKC.  Anna M. Kross Center.

19   Q.    How long have you been assigned to AMKC?

20   A.    About two years and eight months.

21   Q.    Have you been there during your entire tenure

22   with the DOC?

23   A.    Yes.

24   Q.    Your current job title is correction officer,

25   correct?

M. CRIVERA

1    out the overtime?

2         A.    Well, there's an abundance of overtime.  What

3    happens is they're short in certain shifts, so they just

4    try to balance out the amount of officers so there's an

5    equal amount of overtime on all shifts.

6         Q.    You were one of the officers with the least

7    seniority, so you were switched?

8         A.    On the day tour.

9         Q.    On the day tour, you were one of the officers

10   with the least seniority?

11        A.    Yes.

12        Q.    Do you have regular days off?

13        A.    No.

14        Q.    Do you work four days, with two days off?

15        A.    Yes, ma'am.

16        Q.    Who are the captains that work your tour?

17        A.    There's a lot.

18        Q.    Do you have any steady captains?

19        A.    Yes.  The control room captain.

20        Q.    Who is that?

21        A.    Captain John.

22        Q.    Do you recall who the control room captain was on

23   that day tour?

24        A.    Captain Pack (phonetic).

25        Q.    Do you remember who was on the 3 to 11?

M. CRIVERA

1      Q.    We can leave a blank in the transcript, and when

2      you go back to review it, if you remember any of the names

3      of any other posts, you can fill them in.

4      A.    No problem.

5      _____

6      _____

7      Q.    I'm going to ask you the same question, but for

8      all three of your tours. We'll begin with the midnight

9      tour.  What I want you to do is walk me through what

10     happens when you first arrive at the facility.  I know

11     there are gates at the front of the facility.  So start

12     from there and walk me through what you do when you first

13     get there.

14     A.    Do you want after the route bus or before the

15     route bus?

16     Q.    After.  When you're at the outside of the

17     facility.

18     A.    You come in to the facility, you got to show your

19     ID.  If you have a firearm, you got to check that in.  You

20     got to put all your personal or anything that's going to

21     set off the magnometer.  You got to clear the magnometer in

22     the front.  After you clear the magnometer, you take all of

23     your stuff, put it back in our bag, go through the main

24     door.

25            Then, I walk downstairs.  I go into the locker

1    room, change all my clothes.  After that, I go upstairs,

2    check my schedule, make roll call.

3        Q.    That first step of clearing the magnometer, how

4    long would you say that that takes you, when you're

5    arriving?

6        A.    It depends on how many people are on that hours.

7    It all depends, because we have a lot of people in our

8    jail, a lot of officers, a lot of civilian staff, so by the

9    time you get through there, like I said, it all depends.

10       Q.    If you could give an average amount of minutes to

11   it, what would you say?

12       A.    For the night, five to seven, eight minutes.

13       Q.    You said that you go downstairs to the locker

14   room?

15       A.    Yes.

16       Q.    Do you arrive to work in civilian clothes?

17       A.    Yes.

18       Q.    Do you ever come to work already in your uniform?

19       A.    No.

20       Q.    Why not?

21       A.    It's like walking around with a target on your

22   back.

23       Q.    What do you mean?

24       A.    I just don't feel safe, you know, walking around

25   the street.  We have pretty much the same uniform as a cop.

M. CRIVERA

1      The only difference is the patches.  So, if you look at me
2      and I look like a cop, but you don't really see the patch,
3      what's the difference.

4          Q.    Did anyone, any supervisors at DOC, ever tell you
5      not to wear any part of your uniform outside Rikers?

6          A.    When we were in the Academy, the instructors
7      would tell you, like, "Don't wear your uniform outside.  If
8      you're on the train, you know, wear a big sweatshirt to
9      cover up your uniform."

10         Q.    Can you describe to me what the uniform entails?

11         A.    Yes.  Basically, you have the stab-proof vest
12     underneath the B shirt.  You have cargo pants, utility
13     belt, boots.

14         Q.    What goes on the utility belt?

15         A.    Okay, start with your 911 knife.  You have a
16     glove pouch, you have an OC holder, a key holder,
17     flashlight holder, flashlight.  That's basically it.

18         Q.    Do you bring a uniform with you every day or do
19     you leave it in your locker?

20         A.    I bring two with me.  So I wear the first one,
21     bring that home, wash it and then wear the next one, put
22     that one back in.

23         Q.    You bring them in twice during a week?

24         A.    Yes.

25         Q.    Do you leave your utility belt in your office?

M. CRIVERA

1      A.    Yes.

2      Q.    Do you leave the things that you described, the

3      911 knife, the OC holder, the key holder, the flashlight

4      holder, the flashlight, do those stay attached to the

5      utility belt?

6      A.    Yes.

7      Q.    You mentioned the vest.  Can you describe to me

8      what the vest looks like?

9      A.    It's very similar to a bulletproof vest.  It's

10     just a lot lighter and different material to stop you from

11     getting stabbed, God forbid you get stabbed.

12     Q.    Can you describe to me how you put it on?

13     A.    You put it over your head, you have a Velcro and

14     adjust it.

15     Q.    The Velcro is around by your ribs?

16     A.    Yes.

17     Q.    How long would you say it takes you put the vest

18     on?

19     A.    The vest itself?  A minute, minute and a half,

20     two minutes.

21     Q.    How long would you say it takes you to get

22     dressed from start to finish?

23     A.    I'd say at least fifteen-twenty minutes.

24     Q.    What takes the longest to put on?

25     A.    Just getting a seat to put on your boots and

M. CRIVERA

1   everything, because my jail is overcrowded.  The locker

2   room is overcrowded, so just trying to make room, trying to

3   get dressed.

4       Q.     How many correction officers in your tour, would

5   you say, if you know?

6       A.     The midnight tour is a little light.  The 7 to 3

7   and 3 to 11, there's anywhere between two hundred and three

8   hundred people.

9       Q.     Then you said once you get dressed, you go and

10  check the schedule.  Where is the schedule located?

11      A.     It's upstairs from the locker room and it's

12  straight to the left upstairs.  It's before the main gates.

13      Q.     Is there a sign-in book?

14      A.     Sign-in sheet.

15      Q.     Where is that?

16      A.     It's right before the front gate, the main gate.

17      Q.     When do you sign in?

18      A.     When do I sign in?

19      Q.     Do you sign in as soon as you walk in?  At what

20  point in the morning --

21      A.     No, I sign in after I'm dressed, and right before

22  roll call.

23      Q.     Between the locker room and roll call, you'll

24  check the schedule and sign in?

25      A.     It depends.

M. CRIVERA

1    Q.    That's two times a week that the relief is --

2    A.    Is late.  Getting out late, you know, just eating

3    the time.

4    Q.    Other than the mandatory when you're working a

5    full double, how many times a week do you turn in an

6    overtime slip?

7    A.    You mean when I'm being relieved?

8    Q.    Right.

9    A.    You don't really turn it in unless it's forty

10   minutes.

11   Q.    How often is it forty minutes or more?

12   A.    Not very often.

13   Q.    You said that's an unwritten rule.  When did you

14   first hear about that not to turn in an overtime slip for

15   less than forty minutes?

16   A.    When I first got to the jail, I was turning in

17   slips for -- what happens is usually the captain just

18   ripped them up or doesn't really honor them.

19   Q.    Did a captain ever say anything to you about it?

20   A.    No, they're just not honored.  They don't really

21   talk to you about it.  Then you ask another officer and

22   they're like, "That's just the way it is."

23   Q.    When you first started you would turn in overtime

24   slips?

25   A.    Yes.

35

M. CRIVERA

1      Q.     For less than forty minutes?

2      A.     Yes.

3      Q.     Do you know if any of those were granted and that

4   you got paid for it?

5      A.     I can't remember really any.

6      Q.     When would you say was the last time you turned

7   in an overtime slip for under forty minutes?

8      A.     Probably when I first started the job, say two

9   and a half years ago.

10     Q.     So back in 2008?

11     A.     Yes.

12     Q.     You say the captains would rip them up.  Did you

13  ever see a captain rip up an overtime slip?

14     A.     No.  It's what I'm told.  But they're not

15  honored, so what else are they doing with them?

16     Q.     If an overtime slip is approved, do you get a

17  copy back?

18     A.     No.

19     Q.     How do you know if an overtime slip has been

20  approved?

21     A.     Well, I check the records in my book and on my

22  check to see if it's good, and I call up the timekeeper to

23  see what they say.

24     Q.     Your paycheck, does it break down by minutes or

25  hours the amount of overtime, or is just a dollar amount?

M. CRIVERA

1    A.    Well, I would have the overtime slip in cash and

2    they would call up and go, "No, you can't put it in cash."

3    But, most of the time what happens is, I have like a

4    forty-minute overtime slip, and then I would have, like,

5    three and a half hours, so they would just add that in, so

6    it's not a problem.  If you have just forty minutes for the

7    week, they want it in comp.

8    Q.    Has a captain ever said anything like that to

9    you, you know, "Don't put it in for cash, put it in for

10   comp"?

11   A.    No.

12   Q.    How many timekeepers are there in your facility?

13   A.    I believe four.  I'm not positive, though.

14   Q.    I think you said that if it's over an hour,

15   you'll do it in cash?

16   A.    Yes.

17   Q.    So, let's just say you're working an hour

18   overtime, when you sign out will you then sign out at 8:31?

19   A.    Yes.

20   Q.    Correct me if I'm wrong, but if you're turning in

21   an overtime slip for ninety minutes, you would just add

22   ninety minutes to the end of your tour?  That's what you

23   would sign out as?

24   A.    Yes.

25   Q.    Got it.  I'm going to go through now when you

Exhibit E

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   -------------------------------------------------X
    ERIC EDWARDS, Individually, and on Behalf of
3   All Other Persons Similarly Situated,

4                                        PLAINTIFFS,

5            -against-                   Case No.:
                                         08cv3134
6                                        (DLC)(GWG)

7   THE CITY OF NEW YORK,

8                                        DEFENDANT.
    -------------------------------------------------X
9

10                  DATE: February 9, 2011

11                  TIME: 10:15 a.m.

12

13       DEPOSITION of the Plaintiff, THEODORE ALLBRIGHT,

14   taken by the Respective Parties, pursuant to a Court Order

15   and to the Federal Rules of Civil Procedure, held at the

16   office of the Special Federal Litigation Unit, New York

17   City Law Department, 100 Church Street, New York, New York

18   10007, before Susan Pines, a Notary Public of the State of

19   New York.

20

21

22

23

24

25

T. ALLBRIGHT

1      Q.    What dates were you assigned to GRVC?

2      A.    From 1990 to 2007.

3      Q.    And what dates were you assigned to RMSC?

4      A.    1989.

5      Q.    What about from 1987 to 1989?

6      A.    I came on the job in 1989.

7      Q.    All of my questions will focus on your

8   time at GRVC, unless I ask you otherwise.

9      A.    Okay.

10     Q.    At the time of your retirement, what was

11   your tour?

12     A.    2300 to 0731.

13     Q.    How long had you worked that tour?

14     A.    I guess ten years, nine years.

15     Q.    What tour did you work prior to that?

16     A.    I was on the wheel.

17     Q.    So you started on the 11:00 to 7:31 in,

18   approximately, 1996?

19     A.    1998, '99 something like that.

20     Q.    Then prior to that you were on the wheel?

21     A.    Yes.

22     Q.    Were you on the wheel for the whole part

23   of your employment prior to 1998/1999?

24     A.    Yes.

25     Q.    While you were working the 11:00 to 7:31,

T. ALLBRIGHT

1    did you have regular days off?

2        A.    I was four and two.

3        Q.    That means you worked four days on and had

4    two days off?

5        A.    Right.

6        Q.    At the time of your retirement, did you

7    have a steady supervisor that you reported to, or

8    did it change depending on the day?

9        A.    I had two steady supervisors.

10       Q.    Who were they?

11       A.    My area caption, Vernon Meeks, and the

12    other captain, the last name was Chestnut, I forget

13    his first name.

14       Q.    At the time of your retirement, did you

15    have a steady post?

16       A.    Yes.

17       Q.    What was your post?

18       A.    Eight control.

19       Q.    Eight, as in the number eight?

20       A.    Yes.   The thing about that, I was steady

21    midnight.   On paper I didn't have a steady post, but

22    when I looked at the schedule, they always sent me

23    to 8 Control.   On paper, when you get a steady post

24    it's supposed to be in writing on paper.   I never

25    had it on paper.

T. ALLBRIGHT

1      Q.   Okay.  So you arrive and park your car at

2   10:00 p.m.?

3      A.   At the bus area.

4      Q.   You then you wait for the bus?

5      A.   Right.

6      Q.   And then the bus will drop you off at your

7   facility?

8      A.   At my jail, right.

9      Q.   What time do you typically get dropped of

10   at the jail?

11      A.   And 10:15.

12      Q.   So now you're at the jail?

13      A.   Right.  I got to go through the

14   magnetometer and make sure I don't have any weapons.

15   I sign a sign-in sheet.

16      Q.   Where's the sign-in sheet located?

17      A.   It's right outside -- it's like a long

18   hallway that you walk down before you get to the

19   locker room, outside the administration area.

20      Q.   So is it far from the magnetometer?

21      A.   No.

22      Q.   It's right next to it?

23      A.   Right.

24      Q.   Then you sign in and then you walk to the

25   locker room?

T. ALLBRIGHT

1          A.    Right.

2          Q.    And how far is the sign-in book to the

3    locker room; how long does it take you to walk?

4          A.    Like, a minute, 40 seconds.

5          Q.    So you get to the locker room, or let me

6    back up for a second.  How long does it take you on

7    a typical day to clear the magnetometer?

8          A.    A typical day to clear the magnetometer,

9    it takes about ten seconds.

10         Q.    Is there ever a wait to get through?

11         A.    Yes.

12         Q.    So how long do you, on a typical day,

13   typically wait to get through the magnetometer?

14         A.    Average day, ten seconds.

15         Q.    So, now, once you get to the locker room,

16   what do you do?

17         A.    I have to take all my clothes off, and I

18   have to put my uniform on.  I put on my shoes, my

19   pants, my stabproof vest, my shirt, my jacket, my

20   tie, my utility belt, flashlight, the utility knife,

21   a key holder, a glove holder, and then I've got to

22   wait when I go up front.  After roll call I get

23   gas -- OC -- I get a tag for that.  Sometimes I get

24   a radio.

25         Q.    I'm going to back you up for second, going

T. ALLBRIGHT

1    back to when you're still in the locker room.  You

2    said "a light, a knife, a key holder and a glove

3    holder."  Are those all on the utility belt?

4         A.   Yes.

5         Q.   Do you keep those attached to the utility

6    belt?

7         A.   Yes.

8         Q.   When you come in in the morning, do you

9    wear any part of your uniform?

10        A.   No.

11        Q.   Do you ever wear any of your uniform

12   outside of Rikers Island?

13        A.   No.

14        Q.   Why not?

15        A.   It's dangerous, you know, you don't want

16   to be recognized from inmates because the majority

17   of times they recognize you before you recognize

18   them, because you deal with so many inmates.

19        Q.   Have you ever been recognized outside

20   Rikers Island by an inmate?

21        A.   Yes.

22        Q.   When was that?

23        A.   When?

24        Q.   Yes.

25        A.   A whole lot of times, not just one time.

T. ALLBRIGHT

1    it according to that.  I can take half an hour or

2    ten minutes to get ready, all depending on the clock

3    in my head and what I'm doing.

4        Q.    If you get there early --

5        A.    Like, if I was in a speed contest, I could

6    get dressed a lot quicker than that.

7        Q.    If you're there early and have time to

8    kill, you'll take your time getting dressed?

9        A.    I'll take my time getting dressed.

10       Q.    But if you're there and roll call is

11   starting in ten minutes, you can get dressed?

12       A.    I can do it in that time that I told you.

13       Q.    Can you describe to me the vest; what does

14   it look like?

15       A.    It has straps on the side.  It pulls over

16   your head, you have to strap it here, you have to

17   strap it here (indicating).

18       Q.    When you say "here," you're talking about

19   your shoulders and around your ribs?

20       A.    Right.  Around my thighs, and I tuck it in

21   my pants.

22       Q.    And then there's, sometimes there's -- I

23   forget what you called it -- something in the back

24   of the vest that you take out when it's hot?

25       A.    Yeah, the pads.  The vest has pads that go

T. ALLBRIGHT

1    in here (indicating), like if somebody tries to stab

2    you, or whatever, in the front and the back.

3         Q.   The panels?

4         A.   Yeah, they're like panels.

5         Q.   Do you have paneling that is bulletproof

6    that you can put into the vest?

7         A.   That's when I go out on the hospital run.

8         Q.   So when you go out on the hospital run --

9         A.   It's a completely different vest.

10        Q.   It's a different vest?

11        A.   Yes.

12        Q.   Okay.  So it's not the same vest that you

13   insert different panels in, it's a wholly different

14   vest?

15        A.   Right.

16        Q.   Got it.  Do you bring a uniform with you

17   every day when you go to work?

18        A.   I have three uniforms in my locker.  Then

19   you have to take two home at the end of the week,

20   take them home to clean them and bring them back.

21        Q.   Going back to when you sign in, do you

22   sign in the start time of your tour, meaning

23   11:00 p.m., or do you sign in the actual time you're

24   at the sign-in book?

25        A.   I sign in the start time of my tour.

T. ALLBRIGHT

1    Q.   So let's say, for example --

2    A.   If I'm there at 10:00, I'll still sign in

3    at 11:00.

4    Q.   That was my question.  Is there any time

5    where you wouldn't sign in the start time of your

6    tour, where you would sign in a different time?

7    A.   If they tell me something to do early, if

8    they tell me to prepare for a hospital run, I'll

9    sign in at 10 o'clock.  The thing is, I still, I

10   don't fill out overtime slips for that.  The sign-in

11   time, I don't fill out overtime slips.  It doesn't

12   matter what time I sign in, as long as I don't sign

13   in after 11 o'clock, any time before 11 o'clock, you

14   cannot sign in after that, that's saying you're

15   late.

16   Q.   Would you be told the day before to come

17   early because you're going to do a hospital run?

18   A.   No.

19   Q.   What do you mean, you said they might tell

20   you to prepare for a hospital run; what do you mean

21   by that?

22   A.   In the jail, during the course of the

23   tour, inmates get sick, whatever.  So the control

24   room captain has to send them out.  If it's close

25   to, say 11 o'clock, if it's 10 o'clock or 10:30,

T. ALLBRIGHT

1      A.    What time do I really leave?

2      Q.    What time do you actually get to the

3  sign-in book?

4      A.    About five minutes to eight.

5      Q.    So it's about 24 minutes after your tour

6  ends?

7      A.    Right.

8      Q.    I'm just going to say 25 minutes.  For

9  that 25 minutes, on average, that you're actually

10  leaving after your tour ends, do you ever request

11  overtime for that period of time?

12     A.    No.

13     Q.    Never have?

14     A.    Probably in the beginning, you know, when

15  I had six months on the job.

16     Q.    So in the past 15 years you haven't?

17     A.    No.

18     Q.    What's the minimum amount of time you

19  would turn in an overtime slip for?

20     A.    The minimum amount of time would be

21  half-hour, no, 45 minutes.

22     Q.    So if you're leaving at 8:15, then you

23  would put in an overtime slip?

24     A.    Yeah.

25     Q.    Why 45 minutes?

T. ALLBRIGHT

1    recent time you turned in an overtime slip for less

2    than 45 minutes?

3        A.   About ten years ago, something like that.

4        Q.   When you would turn in an overtime slip

5    for 45 minutes or more, would you get paid, when you

6    turned in those slips?

7        A.   Yes.

8        Q.   Let's talk a little bit about when you'd

9    work doubles.

10       A.   Right.

11       Q.   I think you said two times a week you

12   would work double shifts?

13       A.   Yes.

14       Q.   So you would work, essentially, the 7:00

15   to 3:31 p.m. tour?

16       A.   The 7:31.

17       Q.   7:31 to 3:00 p.m., is that right?

18       A.   3:31.

19       Q.   So, 7:31 to 3:31?

20       A.   Yeah.

21       Q.   No, it would be 7:00 to 3:31.

22       A.   No, because I'm on overtime, so I start at

23   7:31.

24       Q.   Oh, I see.

25       A.   And my tour ends at 3:31.

T. ALLBRIGHT

1      Q.   Other than that time in 2003 and the time
2    in 2006, were there any other times where you turned
3    in an overtime slip that you weren't paid for that
4    overtime?
5      A.   No, because I would never turn in an
6    overtime slip, like I said, that's under 45 minutes.
7    So I didn't hand in overtime slips with that.
8           MS. O'CONNOR:   Thank you, sir.  I think
9        your attorney has a couple of questions for
10       you.
11          MR. RAND:   Just a couple of questions.
12   EXAMINATION BY
13   MR. RAND:
14     Q.   First question, during the period you
15   worked for the Department of Corrections, did you
16   ever see a notice posted that indicated that you had
17   a right to get paid time and a half for overtime?
18     A.   No, I never saw a notice.
19     Q.   You talked about the time it took you to
20   change in the locker room.  Was the locker room
21   crowded when you changed in it?
22          MS. O'CONNOR:   Objection.
23     A.   Sometimes.
24     Q.   What were the conditions in the locker
25   room when you changed before your shift started?

T. ALLBRIGHT

1       A.      If somebody is going home, you know, and
2   his locker is by yours, and if somebody's coming to
3   work and his locker is near yours, we all have to
4   share the same bench, we're changing clothes right
5   on top of each other.

6                       And his locker is pushing yours
7   closed, and you're trying to keep yours open.  I
8   mean, everybody, it's enough room in the locker
9   room, but you might have the guys in the same area
10  that all have to share the same tour, so we're all
11  in this area.  Even though there's a lot of room
12  over here, we're all here (indicating).

13      Q.      When it's crowded does that slow you down?
14      A.      It slows you down, yeah.

15      Q.      How often was the locker room crowded when
16  you changed; let's say in a four-day period, you
17  worked a four and two, correct?

18      A.      About two days it would be very crowded.
19              MS. O'CONNOR:  Objection.

20      Q.      How many extra minutes would it take you
21  to change due to the crowded conditions in the
22  locker room?

23      A.      About five.

24      Q.      Could you describe the layout of the
25  housing areas at the GRVC?

Exhibit F

1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ----------------------------------------------------X
   ERIC EDWARDS, Individually and on behalf of all
3  other persons similarly situated,

4
                                       Plaintiff,
5                              08 Civ.3134(DLC)(GWG)

6
        -against-
7

8  CITY OF NEW YORK,

9                                      Defendant.

10 ----------------------------------------------------X

11
                    DATE:  March 9, 2011
12
                    TIME:  10:15 a.m.
13

14

15

16      EXAMINATION BEFORE TRIAL of the Plaintiff,

17 HARRY BASS, taken by the Defendant, pursuant to

18 Court Order, held at the New York City Law Department,

19 100 Church Street, New York, New York, before

20 Gena Nardone, a Notary Public of the State of New York.

21

22

23

24

25

H. BASS

1     Q     Okay.

2     A     It varied from day-to-day.  My office was

3     at a different location every day.

4     Q     So what was your assignment at the time

5     you were retired or did that vary as well?

6     A     It varied, yeah.

7     Q     Why did it vary?

8     A     I didn't have a steady post.  I think

9     that's what you're trying to find out.  If I had a

10    steady post, where I went every day.

11    Q     Or just where did you report every day,

12    what facility?

13    A     I reported to the -- no, the Manhattan

14    Detention Complex, MDC, at the end.

15    Q     How long had you been reporting there when

16    you retired?

17    A     Since 2003.

18    Q     So all of my questions today will pertain

19    your time at MDC, but I guess just prior to MDC

20    where were you assigned?

21    A     Prior to MDC I was assigned to the

22    Brooklyn House of Detention.

23    Q     What were your dates of assignment there?

24    A     I believe -- I believe, to the best of my

25    knowledge, 1992 to 2003.

H. BASS

1    kind of like when you get on a plane.  You have to

2    take everything out of your pockets.  You have an X

3    ray machine, you know, you come in, you walk

4    through.  Once the captain says you're okay, you go

5    in the door.

6        Q    How long would that process take of

7    putting your stuff, being X-rayed, being searched

8    and the captain saying okay, go ahead?

9        A    It depends on how many people are on line.

10       Q    So what's the shortest amount of time it

11   could take?

12       A    Shortest amount of time, maybe five, seven

13   minutes.

14       Q    What's the longest amount of time?

15       A    A long time; 15 minutes, 20 minutes.

16       Q    What's the average?

17       A    I would say between the arsenal and the --

18       Q    Not including the arsenal.

19       A    Not including the arsenal, okay.  I would

20   say a good seven minutes.

21       Q    Then what would you do next?

22       A    Then you would go to the locker room and

23   change.

24       Q    Where is the locker room located in

25   relation to kind of the front doors?

H. BASS

1         A     Well, in Manhattan House, there's a number

2    of locker rooms.  The one that I had, it was

3    actually pretty close to the front door.  There's a

4    number of steps.  You went down these steps.  There

5    was a tremendous locker room at the bottom.

6         Q     What would you bring with you every day to

7    work?

8         A     Well, what do you mean?

9         Q     Well, would you bring your uniform with

10   you?  Would you bring a bag with you?  What would

11   you bring?

12        A     On the first day I used to bring my bag

13   and all my uniforms.  Park them in the locker.  By

14   the last day you would take them home.

15        Q     On the first day you mean -- did you work

16   four and twos?

17        A     Yes.

18        Q     So on the first day of the four day

19   stretch, you would bring a bag with your uniforms in

20   it?

21        A     Yes.

22        Q     Anything else you would bring with you?

23        A     Well, I can't think of anything.  I mean

24   other than your personal items; money, keys, you

25   know.

H. BASS

1    Q    How many uniforms would you bring with

2    you?

3    A    Four.

4    Q    Would you take all the uniforms home with

5    you at the end of the stretch or would you take them

6    home as you go?

7    A    No, they all go in one time, they all come

8    out one time.  You got to remember where you're

9    working now.  Just think about what's around you.

10    Q    Would you ever wear part -- would you ever

11    come to work in any part of your uniform already?

12    A    Never.

13    Q    Why not?

14    A    Well, one reason, when you work in the

15    jail and especially Manhattan, the place is filthy,

16    okay.  No matter how much you clean it up.  You try

17    to keep it clean.  You're searching inmates.  You're

18    doing this and that.  You don't want to bring that

19    stink into your car.  And number two, you're a

20    target.  Someone sees you with a uniform in a car,

21    you're off duty, you're by yourself, you never know

22    what could happen, you know.

23    Q    Did anybody ever tell you not to wear

24    any -- not to arrive to work in any part of your

25    uniform?

61

H. BASS

1      Q    A lot in a given -- in a four and two

2    schedule, out of those four days --

3      A    I'm sorry?

4      Q    Out of those four days, how of:en would

5    you not take a lunch?

6      A    Maybe two days, or not get a lunch -- get

7    a relief, yes.

8      Q    On those days when you did not get a

9    relief for a meal break, would you turn in the no

10   meal slips?

11     A    Yes, forty minutes for no meal period it's

12   called.

13     Q    That's in comp time?

14     A    Yes.

15     Q    Would you always turn those in

16     A    No.

17     Q    Out of the two days where no meal relief

18   would come, out of those two days, how often would

19   you turn in the 40 minute slip?

20     A    Depended how mad I was or what the reason

21   was.  I mean it's not a yes or no question.  I mean

22   if I thought that someone was supposed to relieve me

23   and instead they left and didn't come back for four

24   hours, yeah, I would put in a slip.  Would I get the

25   time for it, probably not.  I mean it's not a yes or

H. BASS

1   would come or was that the time that you would leave

2   the post?

3        A    It depended.  Let's say leave the post.

4        Q    Once you're relieved from your post and

5   you're relieved, what do you do next?

6        A    Now you have to get out of the building.

7        Q    Okay.

8        A    Which takes --

9        Q    Do you go back to the control room after

10  you leave your post?  Where do you go first?

11       A    After you leave your post, now you have to

12  turn in your equipment.

13       Q    You go back to the control room?

14       A    Go back to the control room, on the other

15  side of the building, in my case.  Turn all your

16  stuff in.  Then you go all the way back to the other

17  building, go downstairs.  Once you're out the gate,

18  now you can go to the locker room.

19       Q    Then I'm assuming you would then take off

20  everything that you had put on?

21       A    Yeah, change your clothes and wash up.

22  And that would be the end of your tour.

23       Q    Would it take you approximately the same

24  amount of time to take off all the elements of your

25  uniform as it did to put them on?

H. BASS

| | | |
|---|---|---|
| 1 | A | Longer. |
| 2 | Q | Why would it take longer? |
| 3 | A | Because you have to wash. |
| 4 | Q | I'm assuming you would take off your |

5    uniform before you wash?

| 6 | A | Uh-huh. |
|---|---|---|
| 7 | Q | Would you shower? |
| 8 | A | You could shower, if it was working. |
| 9 | Q | I'm asking what you would do. |
| 10 | A | No, I didn't shower, no.  I wasn't brave |

11    enough for that.

| 12 | Q | Just in terms of taking off the uniform, |
|---|---|---|

13    not including the washing --

| 14 | A | Washing up time. |
|---|---|---|
| 15 | Q | -- would that take about the same amount |

16    of time -- would it take about the same amount of

17    time to take off your uniform as to what you

18    testified earlier that it would take to put it on?

| 19 | A | It would probably take a little less time. |
|---|---|---|
| 20 | Q | Then once you were all changed, washed up, |

21    what would you do next?

| 22 | A | Go home. |
|---|---|---|
| 23 | Q | Changed meaning you're out of your |

24    uniform?

| 25 | A | Leave. |
|---|---|---|

H. BASS

1    Q    Would you sign out?

2    A    Yes, of course.

3    Q    Would you sign out the actual time or your

4    tour end time?

5    A    Actual time.

6    Q    So if you were leaving at nine o'clock,

7    you would sign out at nine o'clock?

8    A    Yes.

9    Q    Looking at these days, approximately those

10   two days a week when you would leave your post at

11   8:40 or so, an hour and nine minutes after your tour

12   was scheduled to end, would you, on those two days,

13   put in an overtime slip for that time?

14   A    Yes.

15   Q    Always?

16   A    For that amount of time, yes.

17   Q    What about the days when you left your

18   post between 7:45 and 8 o'clock, would you put in an

19   overtime slip?  Let's take from 7:45, would you put

20   in an overtime slip for the fifteen minutes?

21   A    Yes.

22   Q    What about if it was 8 o'clock, 29 minutes

23   or a half hour?

24   A    Yes.

25   Q    I guess describe to me the process of the

DIAMOND REPORTING   INC   718-624-7200   info@diamondreporting.com

Exhibit G

1

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ---------------------------------------------------X
      ERIC EDWARDS, Individually and on behalf of all
 3    other persons similarly situated,

 4

 5                                           Plaintiff,

 6                                    08 Civ.3134(DLC)(GWG)

 7
               -against-
 8

 9    CITY OF NEW YORK,

10                                           Defendant.

11    ---------------------------------------------------X

12

13                        DATE:  March 9, 2011

14                        TIME:  2:10 p.m.

15

16

17         EXAMINATION BEFORE TRIAL of the Plaintiff,

18    ALETHEA MILLER, taken by the Defendant, pursuant to

19    Court Order, held at the New York City Law Department,

20    100 Church Street, New York, New York, before, GENA

21    NARDONE, a Notary Public of the State of New York.

22

23

24

25
```

12

A. MILLER

1   your tour?

2        A    0700 to 1531.

3        Q    So that's 7 a.m. to 3:31 p.m.?

4        A    Yes.

5        Q    How long had you been assigned that tour?

6        A    For over -- for about ten years.

7        Q    So, again, all of my questions will deal

8   with your time at NIC.  Is that commonly referred to

9   as the day tour, the 7 to 3:31 tour?

10       A    Yes, it is.

11       Q    Did you work four and twos?

12       A    Yes.

13       Q    What was your post at NIC -- or let me ask

14   you this.  Did you have a steady post?

15       A    Yes, I did.

16       Q    What was that?

17       A    That was in A dorm.  I was A person in the

18   dorm.  That was in the annex building of NIC, which

19   was known as the hospital section of NIC.

20       Q    The hospital section?

21       A    Yeah.

22       Q    The A post, is that in the bubble?

23       A    Bubble, yeah.

24       Q    How long did you have that steady post

25   for?

A. MILLER

1    walk in?

2         A      We go into a magnetometer, go through a

3    magnetometer and then we have to put our bags in for

4    screening, our pocketbooks and whatever it is, for

5    screening.

6         Q      What would you bring with you on a typical

7    day to work?

8         A      Well, there's only certain things that are

9    allowed.  So everything has to be in a clear bag.

10   Clear water, no bottle, no cans, everything has to

11   be in plastic containers.  It's minimal the things

12   that you could bring in.

13        Q      Would you bring in -- would you bring in a

14   uniform every day or would you bring them in at the

15   beginning of a week?

16        A      Well, if I was -- on my days off I would

17   have my bag with my clean uniforms in hand.  If not,

18   they would be in my locker.

19        Q      So on the first day back from a day off,

20   you would have --

21        A      I would have my uniforms, right.

22        Q      So now once you would kind of clear the

23   magnetometer and get through security, what would

24   you do next?

25        A      I would go in and proceed to the locker

A. MILLER

1    room.

2        Q    What would you do once you got to the
3    locker room?

4        A    Well, if there was room for me to change
5    where my locker was, that would be my next step, to
6    proceed with changing into my uniform.  And
7    sometimes, if room permitted, I would change at my
8    locker.  If not, I would have to go in the ladies
9    rest room to change.

10       Q    What does your uniform consist of?

11       A    It consists of two belts.  One belt is to
12   hold your pants up.  The other belt is called the
13   utility belt.  And on it we have a flashlight, a
14   knife, what else is on there, a glove pouch,
15   whistle.  I think that might be it.

16       Q    What else consists of the uniform?

17       A    The stab resistant vest, which we also had
18   to put on as a part of our uniform; the collar
19   insignias.  I believe that's it.

20       Q    Shirt and pants?

21       A    Yeah.

22       Q    And shoes?

23       A    Most definitely.

24       Q    How long would you estimate that it took
25   you to put your uniform pants on?

A. MILLER

1    corn, chicken that was pink inside.  Who wants that

2    stuff?  You may want to sometimes go in and grab a

3    milk.  Then the kitchen is locked in between our

4    shifts, for that reason.  So we won't take time out

5    to go into the kitchen.  I don't know if they had a

6    snack machine there -- no, I don't think so.  We

7    don't take time to go out to the kitchen and waste

8    time to get to the -- they lock the kitchen.

9         Q    You said after you had returned the OC,

10   you would go to the locker room?

11        A    And get dressed.

12        Q    And get dressed.  How long would it take

13   you to get out of your uniform?

14        A    It seems like it takes almost the same

15   amount of time, if not longer, to get dressed

16   because now I'm taking back off everything that I

17   put on, and placing it back in the locker.  Then I

18   have to put my socks on and whatever, and then I

19   have to go to the bathroom, you know, do all of that

20   stuff.  So it seems like it takes almost the same

21   amount of time, if not longer, to leave out.

22        Q    Why would it take longer?

23        A    I said, if I have to go to the bathroom,

24   you know, seems like it takes about the same amount

25   of time to take it off as it is to put it on.

A. MILLER

1      Q     Once you were all changed out of your
2   uniform, what would you do next?
3      A     I would proceed to go out to the check
4   point and to the sign out sheet.
5      Q     When you signed out, would you sign out
6   the actual time or would you sign out your tour end
7   time?
8      A     By then it's four or after four, so I
9   would sign out my tour end time, not the actual
10  time.
11     Q     Why would you do that?
12     A     Because I knew I wasn't going to get paid
13  for all that time spent from coming from one -- from
14  the post into the locker room, getting changed.  I
15  knew I wasn't going to get paid for that.
16     Q     What time were you typically kind of at
17  this sign out book to sign out?
18     A     Like four or 4:05, 4:30.
19     Q     So 3:31 to 4:05, would you put in an
20  overtime slip for that amount of time?
21     A     No, they are not going to pay us for that.
22     Q     What is the minimum amount of time that
23  you would put in an overtime slip for?
24     A     Maybe like anything over, maybe like an
25  hour or more.

A. MILLER

1     Q     Why would you only put in slips for only

2   an hour or more?

3     A     Because if I'm over that half hour or

4   whatever, then the supervisor may be more aware that

5   I'm stuck someplace on a post and maybe she would

6   approve it, approve that hour or more overtime

7   because I would leave at four o'clock, had I not

8   been stuck somewhere waiting for someone.  She would

9   be more aware of it.  Then sometimes they don't give

10  it to you.

11    Q     Well, what is -- have you ever put -- let

12  me ask you this first.  How often would you turn in

13  an overtime slip at NIC?

14          MR. RAND:  Objection.

15    A     I would put one in when I was approved for

16  an eight hour slot.

17    Q     If you're working a double?

18    A     Right.

19    Q     How often did you work doubles?

20    A     Pretty often, every Saturday for the last

21  three years; 2006, 2005, 2004, maybe longer, every

22  Saturday I was scheduled for overtime.

23    Q     So at least once a week you worked a

24  double?

25    A     Right.

A. MILLER

1     Q     What's your position there?

2     A     Public safety officer.

3     Q     I'm just going to take one minute and look

4     over my notes real quick.  We'll probably be done.

5                 I know you said that you were never

6     brought up on any disciplinary charges.  Did you

7     ever have any facility level discipline, like a

8     warning letter or a disciplinary conference,

9     something like that?

10    A     Not that I can recall.

11    Q     Would you ever take your vest home, like

12    to clean it?

13    A     Had to wash it, yeah.

14    Q     How often would you take it home?

15    A     Maybe -- they gave us two.  So I would

16    take one home and I would have another one there, to

17    wash it.

18    Q     Would you ever come to the facility

19    already in any part of your uniform?

20    A     No, that's not allowed.

21    Q     Why isn't it allowed?

22    A     Because they say that -- we might be in

23    uniform, we might run into an inmate in our travels

24    and/or someone would think that we're a police

25    officer and ask us to get involved in something that

A. MILLER

1    do that; is that correct?

2         A    Right.

3         Q    Were you present for that conversation?

4         A    Well, I've tried it myself on occasion and

5    things like that they mention at roll call.  So --

6         Q    I'm sorry.

7         A    There probably was a memorandum out in

8    reference to that also, I believe.

9         Q    So you have worn your uniform pants to

10   work?

11        A    I've tried it, on occasion.

12        Q    Tried, meaning you put them on at home,

13   wore them during your commute and arrived to work in

14   uniform pants?

15        A    Yeah, then I was told that we cannot wear

16   part of the uniform, part street clothes and part of

17   the uniform pants to work, you know, that it was not

18   allowed.

19        Q    So you weren't allowed to mix uniform with

20   civilian clothing?

21        A    Right, that's it.  Naturally I stopped

22   doing that.

23        Q    I'm assuming this was a captain who said

24   something?

25        A    Yes.

# Exhibit H

$2008-31408$

1

$\angle E$

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ----------------------------------------------------------X
      ERIC EDWARDS, Individually and on behalf of all other
 3    persons similarly situated,

 4                                          PLAINTIFFS,

 5                        -against-    Index No:
                                       08civ.3134 (DLC) (GWG)
 6
      CITY OF NEW YORK,
 7
                                          DEFENDANT.
 8    ----------------------------------------------------------X

 9
                           DATE: December 17, 2010
10                         TIME: 2:00 p.m.

11

12               EXAMINATION BEFORE TRIAL of the Plaintiff,

13    VANDORN LADSON, taken by the Defendant, pursuant to a Court

14    Order, held at the offices of NEW YORK CITY LAW DEPARTMENT,

15    OFFICE OF THE CORPORATION COUNSEL, 100 Church Street, New

16    York, New York, 10007, before Loni Bronfen, a Notary Public

17    of the State of New York.

18

19

20

21

22

23

24                                        .

25
```

V. LADSON

```
 1   you know?
 2      A.   I would say at least a hundred.
 3      Q.   Do you have regular days off?
 4      A.   Days off rotate.
 5      Q.   Do you have them two in a row, though?
 6      A.   Yes.
 7      Q.   Who is your direct supervisor?
 8      A.   I don't have any direct supervisors.
 9      Q.   Who are the captains on your tour?
10      A.   I don't know them at hand because they change
11   constantly.
12      Q.   Who was the captain that you reported on the tour
13   you just worked recently?
14      A.   Good question.  Captain Johnson.
15      Q.   Do you remember any other captains on your tour?
16      A.   Captain Reed.
17      Q.   R-E-E-D?
18      A.   Yes.
19      Q.   Captain Butler.
20           MR. RAND:  These are all the captains on
21           your tour?
22           THE WITNESS:  Yes.
23      Q.   And you said that now you don't have a steady
24   post?
25      A.   No.
```

V. LADSON

1      Q.      So, 10:45 p.m.?

2      A.      Yes.

3      Q.      Describe to me when you first walk through the

4    facility doors, what do you see?

5      A.      When you first walk through, you have to be

6    buzzed in.  So, you get buzzed in -- well, the first thing

7    is you secure your weapon.  Since I haven't been to the

8    range, so I don't have a weapon now.  That's another thing,

9    but that's something else.

10             So, you secure your weapon, you show the officer

11   who's at the front gate your ID and he buzzes you in.  You

12   have to pass through the McNomino (phonetic).  If you ring,

13   you have to take out all your, whatever, metal objects or

14   whatever so you can pass through the metal McNomino.

15     Q.      And then what do you do next?

16     A.      You go past the gate, you go up to your locker

17   room.

18     Q.      So, now you're inside the building.  So, the

19   metal detector is inside the building?

20     A.      Yes.

21     Q.      Where is the metal detector in relation to the

22   locker room?

23     A.      The locker room is up -- you have to go upstairs

24   from the metal detectors, as soon as you walk through the

25   door.

1    right on you.  Because then you put your shirt on.  Now,

2    since I don't go on hospital runs, but other officers may

3    have to go on hospital runs, they have to change their

4    inserts of their vests.  Because one is for slash protector

5    and one is for ballistics.

6         Q.    So, if you're going on a hospital run, you put in

7    the ballistic and if you're staying at the facility, you

8    use the stab resistant?

9         A.    Right.

10        Q.    I'm going to back you up for a second.

11              When you're reporting to work and you come in,

12   are you in civilian clothes or are you in your uniform?

13        A.    I'm in civilian clothes.

14        Q.    So, do you leave your uniforms in your locker?

15        A.    Yes.  I mean, you do bring them home to wash.

16        Q.    Describe to me what makes up the uniform.  Let's

17   start with the clothing of the uniform.

18        A.    You have your -- you have to wear socks, blacks

19   socks or white stocks, your boots, you pants.  Like I said,

20   you have your white T-shirt.  You put on your vest, whether

21   for hospital run or just to wear against the inmates.  You

22   put your shirt on.  If it's cold, you may have to put a

23   jacket on.  You have your belt, you have your 911 knife.

24   You have your whistle.  You have your cuffs.  You have your

25   flashlight.  You have your memo book.  If I'm missing

V. LADSON

1     they give you this big speech.  And then they do a head

2     count.  You know, they also check to see if you have your

3     equipment.

4          Q.    So, they do like a uniform check?

5          A.    Yes.  And they call your name, "present."

6          Q.    How long does roll call usually last?

7          A.    I would say it lasts no more than maybe five

8     minutes.  Depending.  Most of the time I would say about

9     five minutes, but depending on the situation.

10         Q.    Like if something happened the night before, they

11    would tell you that and it would be longer?

12         A.    On the previous tour, if something happened.  Or

13    sometimes roll call is late.

14         Q.    Would you say that it typically starts on time,

15    at 11:00?

16         A.    I would say typically it starts on time.  I won't

17    go that far and say it doesn't, but it's late often, but

18    typically it starts on time.

19         Q.    How many times in a week would roll call start

20    late?

21         A.    Average maybe, I would say maybe once or twice.

22    And I'm talking about minutes, not -- it could be one, two

23    three.  It depends.

24         Q.    So, when it does start late, how late does it

25    start?

V. LADSON

1    late slip?

2        A.    He shouldn't.  And that's something we

3    understand.  The officer, you know, he's being relieved.

4    He'll call up and say, "Listen, I'm going to be a little

5    late, I haven't been relieved yet."

6        Q.    So, then you sign out.  Then what do you do?

7        A.    Change and go downstairs and leave and wait for

8    the bus.  Which is another fiasco, horrendous.  The time

9    you gotta wait just to leave Riker's Island.

10                MS. O'CONNER:  Off the record, please.

11                (Whereupon, an off-the-record

12                discussion was held.)

13        Q.    How long would you say it takes you to change out

14    of your uniform and back into your civilian clothes?

15        A.    I'd say around -- because you want to rush out of

16    there.  I would say about ten minutes.

17        Q.    Do you ever come to work in your uniform?

18        A.    No.  Because if something happens, I don't want

19    to have to really respond to a situation.  Because they're

20    not going to protect you.  The City is not going to protect

21    basically an officer who is going out there trying to do

22    something that's right.  I have no confidence in the City

23    right now.

24        Q.    I don't understand what you mean.

25        A.    In other words, that I prefer not to wear my

V. LADSON

1    uniform to work just in case something happens, where they

2    might see me in uniform and ask me to basically respond to

3    a situation.

4        Q.   Oh.   You're saying that if you are out in your

5    DOC uniform, a member of the public might ask you for

6    assistance because they see you in uniform?

7        A.   Right.   Or it could be a car accident.   It could

8    be something.   I'd rather just not wear my uniform to work.

9        Q.   Do you have any clothing that says Department of

10   Correction that's not your uniform?

11       A.   No.

12       Q.   Do you have any Department of Correction

13   T-shirts?

14       A.   No.

15       Q.   You don't wear a T-shirt underneath your vest?

16       A.   No.   I wear a white T-shirt.

17       Q.   Just like a white cotton T-shirt?

18       A.   Yes.

19       Q.   So, then you change and you leave for the day?

20       A.   Yes.

21       Q.   Let's go to kind of leaving for the day when you

22   were on the closed box post.   I think you said you don't

23   have to wait for anybody to relieve you?

24       A.   Right.

25       Q.   So, could you essentially kind of, as soon as

V. LADSON

1      A.    Exactly.

2      Q.    You've been medically monitored since February of

3    2009?

4      A.    November of 2008.

5      Q.    November of 2008, when the incident occurred?

6      A.    Right.

7      Q.    So, have you received any overtime since November

8    of 2008?

9      A.    I'm not supposed to receive -- yes, I have.

10   Because I was involved in the incident.  So, this happened

11   July 23rd of 2010, when I got hurt.  They could not stop me

12   from putting in an overtime slip for that.

13     Q.    Was that the only time that you were paid for

14   overtime from November of 2008 till the present?

15     A.    Yes.

16     Q.    And was that just one day?

17     A.    One day, couple of hours.

18     Q.    Then I guess I'm assuming for the approximately

19   half-hour between 7:31 and when you would sign out where

20   the actual time is closer to 8:00 a.m., you wouldn't put in

21   an overtime slip for that time?

22     A.    No.

23     Q.    Did anybody tell you not to put in an overtime

24   slip for that time?

25     A.    The unwritten rule, captains frown upon us

Exhibit I

<pre>
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    -------------------------------------------X
      ERIC EDWARDS, Individually and On Behalf
 3    Of All Other Persons Similarly Situated,

 4                              PLAINTIFF,

 5
                  -against-        Case No:
 6                                 08 Civ. 3134(DLC)(GWG)

 7
      CITY OF NEW YORK,
 8
                              DEFENDANT.
 9    -------------------------------------------X

10

11                    DATE: January 21, 2011

12                    TIME: 2:32 p.m.

13

14

15              EXAMINATION BEFORE TRIAL of a Plaintiff,

16    TRINA JACKSON-GASPARD, taken by the Defendant(s), pursuant

17    to Notice and to the Federal Rules of Civil Procedure, held

18    at the offices of The New York City Law Department,

19    100 Church Street, New York, New York 10007, before Cicely

20    R. Jolley, RPR, a Notary Public of the State of New York.

21

22

23

24

25
</pre>

16

JACKSON-GASPARD

1      A.     Correct.

2      Q.     What was your tour prior to that?

3      A.     Prior to that I, I was on the wheel.

4      Q.     What does "the wheel" mean?

5      A.     The wheel is when you work various tours, you --

6      the tours fluctuate.  So, one week you will work 0700 to

7      1531, then you would work 1500 to 2331, and then you would

8      work 2300 to 0731.

9             MS. O'CONNOR:  Can we just go off for a

10            second.

11            (Whereupon, an off-the-record

12            discussion was held.)

13     Q.     Most of my questioning will focus on your current

14     tour, the one that you're working now that you started in

15     2006.  Most of my questions will focus on that, although I

16     may ask you a couple about your previous one, but most will

17     focus on this most current tour.

18     A.     Okay.

19     Q.     Do you have regular days off now?

20     A.     Yes -- no.  Well, let me rephrase that.  I work

21     four days and I'm off two days, so, it changes.

22     Q.     Do you have a steady post right now?

23     A.     Yes, I do.

24     Q.     What's that?

25     A.     The main clinic waiting treatment area.

Case 1:08-cv-03134-DLC Document 108-1 Filed 04/29/11 Page 97 of 103

 1    staff.  But if they need my assistance I would, but it's

 2    very, very rare.

 3        Q.    Are you essentially going to escort the medical

 4    staff to their medical emergency?

 5        A.    Correct.

 6        Q.    The medical staff, are they civilian employees?

 7        A.    Yes.

 8        Q.    Did you receive any additional training from DOC

 9    in advance of coming on this clinic duty tour?

10        A.    No.

11        Q.    Looking at the current tour that you're on now,

12    you say it starts at 7 a.m.?

13        A.    Correct.

14        Q.    What time do you arrive at the facility?  And

15    when I say "arrive at the facility," I mean walk through

16    the gates.

17        A.    Approximately 6:30.

18        Q.    Can you describe to me when you first get to -- I

19    think there's security gates first --

20        A.    Correct.

21        Q.    -- so, what happens when you first arrive at

22    those gates?

23        A.    When you first arrive at the gates, I have to

24    secure my firearm.  And then after I secure my firearm,

25    then you have, you have to clear the magnometer (SIC), you

1    have to empty your pockets, you know, take everything off,

2    you know, remove your jacket and walk through.  If you do

3    not clear, then you have to be scanned by a transfrisker,

4    then I proceed down the corridor to the female locker room

5    where I go and change into my uniform.

6        Q.    On a typical day, how long would you say it takes

7    you to, from the time you arrive at the gates and go

8    through that process of securing your firearm, going

9    through the metal detector and arriving at the locker room,

10   how long would you say that takes?

11       A.    Approximately, about, 10 -- about 10 minutes.

12       Q.    What's the longest it has ever taken?

13       A.    Maybe 30.

14       Q.    Why, if you know, would it take longer?

15       A.    There may be an alarm, there may be abundance of

16   people coming in at the same time and they are unable to

17   clear so you have to wait.

18       Q.    What's the shortest it has ever taken to go

19   through that process?

20       A.    Maybe five minutes.

21       Q.    What do you do once you arrive at the locker

22   room?

23       A.    Once I arrive at the locker room, then I change

24   into my uniform and I secure my personal items.

25       Q.    Do you bring a uniform with you every day or do

JACKSON-GASPARD

1    you leave some in your locker?

2        A.    What I do is, normally I would bring my uniform

3    in twice a week.  So, on my first day and also on my third.

4        Q.    Can you describe to me what the uniform consists

5    of?

6        A.    Sure.  It consists of a shirt, pants, a belt,

7    holster, tie, shoes.  And in the winters, I usually wear my

8    sweater.

9        Q.    Do you change into all of those items at the

10   facility?

11       A.    Yes.

12       Q.    You said a "Holster," what goes on the holster?

13       A.    On the holster is flashlight, 9-11 --

14       Q.    9-11, that's a knife; correct?

15       A.    Yeah, 9-11 knife.  Ahh, whistle, key holder,

16   little pouch for your gloves, and also for your pens, a pen

17   holder.

18       Q.    These items are attached to the holster?

19       A.    Correct.

20       Q.    Do they stay attached?  Or at the end of your

21   tour do you unattach them and then when you come back in

22   reattach them?

23       A.    They stay attached.

24       Q.    Do you wear a vest?

25       A.    Yes.

JACKSON-GASPARD

```
 1    A.    I don't know.

 2    Q.    Could you estimate?

 3    A.    I don't know.  Forty-five seconds?

 4    Q.    What about the straps across the rib cage?

 5    A.    I don't know.  Maybe another 45 seconds.

 6    Q.    Have you ever come to work with any part of your

 7   uniform already on?

 8    A.    No.

 9    Q.    Why not?

10    A.    Because it's a security --

11    Q.    What do you mean by "security"?

12    A.    Like, it's a threat, you know, to walk around,

13   you know, outside with your uniform on.  You know, just for

14   my safety.

15    Q.    Is that something somebody told you or is that

16   just your own thought?

17    A.    No, that's definitely from experience.  I mean,

18   just even without my uniform on, I've had inmates come and

19   approach me, so --

20    Q.    Inmates that have recognized you?

21    A.    Yes.

22    Q.    When you say for your safety, you're meaning that

23   you wouldn't want to be identified as a Correction Officer?

24    A.    Correct.

25    Q.    After you're dressed in your uniform, what do you
```

JACKSON-GASPARD

```
 1     A.    No.

 2     Q.    Are you paid for that 40-minute meal break?

 3     A.    Yes.

 4     Q.    I know you said that you respond to medical

 5  emergencies --

 6     A.    Correct.

 7     Q.      -- during the day, in a given week, how many

 8  medical emergencies would you say that you respond to?

 9     A.    Maybe 10.

10     Q.    Do any of those fall or have they ever fallen

11  during a time when you're on your meal break?

12     A.    When I'm on my meal break?

13     Q.    If you're on a meal break and there's a medical

14  emergency, do you respond to that?

15     A.    No, no.

16     Q.    What if there was an emergency, like an alarm

17  during a meal break --

18     A.    Yes.

19     Q.      -- explain to me what happens when an alarm goes

20  off when you're on a meal break.

21     A.    Stop everything.

22     Q.    What do you do?

23     A.    Run.

24     Q.    Where do you run?

25     A.    You have to go run to the staging area and then
```

JACKSON-GASPARD

    1    A.      Thirty minutes.

    2    Q.      When you put one in for 30 minutes, are those

    3   typically approved?

    4    A.      Most of the time.

    5    Q.      I know you said it was an "unwritten rule," did

    6   you ever have a captain or any other type of supervisor say

    7   to you, 'don't put in a slip for less than 30 minutes?'

    8    A.      Yeah.  Like, if I put in a slip, the other

    9   officer is gonna get a late slip, you know?

   10    Q.      If you put in an overtime, then your relief is

   11   going to get a late slip?

   12    A.      A lateness.

   13    Q.      Do you recall who said that?

   14    A.      No.

   15    Q.      Do you recall when that was said?

   16    A.      That was, like, early in my career.

   17    Q.      In the first two years?

   18    A.      Yeah, maybe, like, the first two, three years.

   19    Q.      Have you ever heard anybody say that since you've

   20   been on this most recent tour?

   21    A.      Now?  I mean, I've been on the job for so long,

   22   that I already know, you know, after you've been somewhere

   23   for a while, so -- I mean, to say it to me, like, they

   24   wouldn't say it to me now.

   25    Q.      How many times a week would you say you put in a

        1      A.     Correct.

        2      Q.     -- then put on your civilian clothes?  How long

        3   would you say does that take to take your uniform off?

        4      A.     Probably, about, 10 minutes.

        5      Q.     Would you say it's about the same amount of time

        6   for your vest?  I think you said that it's about two

        7   minutes to put your vest on, how long does it take to take

        8   your vest off?

        9      A.     Probably about a minute.

       10      Q.     Does your vest always stay in your locker?

       11      A.     No.

       12      Q.     You'll take your vest home?

(      13      A.     Yes.

       14      Q.     Do you take it home every day?

       15      A.     No.

       16      Q.     Do you take it home, how about, on the last day

       17   of your four-day work week?

       18      A.     Correct.

       19      Q.     What do you do after you change out of your

       20   uniform?

       21      A.     Then I put my civilian clothes on and then I

       22   leave.

       23      Q.     Going back to that tour you worked, the 9:30 to

       24   6:01 tour, you said that's at RMSC 2 or that was at RMSC 2?

(      25      A.     Yes.