# EXHIBIT W

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

--------------------------------
ERIC EDWARDS, Individually
and on Behalf of All Other
Persons Similarly Situated,

      Plaintiffs,

        vs.        No. ECF 2008
                  Civ: 3134 (DLC)

THE DEPARTMENT OF CORRECTIONS
OF THE CITY OF NEW YORK and
THE CITY OF NEW YORK,

      Defendants.
--------------------------------

          January 15, 2009
          9:46 a.m.

      Deposition of PETER PANAGI, held at

the Law Office of William Coudert Rand,

711 Third Avenue, New York, New York,

pursuant to Notice, before Theresa

Tramondo, a Notary Public of the State of

New York.



**David Feldman**
W o r l d w i d e

From File to Trial™

26

Panagi

1
2    A.   Vierno, V-I-E-R-N-O.
3    Q.   What is the George R. Vierno
4    Center?
5    A.   It's an adult maximum security
6    detention facility on Rikers Island.
7    Q.   What was your title there?
8    A.   Deputy warden of programs.
9    Q.   What did your responsibilities
10   entail?
11   A.   Overseeing inmate programs and
12   services.
13   Q.   How long did you have that job?
14   A.   About two years.
15   Q.   What was your next job?
16   A.   I subsequently took a leave of
17   absence just for the record.
18   Q.   Where did you go when you took your
19   leave of absence?
20   A.   No. I had a personal matter. I
21   took a leave of absence for about 20 months.
22   Q.   What was the personal matter?
23   A.   My son.
24   Q.   What occurred with your son?
25   A.   He was diagnosed with diabetes at

27

Panagi

1
2    the age of one.
3    Q.   Did you take a leave of absence to
4    try to help treat your son?
5    A.   Yes.
6    Q.   When did you return as a correction
7    officer -- not as a correction officer, but
8    did you return to the Department of
9    Corrections?
10   A.   Yes.
11   Q.   When did you return?
12   A.   November 2004.
13   Q.   During the period you took a leave
14   of absence, did you work any jobs?
15   A.   No.
16   Q.   When you returned in November of
17   2004, what was your title?
18   A.   Deputy warden.
19   Q.   Where did you work?
20   A.   At the Otis Bantum Correction
21   Center.
22   Q.   And what were your responsibilities
23   as deputy warden at the Otis Bantum
24   Correction facility?
25   A.   I was deputy warden of

28

Panagi

1
2    administration, same duties as before.
3    Q.   Can you describe those duties in
4    more specificity?
5    A.   Overseeing personnel matters,
6    discipline, food service, day-to-day food
7    service operation, maintenance and the
8    completion of work within the facility, which
9    includes repairs, as well as renovation,
10   fabrication of different items in the
11   facility.
12   Q.   Were you responsible for payroll?
13   A.   Yes.
14   Q.   Were you responsible for keeping
15   track of the hours worked by the correction
16   officers?
17   A.   Yes, all of that is under
18   personnel.
19   Q.   How long did you work as the deputy
20   warden of administration at the Otis Bantum
21   facility?
22   A.   About one month.
23   Q.   Why did you work there for such a
24   short period?
25   A.   I requested a promotion. Teletype

29

Panagi

1
2    announced a vacancy at Bellevue Hospital
3    prison ward for a deputy warden in command. 
4    It was a promotion. I submitted for
5    consideration and I was awarded the position.
6    Q.   What was your next title?
7    A.   Deputy warden in command at
8    Bellevue Hospital prison ward.
9    Q.   "In command" is part of the title?
10   A.   Yes.
11   Q.   Deputy warden?
12   A.   It designates commanding officer.
13   Q.   Deputy warden in command at
14   Bellevue Hospital?
15   A.   Bellevue Hospital prison ward.
16   Q.   Prison ward.
17        What were your responsibilities as
18   deputy in command at the Bellevue Hospital
19   prison ward?
20   A.   Overseeing everything, everything,
21   personnel, security, maintenance.
22   Q.   Did your job entail --
23   A.   Also -- I am sorry. I also wanted
24   to add to that liaison also with hospital
25   staff, addressing medical and psychiatric

38

Panagi

1  A.  Yes.
2  Q.  Do the correction officers that are
3  in administration have the same shifts as the
4  correction officers that are supervising the
5  inmates?
6  A.  **They may not.  They may not.**
7  Q.  Generally do the correction
8  officers guarding the inmates have the same
9  shifts?
10  A.  **In the housing areas?**
11  Q.  Yes.
12  A.  **Generally, yes.**
13  Q.  What are those shifts?
14  A.  **7:00 to 3:00, 3:00 to 11:00 and**
15  **11:00 to 7:00.**
16  Q.  7 o'clock to 3 o'clock?
17  A.  **Right.**
18  Q.  Then?
19  A.  **3:00 to 11:00 and 11:00 to 7:00.**
20  Q.  When you said there are
21  administrative correction officers in the
22  housing units, what are their shifts?
23  A.  **Not in the housing units.**
24  **Correction officers working in the facility.**

39

Panagi

1  Q.  I used "housing units."  There are
2  ten facilities which house prisoners?
3  A.  **Yes.**
4  Q.  When you interpreted me using
5  "housing units," what did you think I was
6  referring to then?
7  A.  **You were saying administrative**
8  **correction officers working in housing unit.**
9  Q.  Well, you had said of the people
10  working in these ten facilities --
11  A.  **Right.**
12  Q.  -- a number of them were
13  administration people that did not have
14  contact --
15  A.  **But they worked in the**
16  **administration area.  They don't work in the**
17  **housing unit.**
18  Q.  Well, then, they're not working in
19  the facility?
20  A.  **Yes, they are.**
21  Q.  In other words, the facility?
22  A.  **Yes, they are.  In other words, the**
23  **facility is -- the layout of the facility**
24  **is -- in other words, here is the --**

40

Panagi

1  Q.  I see, the facility is bigger than
2  the housing unit?
3  A.  **Exactly.**
4  Q.  So the facility includes the
5  administrative area and --
6  A.  **When you say "housing unit," I am**
7  **taking that to mean one housing area of a --**
8  Q.  No problem.  We are just getting a
9  mix up.
10  A.  **So a facility may have 10 housing**
11  **units, 20, et cetera.**
12  Q.  What is the shift schedule for
13  administrative correction officers at the
14  facilities?
15  A.  **You're talking about the officers**
16  **that do not work with the inmates, that work**
17  **in administrative areas?**
18  Q.  Right.
19  A.  **That varies.  It could be almost**
20  **anything.  It's -- there is considerable**
21  **variation in the facilities, but mostly -- it**
22  **covers mostly very early tours through the**
23  **late afternoon, mostly.  So, in other words,**
24  **if you were to go into a facility at**

41

Panagi

1  **9 o'clock at night, you wouldn't find the**
2  **personnel office open, but you would find the**
3  **security office open.**
4  Q.  So it's going to be closer to 9:00
5  to 5:00, if they're doing work, they could be
6  done at any time?
7  A.  **If you're doing the schedule, you**
8  **may work 5 o'clock in the morning until 1:00**
9  **or early hours like that, but there is a**
10  **considerable variation.**
11  Q.  Does uniform also require that the
12  correction officer have a can of teargas?
13  A.  **If they're qualified to use**
14  **handheld OC and they're working in an area**
15  **supervising inmates that does not prohibit**
16  **such use, then they can -- should check out**
17  **handheld OC from the control room.**
18  Q.  Are the correction officers who
19  supervise inmates at the ten facilities at
20  Rikers Island required to have OC on their
21  belts?
22  A.  **I think I just answered that, but**
23  **if they're qualified to use it and they're**
24  **supervising inmates in an area that's not**



46

1        Panagi
2    You said bullet resistant and it's not.
3        MR. RAND: I though I said stab
4    resistant.
5        (Record read.)
6        MR. RAND: I don't know where I got
7    that from. It's not even on here.
8    Q.   Is the stab/slash vest designed to
9    protect the correction officers from
10   stabbings or slashings by inmates?
11   A.   Yes, but only obviously the parts
12   that are covered.
13   Q.   Is the stab/slash vest necessary
14   for the performance of a correction officers'
15   duties supervising inmates?
16       MR. SITARAS: Objection.
17       Go ahead.
18       THE WITNESS: Do you want me to
19   answer that?
20       MR. SITARAS: Yes, you can still
21   answer. It's for the record.
22   A.   No.
23   Q.   Why is it not necessary?
24   A.   Because they can perform their
25   duties without it.

47

1        Panagi
2    Q.   Would it be dangerous for them to
3    perform their duties --
4        Would it be dangerous for
5    correction officers to supervise inmates
6    without wearing a stab/slash vest?
7    A.   For me to answer that question
8    today, I would have to refer to the violence
9    indicators. I would say probably not.
10   Q.   Have you referred to the violence
11   indicators?
12   A.   Sure.
13   Q.   What violence indicators have you
14   referred?
15   A.   For example, this past year, 2008,
16   the Department has had 19 stabbings and
17   slashings between and among inmates solely.
18   That's in every facility. So that's an
19   all-time historic low. So the number of
20   weapons that we uncover these days are very,
21   very few and far between. And the number of
22   violent incidents involving weapons are very,
23   very few compared to many years when it was
24   very, very common and the jails were very
25   violent.

48

1        Panagi
2    Q.   Has anybody suggested not requiring
3    a stab/slash vest as part of the uniform?
4        MR. SITARAS: Objection.
5        Go ahead.
6    A.   Has anybody suggested that?
7    Q.   Have you ever suggested that to
8    your commander.?
9    A.   I never would.
10   Q.   Do you believe that a stab/slash
11   vest is proper equipment for a correction
12   officer supervising inmates?
13   A.   In my opinion, I believe better to
14   be safe, you know, regardless of what --
15   Q.   Because it would not be safe if you
16   do not have a stab/slash vest and you were
17   supervising inmates; is that correct?
18       MR. SITARAS: Objection.
19       Go ahead.
20   A.   It would not be safe? I don't know
21   if I would say that.
22   Q.   You said it would be better to be
23   safe, correct?
24   A.   Well, I believe it's better to be
25   safe; however, the facts are the facts. The

49

1        Panagi
2    jails are not violent, and I can't remember
3    an officer getting stabbed recent memories.
4    Q.   Have you checked the records to see
5    if any officers have been stabbed in the last
6    year?
7    A.   I don't believe any were.
8    Q.   If you just listen to the question.
9        Have you checked the records?
10   A.   Have I checked the records? I
11   don't have access to some of those records.
12   Q.   If the answer is no, the answer is
13   no. I am asking you if you looked at actual
14   records. If you have, you have; if you
15   haven't, you haven't.
16   A.   Yes, I have looked at actual
17   records.
18   Q.   What actual records have you looked
19   at?
20   A.   The 24-Hour report, which is
21   available to me and every other manager.
22   Q.   What is the 24-Hour report?
23   A.   It's the unusual incident reporting
24   mechanism, so anytime a serious incident
25   occurs, it is broadcast to all managers.

58

```
1              Panagi
2     Q.  Approximately how many inmates have
3  tuberculosis?
4         MR. SITARAS:  Objection.
5     A.  Active tuberculosis?
6     Q.  Yes.
7     A.  Very few, small percentage.
8     Q.  Would it be more than ten?
9     A.  I don't know.
10        MR. SITARAS:  Objection again.
11    Q.  But you do know that some inmates
12 have at times -- during the last six years
13 had active tuberculosis?
14        MR. SITARAS:  Objection.
15    A.  Yes.
16    Q.  Are you aware of any other diseases
17 that the latex gloves might protect -- I am
18 sorry.
19        Are you aware of any other diseases
20 that the inmates have at Rikers Island?
21        MR. SITARAS:  Objection.
22        Go ahead.
23        This covers prisoner privacy rights
24 and certain HIPAA-protected issues.  That
25 is why I am slightly concerned.  We're
```

60

```
1              Panagi
2     A.  911 knife, it's a hooked blade
3  that's designed to cut down someone who may
4  be hanging up.  It's primarily for suicide
5  attempts.
6     Q.  Does it have any other purposes?
7     A.  No.
8     Q.  Has a 911 knife ever been used for
9  any other purposes?
10    A.  Not that I know of.
11    Q.  Are you familiar with the written
12 directives, trainings and orders relating to
13 uniforms?
14    A.  Yes.
15    Q.  Is it required that a correction
16 officer wear only his uniform and not mix his
17 uniform with civil clothing?
18    A.  That's pretty much true.
19    Q.  When you say "pretty much," are
20 there exceptions?
21    A.  That's pretty much true when we're
22 speaking about on duty wearing of the
23 uniform.
24    Q.  And what is true about off duty
25 wearing of uniform?
```

59

```
1              Panagi
2  not discussing about any specific
3  inmates, I know.  Also, it's not part of
4  the scope of the 30(b)(6) witness, A, to
5  testify about the, I'd say, medical
6  makeup of the prison population.
7     Q.  You can answer the question.
8     A.  I don't know.
9     Q.  What is the purpose of the
10 flashlight element of the uniform?
11    A.  To be used when visibility is
12 difficult and dark conditions.
13    Q.  When would that be?
14    A.  Mostly during an evening tour,
15 midnight tour, but could even be during the
16 day when you're searching underneath
17 something where it may be dark.
18    Q.  Is it required to properly perform
19 the duties of a correction officer?
20    A.  I am sorry.  I don't understand.
21    Q.  Is a flashlight required to
22 properly perform the duties of a correction
23 officer?
24    A.  It is required equipment, yes.
25    Q.  What is the 911 knife for?
```

61

```
1              Panagi
2     A.  Well, off duty someone may be going
3  home.  They may be wearing a coat over their
4  uniform.
5     Q.  Can they wear whatever they want
6  off duty?
7     A.  Can they wear whatever they want?
8     Q.  Yes.
9     A.  You mean mixing with a uniform?
10    Q.  Yes.
11    A.  It's not an issue.
12    Q.  The answer is yes, you can wear
13 whatever you want?
14    A.  I don't know I would go that far.
15 I don't know what that means.
16    Q.  Are there regulations regarding the
17 wearing of uniforms during offduty periods?
18    A.  That question is somewhat different
19 than what you're asking.
20    Q.  I am asking a new question.
21    A.  Are there regulations?
22    Q.  Yes.
23    A.  Well --
24    Q.  Written regulations?
25    A.  The only regulation that I can
```



66

Panagi

1 earlier, it would be, let's say, 0700 hours,
2 7 o'clock in the morning, the correction
3 officer would be reporting to roll call in
4 uniform, where a supervisor would inspect his
5 uniform and announcements would be made
6 regarding events that may have transpired at
7 the facility or department announcements
8 would be made and then assignment issues.
9    Q.  Now, you said he's in uniform; does
10 he have his full uniform on when he reports
11 to roll call?
12    A.  He reports in duty uniform.
13    Q.  Does he already have his canister
14 of OC when he reports?
15    A.  No.
16    Q.  He's not in his full uniform?
17    A.  He's in his full uniform. The OC
18 is a piece of equipment that is issued based
19 on your assignment.
20    Q.  Do correction officers sign in when
21 they start their tour?
22    A.  Yes.
23    Q.  Where do they sign in?
24    A.  There's an employee sign-in area.

67

Panagi

1    Q.  In each facility?
2    A.  Yes.
3    Q.  And do they sign in immediately
4 upon arriving at the facility?
5    A.  They're required to sign in at the
6 exact time of their arrival.
7    Q.  Do they sign out at the end of the
8 day?
9    A.  Yes, they do.
10    Q.  Are these sign-in/sign-out books
11 kept in the ordinary course of business by
12 Rikers Island?
13    A.  Yes.
14    Q.  How many years back are these kept?
15    A.  I don't know.
16    Q.  Do you believe that Rikers Island
17 holds sign-in/sign-out sheets for the last
18 six years?
19      MR. SITARAS: Objection.
20      If you know.
21    A.  I don't know.
22    Q.  Do you know where the
23 sign-in/sign-out sheets are kept at Rikers
24 Island?

68

Panagi

1    A.  Every facility maintains their own
2 records.
3    Q.  At the end of each year, are the
4 records delivered anywhere for storage?
5      MR. SITARAS: Objection.
6      Go ahead.
7    A.  I don't know.
8    Q.  Do you know if they're kept at the
9 facilities?
10    A.  To my knowledge, they're kept at
11 the facilities.
12   RQ   MR. RAND: I would call for
13 protection of sign-in/sign-out sheets for
14 all of the correction officers.
15      MR. SITARAS: I am going to subject
16 that to the limitation of what is the
17 opt-in periods over. Obviously, we've
18 produced those for the individuals that
19 opted in as plaintiffs.
20      MR. RAND: Your objection is noted.
21    Q.  They sign in immediately upon
22 arriving for their shift. Do correction
23 officers have lockers?
24    A.  Yes, they do.

69

Panagi

1    Q.  Do they then change into their
2 uniform at their locker?
3    A.  Many do.
4    Q.  Are there showers there?
5    A.  Usually.
6    Q.  Do correction officers generally
7 take showers there?
8    A.  No.
9    Q.  Do correction officers generally
10 change in their uniform before appearing at
11 roll call in the changing room?
12    A.  Yes.
13    Q.  What percentage of officers do not
14 change into their uniforms in the changing
15 room approximately?
16      MR. SITARAS: Objection.
17      Go ahead.
18    A.  I couldn't say.
19    Q.  Is it general practice for a
20 correction officers to change into their
21 uniforms at the facilities?
22    A.  Generally speaking, yes.
23    Q.  Why is that?
24      MR. SITARAS: Objection.

70

1          Panagi
2      If you know.
3      A.  Why would they change into their
4  uniforms?
5      Q.  At the facility.
6      A.  I'm sure because many of them come
7  in civilian attire and leave in civilian
8  attire.
9      Q.  Why do they come and go in civilian
10  attire?
11          MR. SITARAS:  Objection.
12          Go ahead.
13      A.  More comfortable.  They choose not
14  to wear their uniform.
15      Q.  Do you have any reason why
16  correction officers would choose not to wear
17  their uniform outside of the facility?
18          MR. SITARAS:  Objection.
19          Go ahead.
20      A.  I would be guessing.
21      Q.  When you were a correction officer,
22  did you change at the facility?
23      A.  I actually did both depending on
24  what stage of my career I was.  I used to
25  come in and change on some occasions.  Other

71

1          Panagi
2  occasions, I would come in in uniform.
3      Q.  What percentage of occasions did
4  you not change at the facility while you were
5  a correction officer?
6      A.  You know, a lot depends, of course,
7  on convenience, whether I thought I may be
8  delayed getting to work.  There are a lot of
9  variables.  So certainly we have a lot of
10  officers that may be rushing to work and
11  choose to wear their uniform because it's
12  just so much faster.
13      Q.  Is there a cleaning service for the
14  uniform at the facility?
15      A.  Cleaning service?
16      Q.  How do you clean the uniform if you
17  keep it at the facility?
18      A.  You take it home, dry clean it, you
19  bring it back.  That's the responsibility of
20  the staff member.
21      Q.  Is there any service, does anybody
22  get their uniform cleaned directly from the
23  facility?
24      A.  No.
25      Q.  Is there any service that provides

72

1          Panagi
2  dry cleaning for anybody on Rikers Island?
3      A.  No.
4      Q.  You're absolutely positive of that
5  answer?
6          MR. SITARAS:  Objection.
7          Go ahead.
8      A.  Are we referring to –
9      Q.  If you called up a dry cleaning
10  service and said please come dry clean my
11  shirt, I am an administrative officer at
12  Rikers Island, they would not pick up your
13  shirt?
14      A.  Probably not.  We have security
15  checkpoints.  An advance notice would have to
16  indicate who was coming, the number of the
17  vehicle and plates --
18      Q.  They could come to the front desk?
19      A.  I don't see it happening.
20      Q.  They sign in, you then put on
21  the -- the security guard puts on the
22  uniform and then you said there was a roll
23  call.  What occurs at the roll call --
24          The correction officer arrives for
25  his shift?

73

1          Panag
2      A.  Right.
3      Q.  He signs in the book immediately,
4  he then puts on his uniform or has his
5  uniform on, then he appears at the roll call.
6  What is the roll call?
7      A.  As I described earlier, uniform
8  inspection, announcements and then
9  assignments.
10      Q.  What are assignments?
11      A.  Your posts, your duties for the
12  day.
13      Q.  Then you said that afterwards,
14  after the inspection of the uniform, the
15  correction officer is required to get a
16  canister of OC, if required for his duties?
17      A.  He may be required to pick up other
18  equipment that he may needed for the day.
19      Q.  What other equipment might he have
20  to pick up?
21      A.  If he or she is assigned to a
22  hospital room, they may report to the control
23  room to pick up a firearm.  They might go
24  back to the locker room and pick up a duty
25  rig, pick up a firearm, pick up winter wear

78

1              Panagi
2     A.   No, it's never been indicated to
3     me.
4     Q.   Have you ever heard anyone at any
5     time discuss the concept that there may be
6     threatened violence against a correction
7     officer outside the facility if ex-convicts
8     know that person is a correction officer?
9          MR. SITARAS: Objection.
10         You can go ahead and answer.
11    A.   That's a common fear.
12    Q.   And is it also a fear of correction
13    officers that if they wear their correction
14    officer uniform in the community that members
15    of the community may request special favors
16    for their friends and relatives that may be
17    incarcerated?
18         MR. SITARAS: Objection.
19         Go ahead.
20    A.   I've never heard that.
21    Q.   Did you ever wear your correction
22    officer uniform in public when you were not
23    on your way to work or on your way back from
24    work?
25         MR. SITARAS: Objection.

79

1              Panagi
2          Go ahead.
3     A.   I'd have to give that some thought.
4     I don't recall.
5     Q.   Have you ever gone to any
6     relatives' high school graduations?
7     A.   Yes.
8     Q.   And do you wear your uniform to the
9     high school graduation?
10    A.   No.
11    Q.   Have you ever gone to any weddings
12    while you were employed by the Department of
13    Corrections?
14    A.   Yes.
15    Q.   Did you wear a uniform when you
16    went to the weddings?
17    A.   No.
18    Q.   Do you recall any time that you've
19    worn the uniform when you were not on your
20    way to work or on your way home from work?
21    A.   No.
22    Q.   Is there any reason why you've
23    never worn your uniform outside of the
24    workplace?
25         MR. SITARAS: Objection.

80

1              Panagi
2     A.   No reason to.
3     Q.   Was there ever a notice posted at
4     Rikers Island informing correction officers
5     that they had a right to overtime?
6          MR. SITARAS: Objection.
7          If you know.
8     A.   I don't know.
9     Q.   Do you recall ever seeing a notice
10    at Rikers Island informing correction
11    officers that they had a right to overtime
12    wages?
13         MR. SITARAS: Objection.
14         Go ahead.
15    A.   Yes, actually I have seen notices.
16    Q.   Where did you see the notices?
17    A.   Posted on employee bulletin boards
18    in the form of collective bargaining
19    agreements.
20    Q.   Do you mean posted on the board as
21    the small booklet that includes the
22    collective bargaining agreement?
23    A.   Actually, something larger, 8 and a
24    half by 11.
25    Q.   Did you have any separate notice

81

1              Panagi
2     informing correction officers of their rights
3     under federal law to obtain time and a half
4     or overtime?
5          MR. SITARAS: Objection, objection,
6     beyond the scope of this witness.
7          If you know, you can answer.
8     A.   I don't know what you mean by
9     "separate notice "
10    Q.   Is the only notice that you can
11    recall regarding overtime the posting of the
12    collective bargaining agreement?
13         MR. SITARAS: Objection.
14         Go ahead.
15    A.   Are we speaking written notice or
16    verbal communications?
17    Q.   Posted notices.
18    A.   That's the only thing I can recall.
19    Q.   And the posting of the collective
20    bargaining agreement that you recall, was
21    that posted in all facilities at Rikers
22    Island and other facilities where correction
23    officers work?
24         MR. SITARAS: Objection.
25         Go ahead.

# EXHIBIT X

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------
ERIC EDWARDS, Individually
and on Behalf of All Other
Persons Similarly Situated,

       Plaintiffs,

         vs.       No. ECF 2008
                    Civ: 3134 (DLC)

THE DEPARTMENT OF CORRECTIONS
OF THE CITY OF NEW YORK and
THE CITY OF NEW YORK,

       Defendants.
------------------------------

           December 31, 2008
           10:16 a.m.

     Deposition of FRANK SQUILLANTE,

held at the offices of William Rand, 711

Third Avenue, Suite 1505, New York, New

York, pursuant to Notice, before Theresa

Tramondo, a Notary Public of the State of

New York.



**David Feldman**
W o r l d w i d e

From File to Trial™

California | New York | Texas
www.david-feldman.com



18

1    Squillante
2    services, religious services, things of that
3    nature.
4        Q.   Could you describe to me the
5    uniform that correction officers are required
6    to wear?
7        A.   Yes. They wear a uniform similar
8    to that of a New York City police officer
9    minus the firearm.
10       Q.   What does that entail?
11       A.   Blue pants, blue shirt, and various
12   equipment that goes along with it, shield.
13       Q.   Did they have to wear a bulletproof
14   vest?
15       A.   When they go outside the confines
16   of the facility and take a prisoner to either
17   court or to a hospital, they carry firearms
18   and they wear bulletproof protective vests.
19       Q.   When these officers are guarding
20   the inmates, do they have to wear a
21   stab-proof vest?
22       A.   Yes.
23       Q.   That's a little bit less thick; is
24   that the idea?
25           MR. SITARAS: Objection.

19

1    Squillante
2        Go ahead.
3        A.   It serves a different purpose. It
4    protects them against sharp objects
5    penetrating. It's different than a
6    bulletproof vest.
7        Q.   I guess as it states?
8        A.   Stab/slash vest it's called.
9        Q.   What is the purpose of wearing the
10   stab/slash vest?
11       A.   To protect them from being
12   assaulted with sharp objects.
13       Q.   Do some prisoners have sharp
14   objects at Rikers Island?
15           MR. SITARAS: Objection.
16           Go ahead.
17       A.   Yes.
18       Q.   What type of sharp objects do they
19   have?
20       A.   Various types, shanks, shivs.
21   Things that are manufactured from parts of
22   the facility that are considered contraband
23   that they fabricate, sharpened toothbrushes,
24   broken pieces of plexi, pieces of the locker,
25   light fixtures. Anything that he can be

20

1    Squillante
2    creative enough to make some type of a weapon
3    or a shank or a shiv with, they manufacture
4    those from time to time.
5        Q.   Is the prison environment at Rikers
6    Island a dangerous environment for the
7    officers?
8            MR. SITARAS: Objection.
9            Go ahead.
10       A.   It can be.
11       Q.   Do you believe it's necessary that
12   a guard wears stab/slash proof vests while
13   guarding the inmates at Rikers Island?
14       A.   It's a good safety feature, I
15   believe.
16       Q.   Is a correction officer required is
17   its uniform to wear a utility belt?
18       A.   Yes.
19       Q.   Is he required to have a utility
20   belt, a pen, a whistle, a memo book, gloves,
21   a flashlight, a duty knife and a teargas
22   canister?
23       A.   Everything except the gloves and
24   the teargas canister they are expected --
25   they are required to wear.

21

1    Squillante
2        Q.   Isn't it true that the regulations
3    require that correction officers have a
4    teargas canister on their belt?
5        A.   Not at all times, no.
6        Q.   At what times?
7        A.   Depends on their assignments within
8    the facility. There are areas in the
9    facility where you absolutely cannot carry
10   teargas.
11       Q.   Could you explain to me where you
12   are required to have teargas?
13       A.   You're required to carry it in the
14   housing areas and some of the congregate
15   areas?
16       Q.   What does "congregate areas" mean,
17   congregation areas for open spaces?
18       A.   Yes.
19       Q.   What percentage of the correction
20   officers do not - are not required to have
21   teargas on their belt for their job
22   functions?
23       A.   It's a small percentage.
24       Q.   Would it be less than 10 percent?
25       A.   Yes.



22

1        **Squillante**
2     Q.   Would it be less than 5 percent?
3     **A.   It might be.**
4     Q.   So more than 90 percent of the
5    correction officers are required to have a
6    canister of teargas on their utility belt as
7    part of their uniform; is that correct?
8     **A.   I'm recalling the rules and**
9    **regulations from the department, and I don't**
10   **recall it requiring it to be on their person.**
11   **I know it's required in various facilities in**
12   **different areas. I know it's not allowed to**
13   **be carried in the medical infirmaries, the**
14   **clinics and in some mental observation areas**
15   **where it might have an adverse effect on the**
16   **people, the inmates in there, because they're**
17   **on psychotropic medication, et cetera.**
18        **The same thing with the gloves, I**
19   **don't recall gloves being in the rules and**
20   **regulation as required equipment.**
21    Q.   When people come in in the morning,
22   what is the format for putting your uniform
23   on at Rikers Island?
24        MR. SITARAS:  Objection, beyond the
25   scope. I think we set aside someone else

23

1        Squillante
2    for donning and doffing.
3        I will let him answer.
4     **A.   Could you repeat that question?**
5     Q.   I am trying to figure out, is there
6    a locker room where people put on their
7    uniforms?
8     **A.   Yes.**
9     Q.   Where is the locker room located?
10    **A.   In the front of the facility, most**
11   **of the locker rooms are. It depends on the**
12   **facility.**
13    Q.   So since you have nine facilities,
14   do they put on their uniforms at each
15   facility or is there a central building where
16   people check in and put on their uniforms? I
17   am trying to understand how people log into
18   their job in the morning.
19    **A.   Some people come dressed. Some**
20   **people dress at the particular facility**
21   **they're assigned to in their assigned locker**
22   **room area at their assigned lockers.**
23    Q.   For instance, at the Davoren
24   Center, is there a locker facility at the
25   Davoren Center?

24

1        Squillante
2     **A.   Yes.**
3     Q.   Those correction officers arrive in
4    the morning and generally change into their
5    uniforms at the Davoren Center?
6     **A.   Yes. They sign in when they enter,**
7    **they clear the magnetometer and proceed to**
8    **the locker room.**
9     Q.   Sign in when they enter, they clear
10   the --
11    **A.   Magnetometer.**
12    Q.   What is that?
13    **A.   That's like the airport, you have**
14   **to go through - take everything out of your**
15   **pockets. All the facilities have that.**
16    Q.   Then typically they --
17    **A.   Enter the locker room area.**
18    Q.   Is there a locker for each
19   correction officer?
20    **A.   Yes.**
21    Q.   When they change into their
22   uniform --
23        They change into their uniform?
24    **A.   Yes.**
25    Q.   How long does it take for them to

25

1        Squillante
2    change into their uniform, approximately?
3        MR. SITARAS:  Objection.
4        Go ahead.
5     **A.   Five minutes.**
6     Q.   After they change into their
7    uniform, do they have to get a canister of
8    teargas, if they're required to have that?
9    Do they keep that with them? Where is the
10   canister of teargas?
11    **A.   The handheld chemical agent**
12   **canisters you're talking about is OC. It's**
13   **handheld OC.**
14    Q.   What does "OC" stand for?
15    **A.   Olin resin capsule.**
16    Q.   Could we call that "teargas"?
17    **A.   Yes.**
18        MR. SITARAS:  It doesn't matter.
19   We could call it "teargas."
20    **A.   Pepper spray.**
21    Q.   Pepper spray.
22    **A.   So after they get dressed --**
23    Q.   You gave a description of the
24   Pepper spray. Is that something that is
25   available to the public to buy?



30

1                 **Squillante**
2   **officers, the assistant deputy wardens**
3   **inspect the captains. Every uniform member**
4   **has a uniform card of all the required**
5   **equipment and a section that is denoted for**
6   **those inspections once a year.**
7     Q. You said "every," who has the card?
8     **A. Every uniformed employee. There is**
9   **a uniform inspection card for each employee.**
10     Q. Does that describe exactly what
11   he's required to wear?
12     **A. Yes.**
13     Q. So after the roll call is finished,
14   then where do the correction officers go?
15     **A. Some report directly to their**
16   **assigned posts, others stage and await for a**
17   **search. They go on a scheduled search,**
18   **institutional search.**
19     Q. They go from there to whatever
20   their job duties are, whatever that day
21   entails; either they go to supervise the
22   inmates or they go take an inmate to the
23   hospital, whatever their job is requiring
24   them to do?
25     **A. Right.**

31

1                 **Squillante**
2     Q. There is no more pre --
3     **A. No, they go wherever they're**
4   **assigned, whatever the schedule says, that's**
5   **where they go.**
6     Q. Do they ever clock-in and out on a
7   time clock?
8     **A. No.**
9     Q. How do you calculate the hours that
10   the correction officers work?
11        MR. SITARAS: Objection. This is
12   definitely beyond the scope that this
13   witness was designated for.
14     Q. When you were a correction officer,
15   how did they calculate your hours?
16        MR. SITARAS: To your knowledge.
17     **A. To my knowledge, I was scheduled**
18   **from 7:00 a.m. to 3:31 p.m., so I would**
19   **arrive at the facility about a quarter to**
20   **7:00, put on my uniform, sign in at a quarter**
21   **to 7:00, stand roll call at 7 o'clock, and I**
22   **was paid from 7:00 to 3:31.**
23     Q. How many hours per week did you
24   work?
25     **A. 40.**

32

1                 **Squillante**
2     Q. What was your schedule; you said
3   7:00 to 3:31, that's 8 hours and 31 minutes a
4   day you worked?
5     **A. Yes.**
6     Q. So how many days a week did you
7   work?
8     **A. I worked 4's and 2's. I had**
9   **rotating shifts.**
10     Q. So average, when you says 4's and
11   2's, did you mean four days; just explain.
12     **A. Four days on, two days off.**
13     Q. You worked much less than 40 hours
14   a week?
15     **A. I really can't --**
16        MR. SITARAS: Objection. It's
17   beyond the scope. Timekeeping has been
18   designated for a different witness.
19     Q. When correction officers sign in in
20   the morning, how much time is it before the
21   roll call starts?
22        MR. SITARAS: Objection, go ahead.
23     **A. It varies depending on what time**
24   **they arrive at the facility. They need to be**
25   **at roll call with their uniform on at a**

33

1                 **Squillante**
2   **designated time. Whatever it takes them to**
3   **do to do that, is whatever time they get**
4   **there.**
5     Q. So the sign-in sheet has nothing to
6   do with the hours that they're paid for?
7        MR. SITARAS: Objection.
8        Go ahead.
9     Q. For instance, you said you signed
10   in quarter to 7:00, your hours started at
11   7:00. Do people sign in whenever they get
12   there, if they get there a half hour late?
13     **A. They sign in when they arrive to**
14   **the facility.**
15     Q. Before they do anything, before
16   they put on their uniform, do anything?
17     **A. Right.**
18     Q. When they come to work, can they
19   drive right up to the facility with their car
20   or do they have to go through security
21   checkpoints?
22        MR. SITARAS: Objection.
23        Go ahead.
24     Q. I am wondering how people get to
25   their job?

42

Squillante

1
2  A.  Yes.
3  Q.  All the facilities?
4  A.  Yes.  If there is an emergency, and
5  you press the button, in the control room on
6  the panel board, three top lights up that
7  there is a problem.  Those stay at the post.
8  They don't get issued from the control room.
9  Some do though, but a very small portion
10  does, and I can give you examples of those,
11  if you want.
12  Q.  Does an alarm go off once they hit
13  this button --
14  A.  Yes.
15  Q.  -- the protection body alarm?
16  A.  Yes, and the alarm goes off in the
17  control room.
18  Q.  Then what happens?
19  A.  Then the facility locks down and
20  they send a probe team to the scene.
21  Q.  How do they get the probe team?
22  A.  There's designated in each
23  facility.  Traditionally, it's the intake
24  staff, the receiving room or intake staff,
25  they're designated as a probe team.  A

43

Squillante

1
2  supervisor and two or three correction
3  officers go to the scene of that alarm.
4  Q.  Where is the intake staff located?
5  A.  In the front of the facility near
6  the control room traditionally.
7  Q.  If an alarm occurs during a meal
8  break, do correction officers on meal break
9  answer the alarms?
10  A.  Absolutely.
11  Q.  Are they required to answer the
12  alarms?
13  A.  Yes.
14  Q.  When the correction officers take
15  meal breaks, are they required to wear their
16  uniforms?
17  A.  Yes, they're required to wear their
18  uniforms at all times.
19  Q.  Are they required to be on-call and
20  ready to answer alarms?
21  A.  Yes.
22  Q.  What is the purpose of the gloves
23  as part of the uniform?
24  A.  I don't know that the gloves are
25  part of the uniform.  But they're used to

44

Squillante

1
2  protect their hands while they're conducting
3  searches, also to protect them from possible
4  exposure to body fluids of an injured inmate.
5  Q.  Because people may have diseases?
6  A.  People may have contagious
7  diseases.  There may be blood-borne pathogens
8  from an inmate that got assaulted profusely
9  or even a staff member bleeding profusely.
10  There are different types of gloves that are
11  used, but traditionally it's basic prot ction
12  from diseases and to protect them while
13  searching.
14  Q.  Do correction officers generally
15  carry gloves?
16  A.  Generally they do.
17  Q.  If a correction officer is on duty
18  in one of the facilities directly supervising
19  inmates, is he required to carry gloves?
20  A.  No.  To my knowledge gloves is
21  optional.
22  Q.  The flashlight is part of the
23  uniform.  What is the purpose of the
24  flashlight?
25  A.  The flashlight is required to be

45

Squillante

1
2  carried on the 3:00 to 11:00 p.m. shift and
3  the midnight shift, and its purpose is to be
4  utilized to provide extra lighting in dark
5  areas, in cells, other dormitories that the
6  correction officers patrol to make sure that
7  there is no problem with the inm tes, that
8  nobody is attempting to commit suicide,
9  things of that nature.
10  Q.  Is one of the duties of the
11  correction officers to inspect cells?
12  A.  Yes.
13  Q.  So they probably search for weapons
14  and other contraband?
15  A.  Yes.
16  Q.  Do they inspect the cells on a
17  regular basis?  I don't know if you
18  understand the question I am asking.  Is
19  there a time each day that there is cell
20  inspection or is it done on an ongoing basis?
21  A.  No, it's done every day.  Every day
22  cell inspections are conducted.
23  Q.  Always at the same time?
24  A.  Various times.
25  Q.  So the flashlight may be maybe used



46

1          Squillante
2     as part of cell inspection?
3         A.   To help assist in the search and
4     the cell inspection, yes.
5         Q.   As part of the uniform, the
6     correction officer also carries a memo book?
7         A.   That is correct.
8         Q.   What is the purpose of memo book
9     and pen?
10        A.   To denote specific things relative
11    to their post or instructions or assignments
12    for that particular date and tour.  It's a
13    legal document.
14        Q.   If an alarm occurs, would they
15    write up what happened in their book right
16    after it happened?
17        A.   They may make a notation to that in
18    their book.  It's certainly not required.
19    It's kind of optional.  What is really
20    required to be put in there are the date,
21    time and general condition.
22        Q.   You're required to put a date and
23    time and general condition; is it an ongoing
24    log that's kept in these memo books?
25        A.   Each page represents a day.

47

1          Squillante
2         Q.   Are you required to write something
3     in the memo book each day?
4         A.   Yes.
5         Q.   So, for instance, if nothing
6     unusual happens, you might write --
7         A.   Nothing unusual.
8         Q.   -- 12:31, nothing unusual today,
9     but if somebody attacked somebody, you would
10    say X attacked X, or I was there and called
11    alarm --
12         MR. SITARAS:  Objection.
13         Go ahead.
14        A.   You may write that.  There is no
15    specifics to that.  It's date, time, post,
16    the name of your supervisor, and stuff to
17    that nature.
18        Q.   Is there any equipment used by the
19    correction officers that is required that we
20    have not discussed today, any part of the
21    uniform or equipment that we have not
22    discussed?
23         Let me rephrase the question.
24         Is there any part of the required
25    uniform and equipment to be worn and carried

48

1          Squillante
2     by correction officers that we have not
3     discussed today?
4         A.   Not that I recall.
5         Q.   Are the stab proof vests available
6     to the public?
7         A.   I don't know.
8         Q.   When you were a correction officer,
9     did you change at the facility into your
10    uniform?
11         MR. SITARAS:  Objection.
12         Go ahead.
13        A.   Yes.
14        Q.   Did you ever change at home into
15    your uniform?
16        A.   Occasionally.
17        Q.   How often would you change at home?
18         MR. SITARAS:  Objection.
19         Go ahead.
20        A.   Three times a month.
21        Q.   Why would you change sometimes at
22    home and sometimes at the facility?
23         MR. SITARAS:  Real quick, I am
24    going to put a blanket objection to the
25    personal questions.  He's here as a

49

1          Squillante
2     30(b)(6) witness, but I will let him
3     answer as to individual capacity.
4         Go ahead.
5         A.   I was running late.
6         Q.   If you're running late, why is it
7     faster to change at home?
8         Do you carry your uniform home
9     every day?
10        A.   This is the truth.  Ready?  I
11    didn't have a clean shirt in my locker, so I
12    knew it, so I had to dress at home.
13        Q.   But you keep your uniform both at
14    home and at the facility?
15        A.   Well, it's only home when it's
16    dirty, so it had to be washed real quick, but
17    I keep my uniforms in my locker.
18        Q.   Basically you change at the locker?
19        A.   Yes.
20        Q.   Except for these exceptional
21    circumstances when you don't have a clean
22    shirt, et cetera?
23        A.   Yes.
24        Q.   Is it a concern of correction
25    officers that people in their neighborhood



50

1          Squillante
2    know that they are a correction officer?
3          MR. SITARAS: Objection, beyond the
4    scope. Go ahead.
5       A.   I think it's a matter of opinion.
6    Some people say they don't feel comfortable
7    that people in their community know that
8    they're correction officers.
9       Q.   When you say "some people," you
10   mean some correction officers?
11      A.   Some correction officers, yes. I
12   have heard some correction officers.
13      Q.   And have they said that they are
14   concerned that people might retaliate against
15   them in their neighborhood because they would
16   dislike them for being correction officers?
17         MR. SITARAS: Objection.
18         Go ahead.
19      A.   I've heard that.
20      Q.   And when I say "retaliate," did
21   they say that they felt they might be
22   physically threatened, did they feel -- let
23   me rephrase the question.
24         Did they feel that if people in
25   their neighborhood knew they were a

51

1          Squillante
2    correction officer that they might be in
3    danger of physical violence from somebody in
4    the neighborhood or a past inmate or
5    criminal?
6          MR. SITARAS: Objection.
7          Go ahead.
8       A.   I didn't hear that specifically. I
9    was told that they would put a sweatshirt or
10   a coat over their actual uniform shirt so no
11   one would recognize who they were. When they
12   would get to work, they would just take it
13   off and be ready.
14      Q.   Isn't there a regulation that
15   requires no correction officer mix civilian
16   clothes with a uniform?
17         MR. SITARAS: Objection.
18         Go ahead.
19      A.   I don't recall that -- I never saw
20   that regulation.
21      Q.   Have you ever mixed civilian
22   clothes with your uniform?
23      A.   I have. Not at work, though. You
24   know, in the community at home, on my way to
25   work.

52

1          Squillante
2       Q.   What clothes have you mixed with
3    it?
4       A.   I put a Yankee jacket over my
5    correction officer shirt and proceeded to
6    travel to work that way.
7       Q.   When did you do that?
8       A.   I don't --
9          MR. SITARAS: Objection.
10      A.   I don't recall when I did that.
11      Q.   Have you done that recently?
12      A.   Actually, yes, I did. Yes, I did
13   do that recently.
14      Q.   Have you mixed any other civilian
15   clothes with your uniform?
16      A.   No. It has always been usually a
17   coverall garment or jacket type of thing.
18      Q.   Have you ever worn a baseball cap?
19      A.   No.
20         Is it all right if I go --
21         MR. SITARAS: Do you want to take a
22   quick 20-minute break?
23         MR. RAND: Sure.
24         (Recess taken - 11:09 to 11:28.)
25   BY MR. RAND:

53

1          Squillante
2       Q.   Back on the record.
3          Before we had talked about the
4    uniforms and equipment and putting it on in
5    the morning. Now, I want to go toward to the
6    end of the shift. How do you take off your
7    uniform and return your equipment at the end
8    of a shift if you're a correction officer?
9       A.   Pretty much you start at the
10   control room on the way out, drop off any
11   keys or chemical agent or anything else that
12   was issued from there, and then proceed to
13   the locker room, and take all your equipment
14   and uniforms off and put back on your
15   civilian attire and exit.
16      Q.   How long does it take to return
17   your equipment to the control room and the
18   change in the locker room from your uniform?
19      A.   About five or ten minutes.
20      Q.   When do you sign out?
21      A.   As you're exiting.
22      Q.   So is that before you go to the
23   control room?
24      A.   No. After you put on your civilian
25   clothes, traditionally you walk by the

# EXHIBIT Y

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x
ERIC EDWARDS, Individually
and on Behalf of All Other Persons
Similarly Situated,

               Plaintiffs,

                              No.ECF 2008
      -against-               Civ:3134 (DLC)

THE DEPARTMENT OF CORRECTIONS OF THE
CITY OF NEW YORK AND THE CITY OF NEW
YORK,
               Defendants.
----------------------------------------x
               228 East 45th Street
               New York  10017

               October 14, 2010
               9:57 a.m.


               EXAMINATION BEFORE TRIAL of Ira

Kleinburd, taken on behalf of the Plaintiffs, and

held before Connie Stanieski, a Notary Public

within and for the State of New York.

1                        IRA KLEINBURD

2     Buffalo 1972.

3          Q.    And do you have any post graduate

4     degrees?

5          A.    No.

6          Q.    Can you give me a short histo:y of

7     your work background?

8          A.    I have been working for the city

9     since 1973.  I was a pension analyst for about

10    six and-a-half years, and since August 1979 I

11    have worked for the department of corrections in

12    the payroll area, personnel area.

13         Q.    What is the standard schedule for

14    correction officers?

15         A.    It, the standard, the most common

16    schedule is an 8 hour and 31 minute day working

17    four days with two days off so it's a six day

18    schedule.

19         Q.    And so how many hours do they work a

20    week --

21         A.    It varies --

22         Q.    -- on that schedule?

23         A.    It varies based on their specific

24    schedule.

25         Q.    I mean, if you have the schedule you

1                    IRA KLEINBURD

2    his normal day is 8 and-a-half hours and he is

3    told to stay past those 8 and-a-half hours, any

4    hours worked on that day in excess of those hours

5    are paid as overtime.

6         Q.    So it's on a daily basis?

7         A.    Correct.

8         Q.    Thank you.  And when you say 8

9    and-a-half, generally it's 8 hours and 31

10   minutes, correct?

11        A.    It's 8 hours and 31 minutes or it

12   could be 8 hours and 15 minutes depending on the

13   tour.  It gets more complicated as we go along,

14   but for the record it's 8 hour and 31 minutes is

15   for the most part the most common.

16        Q.    And why is it 8 hours and 31

17   minutes?

18        A.    It's been that way for as long as I

19   can remember.  I have absolutely no reason, it

20   could just be the way it was set up in terms of

21   manning.

22        Q.    Because it just seems odd to me that

23   31 minutes, 8 hours and 31 minutes, so it just

24   seems odd to me.

25        A.    I couldn't tell you.

1                    IRA KLEINBURD

2          Q.    So most officers work a weekly

3    schedule that's 42 hours and 35 minutes; is that

4    correct?

5          A.    Most officers work a schedule that

6    is dictated by four days on and two days off and

7    8 hours and 31 minutes a day.

8          Q.    Well, do any officers work on a five

9    day schedule?

10         A.    Yes.

11         Q.    So for those officers how many hours

12   a week do they work?

13         A.    If they work Monday through Friday

14   then they would work 42 hours and 35 minutes.

15         Q.    And they would only get overtime if

16   they work more than the 42 hours and 35 minutes?

17         A.    Actually for those people who work a

18   schedule that's dictated by five days at 8 hours

19   and 31 minutes, they are compensated monthly by

20   receiving compensatory time into their time bank

21   because they are working in excess of their

22   yearly protracted hours.

23         Q.    So what are they getting paid in

24   addition if they work five days?

25         A.    I think it's 11 hours and 40 minutes

1                          IRA KLEINBURD

2        of comp time.

3            Q.    Per month?

4            A.    Yes.

5            Q.    How many correction officers work a

6        five day schedule, approximately?

7            A.    I don't have the exact number, not

8        too many.

9            Q.    So it's less than five percent?

10           A.    I wouldn't venture a guess that's a

11       percentage, but it is few.

12           Q.    So the bulk of the officers work

13       four days on and two days off?

14           A.    Correct.

15           Q.    And for those officers, if they work

16       four days on and two days off in a row without a

17       change in that schedule, they would be working 42

18       hours and 35 minutes per their schedule in a

19       seven day period?

20           A.    Not necessarily.

21           Q.    If you presume they work in a row

22       four days on, two days off, four days on, two

23       days off, without changing that pattern?

24           A.    Not necessarily.

25           Q.    Why?

1                    IRA KLEINBURD

2    8 a.m. in the morning receive an additional 10

3    percent premium.

4         Q.    Is that an exception event also?

5         A.    Yes.

6         Q.    And what other exception events are

7    there?

8         A.    Overtime.

9         Q.    So overtime, night differential.

10   Are there any other differential events?

11        A.    The deduction of pay would be an

12   exception event.

13        Q.    And that's for AWOL or suspension?

14        A.    Correct.  There are additional extra

15   additional payments that are made over the course

16   of the year which are contractually driven but

17   they are isolated.

18        Q.    So like contractual bonus type

19   payments?

20        A.    The individuals get paid holiday pay

21   twice a year and they receive a uniform

22   allowance.

23        Q.    Are there any other special payments

24   that you recall?

25        A.    There are additional recurring

1                          IRA KLEINBURD

2        A.    Yes.

3        Q.    How is the overtime rate calculated

4   for correction officers?

5        A.    It's the annual salary divided by

6   2088 hours per year times time and a half.

7        Q.    Sorry, can you just repeat that?

8        A.    Sure, it's the annual salary divided

9   by 2088 times one and-a-half, and there is an

10  additional factor added in if that overtime is at

11  night.

12       Q.    Where does the 2088 number come

13  from?  Where does that come from?

14       A.    That's the amount of hours that they

15  are I'd like to say contractually agreed upon

16  that they must work within each particular

17  calendar year and I believe that's the case.

18       Q.    So that would coincide with their

19  standard schedule?

20       A.    Yes and no only because depending on

21  the number of appearances per year and the number

22  of hours per day there might be a, there might be

23  the ability to work in excess of those normal

24  hours where an individual possibly could get that

25  compensatory time pop up for let's say the five

1              IRA KLEINBURD

2         to heads of, it concerns city departments

3         and agencies from James F. Hanley,

4         Commissioner, the subject is Executed

5         Contract Correction Officers, term May 1,

6         2005 to July 31, 2005, and it is a 25 page

7         document, it's double sided and counsel

8         does not want to mark it as an exhibit at

9         the deposition.

10        Q.    Does this appear to you to be the

11   2005 and 2007 collective bargaining agreement?

12        A.    Yes.

13        Q.    And do you see in Article 3 it talks

14   about hours and overtime?

15        A.    Yes.

16        Q.    Does it say that correction officers

17   are supposed to get paid overtime after 40 hours

18   in a week?

19        A.    Yes.

20        Q.    Did correction officers get paid

21   overtime after 40 hours in a week?

22        A.    Yes.

23        Q.    I thought they had a schedule that

24   was 42 hours and 35 minutes?

25        A.    It also indicates that, it says

1                    IRA KLEINBURD

2   overtime in excess of 40 hours a week or in

3   excess of the hours required of an employee by

4   reason of his regular duty chart if a week's

5   measurement is not appropriate.

6          Q.    Is a week's measurement not

7   appropriate?

8          A.    In this particular case it is

9   because technically officers may work either a 34

10  hour a week or 42 hour week so for the most part

11  they are paid overtime in excess of their daily

12  tour, so if in an individual works 8 and a half,

13  8 hours and 31 minutes a day, if they work an

14  hour and-a-half in excess of that day they get an

15  hour and-a-half overtime regardless of what they

16  do the rest of the weeks.

17         Q.    Could you just identify where the

18  collective bargaining agreement ends in this

19  package?

20         A.    Officially or unofficially?

21         Q.    I mean, it was all produced to me

22  with double sided, you know --

23              MS. O'CONNOR:   This was produced by

24         our office?

25              MR. RAND:   Yes.

# EXHIBIT Z

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------x
ERIC EDWARDS, Individually and On
Behalf of All Other Persons
Similarly Situated,

                    Plaintiffs,

                            Civil Action No.
          -against-        ECF 2008 CIV: 3134
                            (DLC)(GWG)

THE DEPARTMENT OF CORRECTIONS OF
THE CITY OF NEW YORK and THE CITY
OF NEW YORK,

                    Defendants.
-------------------------------------------x
                    February 28, 2011
                    9:48 a.m.

          Deposition of CYNTHIA LEWIS, taken by
Plaintiffs, pursuant to 30(b)(6) Notice of
Deposition, at the Law Offices of William
Coudert Rand, 228 East 45th Street, New York,
New York, before Georgette K. Betts, a
Certified Shorthand Reporter, Registered
Professional Reporter and Notary Public within
and for the States of New York and New Jersey.

Page 2

1
2  APPEARANCES:
3  LAW OFFICES OF WILLIAM COUDERT RAND
       Attorneys for Plaintiffs
4      228 East 45th Street
       17th Floor
5      New York, New York 10017
       212.286.1425
6      wcrand@wcrand.com
7
       BY:  WILLIAM C. RAND, ESQ.
8
9  Corporation Counsel of the City of New York
       Attorneys for Defendants
10     100 Church Street
       Room 2-146
11     New York, New York 10007
       212.676.2750
12
13     BY:  ANDREA O'CONNOR, ESQ.
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1
2  C Y N T H I A   L E W I S,
3       having been first duly sworn by the
4       Notary Public (Georgette K. Betts), was
5       examined and testified as follows:
6  EXAMINATION
7  BY MR. RAND:
8       Q.  Good morning.
9       A.  Good morning.
10      Q.  My name is William Rand.  I'm
11  going to ask you a few questions today.  If you
12  ever need a break, just let me know.
13      A.  Surely.
14      Q.  And if you ever do not understand
15  a question, just let me know --
16      A.  Indeed.
17      Q.  -- and I will rephrase the
18  question.
19      A.  Thank you.
20      MR. RAND:  Can I mark as
21  Plaintiffs' Exhibit 1 Notice of
22  Deposition of defendant.
23      (Whereupon, 30(b)(6) Notice of
24  Deposition, was marked as Plaintiffs'
25  Exhibit 1 for identification, as of

Page 4

1           Cynthia Lewis
2  this date.)
3       Q.  Have you seen the Notice of
4  Deposition marked as Plaintiffs' Exhibit 1
5  before?
6       A.  No, I haven't.  This is my first
7  time.
8       Q.  What is your educational
9  background?
10      A.  A lot of years of college but
11  basically my major was dance education and
12  theater and I minored in management.
13      Q.  What college was that?
14      A.  I went to Lehman.
15      Q.  When did you graduate?
16      A.  I did not.  I didn't complete any.
17      Q.  Did you graduate high school?
18      A.  Yes, I did.
19      Q.  What high school?
20      A.  South Shore High School in
21  Brooklyn.
22      Q.  And when did you graduate?
23      A.  I believe that was in '75.
24      Q.  What did you do after you
25  graduated from high school?

1  (Pages 1 to 4)

Page 9

Cynthia Lewis

1 user would ask the MOS of what were their
2 illnesses and then that would be put into the
3 system and at that point it would be determined
4 whether the officer should return to duty --
5 given a return to duty date or given an
6 appointment to come into health management.
7 Q.   What I was really asking when was
8 the first time you dealt with time sheets and
9 people --
10 A.   I'm sorry, moving right along --
11 Q.   -- and people's overtime?
12 A.   Moving right along. Um, when in
13 '95 we had another reorganizational change and I
14 became a supervisor over timekeeping for
15 personnel, the uniformed personnel for five
16 years. And what that meant was we would
17 retrieve their time cards from the command and
18 any compensation that was due that officer at
19 that point we would generate it, what we call a
20 generic ETR because it was not a electronic ETR.
21 And the ETR is one of the devices that you use
22 to pay the employee.
23 Q.   All right. Let's just slow down.
24 When did you first start this job you're talking

Page 10

Cynthia Lewis

1 about?
2 A.   That was in '95.
3 Q.   And when did you stop doing this
4 job?
5 A.   Five years later. So that would
6 be like '95 -- '94, '95, '96 -- '95, '96, '97,
7 '98, '99, yeah.
8 Q.   And have you had any job that is
9 related to the time keeping for overtime since
10 year 2000?
11 A.   Now.
12 Q.   Now you do.  Okay.
13 A.   Uh-huh.
14 Q.   When did your job now --
15 A.   Two years.
16 Q.   Just let me finish the question.
17 A.   I'm sorry.
18 Q.   Sorry.  Because otherwise she
19 can't --
20 A.   Sorry.  Very sorry.
21 Q.   Then you don't know what you're
22 answering.
23 A.   Oh, see.  Sorry.
24 Q.   It's okay.

Page 11

Cynthia Lewis

1 So after the year 2000, when did
2 you then again work with overtime time sheets?
3 A.   This is '10, I came in the unit
4 March of 2009.
5 Q.   And you're still in the unit?
6 A.   Yes, I am.
7 Q.   Do you know how the time sheets
8 worked for the period between the year 2000 and
9 2009?
10 A.   Yes, sir.
11 Q.   And do correction officers receive
12 overtime if they do not submit overtime slips?
13 A.   No, they do not.
14 Q.   If a correction officer works
15 overtime and writes down all his sign-in/sign
16 out that he worked overtime but fails to put in
17 an overtime slip, will that correction officer
18 ever receive overtim ?
19 A.   No, he will not.
20 Q.   And normally how are correction
21 officers paid?
22 A.   What do you mean?
23 Q.   Yeah.  If an officer -- let's say,
24 an officer has a day shift --

Page 12

Cynthia Lewis

1 A.   Uh-huh.
2 Q.   -- and he doesn't work any
3 overtime in a two-week period --
4 A.   Uh-huh.
5 Q.   -- how is he paid?
6 A.   He does not work?
7 Q.   If he does not work any overtime?
8 A.   Straight pay.
9 Q.   Right. So I'm just asking how the
10 straight pay works.
11 A.   Based on your sign-in and out
12 sheet, if we see that it is documented that you
13 signed in and out, you will get straight pay.
14 Q.   That will be hourly pay for your
15 shift?
16 A.   Correct.
17 Q.   What is the length of the shift?
18 A.   What do you mean? It's a 40-hour
19 work week. They're custodial employees.
20 Q.   So are they paid for 40 hours?
21 A.   Correct.
22 Q.   And do you know what rate they're
23 paid the 40 hours?
24 A.   Well, it depends.

3 (Pages 9 to 12)

Page 13

Cynthia Lewis

Q. What does it depend on?

A. It depends on what time they came -- when they were employed with the department. All correction officers do not make the same rates.

Q. Is it based on the collective bargaining agreement?

A. Correct.

Q. But they're paid by the hour not by salary?

A. Well there's a basic salary and it's hourly, 40 hours.

Q. And --

A. Which is really New York City Personnel, not necessarily -- the collective bargaining with the union determines their raises, their salary is determined by New York City.

Q. And if a correction officer works more than 40 hours in a week is he entitled to overtime?

A. If he submits a slip, yes.

Q. And at what rate is he paid overtime if he submits a slip?

Page 14

Cynthia Lewis

A. Time and a half.

Q. And how is the time and a half calculated?

A. By the hour.

Q. And how do you calculate the hourly rate?

A. What do you mean? I'm not clear on what you mean by that.

MS. O'CONNOR: Objection to the extent we had a witness who testified as to the calculation of the hourly rate.

So you can answer if you know, but I'm just preserving for the record that we had somebody who testified to this.

A. Well, the hourly rate is still based on what the salary -- what the annual salary is. And because the person is a custodial worker, they will always receive time and a half. The only staff person that will not receive time and a half is a civilian 'cause they work a 35-hour work week.

Q. Okay. Are correction officers

Page 15

Cynthia Lewis

required to change into their uniforms prior to the start of their hourly shifts?

A. Definitely.

Q. And are they paid for the time period that they change into their uniforms prior to their shift commencing?

A. I wouldn't really know that because it's a part of their equipment for their safety and it's part of their training in the academy, so if they have to report to roll call, you know, with their attire, then I guess that's what they have to do.

Q. And you don't know if they're paid for that?

A. No, because I would think that it's included in their salary because of the 31 minutes.

Q. What's the 31 minutes?

A. When the officer reports to roll call at seven or at 11 or at 10:45, what have you, that's the transition time for them to report to roll call and then for them -- at the roll call for the 15 minutes for them to get to relief the officer. So technically there's a

Page 16

Cynthia Lewis

15-minute change in there, so to be exact about them changing their clothes or anything like that, I really couldn't answer that.

Q. Well do you know what the length of a daily shift is for a correction officer, standard shift?

A. 831 is their daily standard shift. Yes, sir.

Q. Eight hours and 31 minutes?

A. That's if they're in the command.

Q. How many hours a week do they work?

A. There's a five and two work week and there's a four and two work week. If they are five and two, they are compensated additional 11 hours and 20 minutes a month. If they four and two they lose two days because of the calendar year.

Q. But if you're a five and two do you work five eight hour and 31 minute shifts in a seven-day period?

A. From what I've witnessed, I've seen them work 831 but usually that depends on what type of five and two job that they're doing

4 (Pages 13 to 16)

Page 21

Cynthia Lewis

1
2      Q.   Well you said that people are paid
3  the hours that they work on their shift?
4      A.   Correct.
5      Q.   And if they work outside their
6  shift they only get paid for that if they submit
7  an overtime slip; is that correct?
8      A.   No, you said what now? Explain
9  that again.
10      Q.   If people work more than their
11  shift --
12      A.   Okay.
13      Q.   -- the only way they can be paid
14  more money is --
15      A.   Right
16      Q.   -- to put in an overtime slip?
17      A.   Correct, correct.
18      Q.   So if they changed into their
19  uniform and equipment before their shift and did
20  not put in an overtime slip, then they would not
21  be paid for that time; is that correct?
22      A.   No, because number one they
23  haven't submitted a slip and, no, they're not
24  compensated for that, you're right.
25      Q.   Okay. And if they changed out of

Page 22

Cynthia Lewis

1
2  their uniform after the end of their shift and
3  did not submit an overtime slip, then they would
4  not be paid for the time period after their
5  shift during which they changed out of their
6  uniform; is that correct?
7      A.   Correct, if they changed, you're
8  right.
9      Q.   Okay. And if an officer's shift
10  is more than 40 hours are they paid for the
11  hours over 40 at time and a half?
12      A.   If they submit a slip, yes, sir.
13      Q.   And if they don't submit a slip?
14      A.   Then they're not compensated.
15      Q.   Are they entitled to submit a slip
16  for -- like you had just said you thought the
17  schedule was 46 and a half hours, is that what
18  you felt the five and two schedule was?
19      A.   No, I've never thought anything
20  about the five and twos. You asked me a
21  question about the five and two.
22      Q.   Okay. Well I'll ask you, how many
23  hours a week --
24      A.   Exactly. You asked me --
25          MS. O'CONNOR: Let him finish.

Page 23

Cynthia Lewis

1
2      A.   Okay.
3      Q.   How many hours a week does an
4  officer work on a five and two when he works
5  eight hours and 31 minutes a day?
6      A.   Uh-huh. Sorry, I draw a blank.
7  I'm just sorry because in my head I'm thinking
8  of Saturday to Sunday. So I'm thinking of --
9  and when we speak of officers reporting for
10  duty, we -- the language is appearances. So a
11  four and two appear in a week to me almost the
12  same time as a five and two.
13      Q.   Right, because they're each
14  working five days in a seven-day period,
15  correct?
16      A.   Correct, right.
17      Q.   So if somebody works an eight hour
18  and 31 minute schedule each day or five days out
19  of a seven-day period, are they -- is that
20  schedule more than 40 hours in a week?
21      A.   That is. It was determined after
22  we did the numbers.
23      Q.   And are the officers always paid
24  time and a half for the hours they work over the
25  40 that is part of their schedule?

Page 24

Cynthia Lewis

1
2          MS. O'CONNOR: Objection.
3      A.   Well, put it to you like this, no,
4  and the reason why I'm saying no is because it
5  has to be something contractual. Has to be.
6      Q.   What has to be?
7      A.   That you're asking me, right, if
8  they work more than 40 hours and they're not
9  putting in a slip, then the thing is are we
10  practicing paying them time and a half whether
11  they submit a slip or not. That's what I'm
12  understanding from the questioning. So, if that
13  is the case, then there's an annual salary and
14  there has to be something contractual in place
15  for it. That's all I'm saying.
16      Q.   Do you review officers' sign-in
17  and sign-out sheets?
18      A.   Yes, sir when my timekeepers have
19  a complaint about certain employees never
20  signing in and out, yes.
21      Q.   So normally does the timekeeper
22  always review all time in/time out sheets of a
23  correction officer?
24      A.   That's how they're paid, so, yes,
25  sir.

6  (Pages 21 to 24)

Page 29

Cynthia Lewis

1   that would be straight pay for daytime hours.
2   If they work a midnight they are compensated for
3   midnight rate. If they work in the evening,
4   let's just say three to 11, they are also
5   compensated for an evening rate.
6       So on those -- and the last box
7   determine how they should be paid based on their
8   appearance of their tour.
9       Q. What does that mean, the
10  appearance of their tour?
11      A. Meaning that they're eight to
12  four, or they're five to one, or they're one to
13  nine that's the appearance of their tour.
14      Q. How does that effect how they're
15  paid?
16      A. How does it effect how they're
17  paid? Well their contractual agreement of their
18  salaries. But remember, by the rate they're
19  paid more.
20      Q. More than what?
21      A. Well, you get 10 percent for every
22  hour I believe it is that you work in an evening
23  or a midnight shift. And that's contractual by
24  the City of New York.

Page 30

Cynthia Lewis

1       Q. Right. There's a premium for
2   working the midnight shift?
3       A. Correct. Five to one, 5:00 a.m.
4   in the morning to one is considered midnight,
5   okay. One to nine is considered an evening. So
6   those rates, again the boxes on the side of the
7   time card, will indicate which rate to
8   compensate the employee so you can pay him his
9   overtime.
10      Because you cannot get compensated
11  if you work -- let's just say if I work a
12  midnight, 11 to seven, I would be compensated
13  for that. But if I go in to seven to three or
14  let's just say I did seven to three and I went
15  into the three to 11, I will not be compensated
16  extra money for overtime for the rate, for the
17  evening rate.
18      Q. Oh, so you're saying that if you
19  have a regular day shift and then you do
20  overtime during a midnight shift --
21      A. Right.
22      Q. -- you get your overtime at the
23  regular day rate?
24      A. Time and a half, correct.

Page 31

Cynthia Lewis

1       Q. Time and a half of your regular
2   day rate?
3       A. Correct.
4       Q. With no adjustment for doing
5   the --
6       A. Correct.
7       Q. -- night shift?
8       A. That's for all city employees of
9   New York, it's not just the officers.
10      Q. And what if you're normally doing
11  a midnight shift and you do overtime during a
12  day shift?
13      A. Correct. If you come in on the
14  midnight you will be compensated for the
15  midnight rate of the midnight, yes. Then you
16  would get your normal overtime in the day,
17  correct. They do change their tours.
18      Q. What I'm saying is, you get a
19  premium hourly rate for working a midnight tour?
20      A. Correct.
21      Q. And if after your midnight tour
22  you do a double shift and work a day tour --
23      A. Right, you just get the overtime.
24      Q. So that overtime would be a time

Page 32

Cynthia Lewis

1   and a half your normal premium midnight tour
2   rate?
3       A. No. Straight pay.
4       Q. It would be time and a half the
5   regular day rate?
6       A. Correct, correct. That's for all
7   city employees. That's a city -- that's a New
8   York City personnel thing, that has nothing to
9   do with them being officers.
10      Q. And on the time card what does it
11  show about overtime?
12      A. It has a code meaning the type of
13  overtime and also -- it's also coded in the rate
14  box which determines at what rate they should be
15  compensated.
16      Q. Does it show the hours of overtime
17  worked by the individual?
18      A. Sure, yes.
19      Q. And is that a weekly amount?
20      A. They don't work a weekly amount.
21  Usually they may do one six sometimes, depending
22  upon the command, some have done four six out of
23  their four-day working appearances, yes.
24      Q. But I mean the overtime is

8  (Pages 29 to 32)

**Cynthia Lewis**

1         **Cynthia Lewis**
2  calculated every two weeks?
3      A.   They're paid every two weeks.
4      **Q.   And so how --**
5      A.   You're always paid two weeks
6  before the week you worked.
7      **Q.   So they're paid their overtime**
8  **every two weeks?**
9      A.   Uh-huh.
10     **Q.   And that's calculated for the two**
11 **weeks prior?**
12     A.   Correct.
13     **Q.   And is the overtime calculated**
14 **over a one-week period?**
15     A.   Yes.  Every week -- yes, at the
16 end of the week it's calculated, correct, sir.
17     **Q.   And when the timekeeper -- does**
18 **the timekeeper review the overtime slips?**
19     A.   What do you mean by review them?
20     **Q.   Do they receive overtime slips?**
21     A.   Every day.
22     **Q.   Okay.  And who gives them the**
23 **overtime slips?**
24     A.   It comes from the control room.
25     **Q.   And who in the control room gives**

**Cynthia Lewis**

1         **Cynthia Lewis**
2  the timekeeper the time slips?
3      A.   After the captain documents all of
4  the overtime of what we call a tour
5  certification sheet, that tour certification
6  sheet along with the overtime slips are
7  submitted to personnel for compensation.  And
8  what they do is that they can't -- they do
9  review the slips because sometimes there may be
10 some discrepancies, so the tour certification
11 sheet along with the time sheet -- the time
12 slip, the overtime slip is reviewed together and
13 then they will go back to the tour commander to
14 ask, you know, just to clarify what they're
15 looking at on the overtime slips versus the tour
16 certification sheet.
17     **Q.   I'm not sure I'm following you.**
18 **So do the overtime slips sometimes not match up**
19 **with the tour certification sheet?**
20     A.   Correct, sir.
21     **Q.   So if they do not reconcile then**
22 **you send them back?**
23     A.   Correct.
24     **Q.   And what is exactly -- who fills**
25 **out the tour certification sheet?**

**Cynthia Lewis**

1         **Cynthia Lewis**
2      A.   The captain.  It's in the control
3  room.
4      **Q.   Sometimes is there an overtime**
5  **slip that is not reflected in the tour**
6  **certification sheet?**
7      A.   Yes, sir.
8      **Q.   What happens in that instance?**
9      A.   Well, when that happens it's given
10 back -- we go back to the control room to find
11 out why the overtime slip wasn't documented.
12 And either sometimes the employee will submit it
13 late, for whatever that employee's reasons, and
14 now we have to find out who authorized the
15 overtime and whether or not -- or which tour
16 certification sheet it belongs on in terms of a
17 late entry.  And then we compensate the
18 employee.
19     **Q.   Well let's use the example that**
20 **there is an overtime slip that's not on the tour**
21 **certification slip.  So the overtime slip has**
22 **been submitted in a timely manner but for some**
23 **reason is not reflected on the tour**
24 **certification?**
25     A.   It wasn't in a timely manner

Cynthia Lewis

1         Cynthia Lewis
2  that's why it's not on the tour certification
3  sheet.  That's what happened, it wasn't
4  submitted in a timely manner.  So the captain on
5  that tour, if he doesn't know who authorized
6  that overtime, he will not assume the
7  responsibility to pay the employee because he
8  needs to know where it came from in order to
9  code the overtime slip for payment.
10     **Q.   Is there ever a time that a**
11 **captain refuses to pass along an overtime slip?**
12     **MS. O'CONNOR:  Objection.**
13     A.   Not to my knowledge.
14     **Q.   But if a captain did not pass a**
15 **along an overtime slip to a timekeeper, the**
16 **timekeeper would not know that, correct?**
17     A.   Correct, would not.  And usually
18 at that time the staff, when they receive their
19 paycheck and the overtime is not compensated,
20 then they come to my office.
21     **Q.   Who comes to your office?**
22     A.   The officer.
23     **Q.   And they complain?**
24     A.   Of course.
25     **Q.   And have you ever had an officer**

Page 81

Cynthia Lewis

1
2    Q.   Then if you look further down in
3    the left side it says HRNT differential?
4       A.   Right, hourly night differential.
5       Q.   So that's the premium he gets for
6    working the night shift?
7       A.   Yeah, it looks like he do a three
8    to 11.
9       Q.   Then if you look further to the
10   right it says "comp time."
11      A.   That is not accurate.
12      Q.   Why is that not accurate?
13      A.   Because we never submit any time.
14   That's something that the City of New York
15   systems just generate and that's fixed.
16   Everybody now that works on Rikers Island has
17   the accurate amount of time balances on their
18   pay stubs.
19      Q.   But this is not accurate on this
20   pay stub?
21      A.   Nope.  It never was.
22      Q.   So when it says negative 8507,
23   what does that refer to?
24      A.   That's referring to 85 hours
25   and -- negative 85 hours and seven minutes,

Page 82

Cynthia Lewis

1
2    that's what it's referring to of comp time.
3       Q.   But that's not a correct number?
4       A.   No, it is not.
5       Q.   So was that a computer error?
6       A.   That's something that the City of
7    New York never computed.
8       Q.   So this does not indicate that he
9    does actually have negative --
10      A.   Correct.
11      Q.   -- 85 hours?
12      A.   Correct.
13      Q.   And what about the --
14      A.   The vacation time, the negative
15   200 hours and 57 minutes and 31 minutes.
16      Q.   Is there an error also?
17      A.   Of course.
18      Q.   What does this say, "Pers LV H&M,"
19   what does that describe?
20      A.   Where are you?
21      Q.   Personal leave something?
22      A.   Right, it's in accurate.
23      Q.   What does it stand for, Pers LV
24   H&M?
25      A.   That's a part of comp time because

Page 83

Cynthia Lewis

1
2    they -- it's two different rates of comp time
3    can be paid.  Meaning holiday versus actual comp
4    time.
5       Q.   And what the --
6       A.   That's personal leave which, like
7    I said, you know, if I had the time card you
8    can -- I can explain it best, but it's personal
9    leave.  Like I said, those numbers are
10   inaccurate period.  That something that comes
11   from the systems of the PMS management systems.
12      Q.   Has that been fixed since?
13      A.   Yes, we're on CityTime.  Only
14   Rikers Island, not the borough jails.
15      Q.   That was fixed by CityTime?
16      A.   Yes.
17      Q.   If you look down the left bottom
18   it says 20 YRIB 414HS, do you know what that
19   description stands for?
20      A.   Uh-huh, that's their pension.
21      Q.   That's the pension?
22      A.   Uh-huh.
23      Q.   And then it says G-CBP-EMPE?
24      A.   That's their medical preference.
25   It's up to them whether they want it or not.

Page 84

Cynthia Lewis

1
2       Q.   Okay.  And then if you look to the
3    right there's another description that says,
4    "20YRIPB health"?
5       A.   That's their union.  That's the
6    union, something with the union there.  How many
7    years.
8       Q.   And is that an insurance fee?
9       A.   That's -- 20 years to me that's
10   something contractual with the union.  That's
11   something that they do with their union,
12   whatever negotiations the union in terms of
13   added for their health insurance.  It could be
14   medicine, I don't know.
15      Q.   If you look at the second page of
16   Plaintiffs' Exhibit 2, do you see on this one
17   on the far left it has something called "holiday
18   premium?"
19      A.   Right.  Holiday premium is only
20   given to civilians not officers.
21      Q.   Was Immanuel Washington paid a
22   holiday premium?
23      A.   It could have been something that
24   was owed him -- you know what this is?  This is
25   when they get -- this is July, they all get

21 (Pages 81 to 84)

Page 85

Cynthia Lewis

1  that. All correction officers get that once.
2  They get it twice a year. They get it July and
3  they get it I think December.
4  Q.  And that's the part of the
5  collective bargaining agreement?
6  A.  Correct, because they work on
7  holidays, that's what that premium is.
8  Q.  Then that shows up in the paycheck
9  twice a year?
10 A.  Yes.
11 Q.  And if a correction officer works
12 overtime during the period that he receives the
13 holiday premium, does his overtime rate reflect
14 the holiday premium?
15 A.  He gets time and a half, yes.
16 Q.  Is it higher than if he was not
17 working during a holiday premium period?
18 A.  The reason why he wouldn't get
19 more is because they already compensated him
20 whether he works or not, they receive that. It
21 doesn't matter. That's in their collective
22 bargaining. They get that money whether they
23 work it or don't work it.
24 Q.  Okay. So if a correction

Page 86

Cynthia Lewis

1  officer --
2  A.  So you'll be double compensating
3  him.
4  Q.  If a correction officer works
5  overtime during a period in which he's paid the
6  holiday premium, is he paid at a higher rate --
7  A.  No.
8  Q.  -- because of the holiday premium?
9  Just wait 'til I finish my
10 question for the court reporter --
11 A.  Okay.
12 Q.  -- and then answer.
13 A.  Okay.
14 Q.  I'm just trying to help her.
15 A.  Okay.
16 Q.  And once again, what is it when it
17 says "service long ED"?
18 A.  Longevity. That means they are
19 compensated for longevity. Every city employee
20 gets longevity based on their -- like officers,
21 I believe it's the fifth or the sixth year and
22 for civilians it's the 15th year.
23 Q.  And is that incorporated into the
24 overtime rate that an officer receives?

Page 87

Cynthia Lewis

1
2  A.  No, it's a gift from the city.
3  MR. RAND: I would like to mark
4  Plaintiffs' Exhibit 3.
5  (Whereupon, electronic pay stub
6  for Warren Swain, was marked as
7  Plaintiffs' Exhibit 3 for
8  identification, as of this date.)
9  Q.  Do you recognize what has been
10 marked as Plaintiffs' Exhibit 3?
11 A.  Again, the electronic pay stub.
12 Q.  Do you know who these are pay
13 stubs for?
14 A.  Let me see. It looks like I
15 guess -- it's not saying the title of the
16 person. On these checks it doesn't give you a
17 title, so it's the same as the one you presented
18 to me.
19 Q.  Well it gives a name, correct?
20 A.  Where is the name? Or Warren, I
21 think, it's Swain, Warren.
22 Q.  I think his name is actually
23 Warren Swain. I think Swain is his last name.
24 Do you know whether the last name and the first
25 name are listed on these pay stubs?

Page 88

Cynthia Lewis

1
2  A.  Yes, I guess Washington, Immanuel,
3  yeah.
4  Q.  So Swain is his last name on this
5  pay stub?
6  A.  I would say.
7  I mean I don't know him but, you
8  know...
9  Q.  Do you recognize these as being
10 the standard pay stubs?
11 A.  Yes.
12 Q.  Do you see on Mr. Swain's pay
13 stubs he also has negative numbers for comp
14 time?
15 A.  Yes.
16 Q.  Are these incorrect numbers?
17 A.  Yes.
18 Q.  Was this the standard problem for
19 all the correction officer's pay stubs during
20 this period?
21 A.  Any city employee, not just
22 officers, everybody.
23 Q.  And the period that this problem
24 occurred was before --
25 A.  CityTime.

22  (Pages 85 to 88)

# EXHIBIT AA

## CORRECTIONS TO DEPOSITION

**Directions:** As you read your deposition, if you have any corrections to make, please itemize them below. Upon completion, follow the instructions in the cover letter.

Date of Deposition:   February 28, 2011

Person Deposed:     Cynthia Lewis

| PAGE | LINE | EXPLANATION/CHANGE |
|------|------|---------------------|
| 31 | 24 | Original Testimony: "Right, you just get the overtime."<br><br>Corrected Testimony: "Right, you just get the overtime that includes the night shift differential."<br><br>Reason for Change: Clarify that the overtime calculation for a Correction Officer is based on the rate paid for the tour to which the overtime is attached. |
| 32 | 4 | Original Testimony: "No. Straight Pay."<br><br>Corrected Testimony: "Yes."<br><br>Reason for Change: After reviewing the collective bargaining agreement covering Correction Officers, witness learned that her Original Testimony was incorrect. |
| 32 | 7-10 | Original Testimony: "Correct, Correct.  That's for all city employees.  That's a city – that's a New York City personnel thing, that has nothing to do with them being officers."<br><br>Corrected Testimony: "No."<br><br>Reason for Change: After reviewing the collective bargaining agreement covering Correction Officers, witness learned that her Original Testimony was incorrect. |

Sworn to before me this

_18th_ day of _Mal_, 20__

MOSES S. WILLIAMS
Commissioner of Deeds
City of New York No. 2-12722
Certificate Filed in New York County
Commission Expires July 1, 20__

_____
NOTARY PUBLIC

_____
Cynthia Lewis

EXHIBIT BB

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK
------------------------------------------------------------------ x
ERIC EDWARDS, Individually and on Behalf of All
Other Persons Similarly Situated,

                                       Plaintiffs,     **AFFIDAVIT**

                 -against-

THE DEPARTMENT OF CORRECTION OF THE      08 Civ. 3134 (DLC)
CITY OF NEW YORK and THE CITY OF NEW
YORK,

                            Defendants.

------------------------------------------------------------------ x

     **IRA KLEINBURD**, being duly sworn deposes and says:

     1.    I have been employed by the New York City Department of Corrections since 1979.   I am currently Assistant Director of Personnel and have held this position since approximately 2007.   My duties and responsibilities include supervising the payroll, timekeeping and auditing unit.

     2.    This affidavit is based on my own personal knowledge and the books and records of DOC.  I submit this affidavit in support of defendant's motion for Summary Judgment and in opposition to plaintiffs' Motion for Summary Judgment in the above-captioned action.

     3.    I was deposed in connection with this action on October 14, 2010 as a Rule 30(b)(6) witness regarding payroll procedures and this affidavit serves to supplement that testimony.

     4.    I have been advised that plaintiffs claim that they are not paid the applicable Night Shift Differential when they work overtime.  This claim is incorrect.

5.      The Payroll Management System ("PMS") is the system the City of New York uses to pay all of its employees, which includes plaintiffs.

6.      DOC employees are paid on a bi-weekly basis.

7.      The pay period is also referred to as the Regular Gross Period.  The Regular Gross Period begins on a Sunday and ends on a Saturday two weeks later.  The paycheck covering the Regular Gross Period is issued on the Friday following the end of the Regular Gross Period, i.e. Saturday.

8.      The actual payroll calculation process is referred to as Pay Calculation ("Pay Calc").

9.      The second week of the Regular Gross Period is referred to as the Anticipatory week because the City pays its employees their regular base salary for that week even though the timekeepers do not have the timesheets for that week until after Pay Calc has occurred.  The City "anticipates" that its employees will work their regularly scheduled hours during this week.

10.     Timesheets for employees are submitted after the week it covers is over, usually the Monday after the end of the previous workweek.

11.     Pay Calc is performed at midnight on Saturday at the end of the Regular Gross Period. The timesheets for the second work week (i.e. the Anticipatory week) of the Regular Gross Period are received by timekeepers on or after the following Monday.  If the timesheets covering the Anticipatory week include overtime worked, it will then be included in the very next Pay Calc processing and therefore included in their next pay check.

12.     In short, overtime earned during week 1 of the Regular Gross Period will be included in the paycheck covering that Regular Gross Period and overtime earned during week 2

(i.e. the Anticipatory week) will be paid in the paycheck covering the following Regular Gross Period.

13.     Pursuant to the collective bargaining agreement in place between the City of New York and the union representing Correction Officers, there is a 10% night shift differential which is paid to Correction Officers assigned to tours of duty for all work actually performed between the hours of 4:00 p.m. and 8:00 a.m., provided that more than one (1) hour is actually worked after 4:00 p.m. and before 8:00 a.m.

14.     Where overtime compensation is to be calculated for tours in a Correction Officer's regular duty chart, the overtime calculation is based on the rate paid for the tour to which the overtime is attached.

15.     By way of example, Test Plaintiff Michael Crivera's regularly scheduled tour is 11 p.m. to 7:31 a.m., i.e. the "midnight tour," and therefore he receives a 10% night shift differential in his regularly recurring salary.

16.     When Test Plaintiff Crivera works  hours in excess of his regularly scheduled tour, his compensation for of the hours and minutes of overtime worked is calculated at time and-one-half his rate of pay, which includes the 10% night shift differential.

17.     This is evidenced by Test Plaintiff Crivera's Pay Details Report, which is annexed to the Declaration of Andrea O'Connor, dated April 29, 2011, as Exhibit HH.

18.     In reading this Pay Detail Report, the column titled "Date Paid" represents the date on which the paycheck covering this Regular Gross Period was issued.  The column titled "Earned Date" is the date on which the overtime pay was earned.  The column titled "Event Type" is the numeric code that corresponds to the column titled "Event Description."  The column titled "Event Description" refers to the "positive" or "negative" exception that can either increase or

decrease the correction officer's gross salary.  The payment of overtime is a "positive" exception.

The column titled "Amount" is the dollar amount paid in connection with the corresponding event

code/event description.  The column titled "Hours" is the number of hours worked in connection

with the corresponding event code/event description.  See Exhibit HH, Pay Details Report of

Michael Crivera.

19.     The event code 1406 refers to the event description "OT Night," i.e.

"Overtime Night," which is used when a correction officer who is entitled to the 10% night shift

differential works overtime.  Event code 1350 is the companion code to 1406 and refers to the

event description "OT NT COM CD," i.e. "Paid Overtime Night Rate Companion Code."

20.     By way of example, on July 3, 2008, Test Plaintiff Crivera worked 8 hours

of overtime in excess of his regularly scheduled midnight tour for which he was paid a total of

$168.16, i.e. $159.39 (code 1406) plus $8.77 (code 1350), which is one and-one-half times Test

Plaintiff Crivera's regular rate of pay, including the applicable night shift differential as specified

within the collective bargaining agreement covering correction officers.

21.     Therefore, as evidenced by the above-example utilizing Test Plaintiff Crivera, when a Correction Officer, who is assigned a regular duty tour for which he is entitled to the 10% night shift differential, works overtime, the overtime calculation is based on his rate of pay that includes the applicable night shift differential.

Dated:      New York, New York
            April 26, 2011

_____
                                    IRA KLEINBURD


Sworn to before me this 28 day of April, 2011

_____
Notary Public

DAVID C. PARNER
NOTARY PUBLIC, State of New York
No. 4T-5003174
Qualified in Queens County
Commission Expires 19 OT 2014

# EXHIBIT CC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK
-------------------------------------------------------------------- x
ERIC EDWARDS, Individually and on Behalf of All
Other Persons Similarly Situated,

                                         Plaintiffs,     **AFFIDAVIT**

                -against-

THE DEPARTMENT OF CORRECTION OF THE        08 Civ. 3134 (DLC)
CITY OF NEW YORK and THE CITY OF NEW
YORK,

                                 Defendants.

-------------------------------------------------------------------- x

      **CYNTHIA LEWIS**, being duly sworn deposes and says:

      1.     I have been employed by the New York City Department of Corrections since 1984. I am currently Supervisor of Personnel at Anna K. Marie Kross facility and have held this position since 2008 and have served in a supervisory capacity in DOC's personnel office for 22 years.  My duties and responsibilities include supervising payroll, timekeeping and scheduling for uniformed members of service.

      2.     This affidavit is based on my own personal knowledge and the books and records of DOC. I submit this affidavit in support of defendant's motion for Summary Judgment in the above-captioned action.

      3.     I was deposed in connection with this action on February 28, 2011 as Rule 30(b)(6) witness regarding timekeeping procedures and this affidavit serves to supplement that testimony.

      4.     During my deposition on February 28, 2011, I was asked a series of questions regarding the 10% night shift differential paid to Correction Officers.

5.      That testimony is as follows:

> Q:      And what if you're normally doing a midnight shift and you do overtime during a day shift?
>
> A:      Correct. If you come in on the midnight you will compensated for the midnight rate of the midnight, yes. Then you would get your normal overtime in the day, correct. They do change tours.
>
> Q:      What I'm saying is, you get a premium hourly rate for working a midnight tour?
>
> A:      Correct.
>
> Q:      And if after your midnight tour you do a double shift and work a day tour - -
>
> A:      Right, you just get the overtime.
>
> Q:      So that overtime would be a time and a half your normal premium midnight tour rate?
>
> A:      No. Straight pay.
>
> Q:      It would be time and a half the regular day rate?
>
> A:      Correct, correct. That's for all city employees. That's a city - - that's a New York City personnel thing, that has nothing to do with them being officers.

6.      However, at the time of my deposition, I did not know if the 10% night shift differential was included in the calculation of overtime pay when an officer, who is assigned a tour to which the differential attaches, works overtime and therefore should not have answered the above-quoted questions as I did.

7.      After reviewing the transcript of my deposition, I consulted the collective bargaining agreement that is applicable to DOC Correction Officers and, after reviewing the agreement, I learned that where overtime compensation is to be calculated for tours in a

Correction Officer's regular duty chart, the overtime calculation is based on the rate paid for the tour to which the overtime is attached.

        8.    Therefore, when a Correction Officer who is assigned a regular duty tour for which he is entitled to the 10% night shift differential works overtime, the overtime calculation is based on his rate of pay which includes the 10% night shift differential.

        9.    In an effort to correct my testimony, on April 18, 2011 I executed an errata sheet which corrected the errors I made in my testimony.  That errata sheet is annexed hereto as Appendix A.

Dated:      New York, New York
              April 28, 2011

MOSES S. WILLIAMS
Commissioner of Deeds
City of New York No. 2-12722
Certificate Filed in New York County
Commission Expires July 1, 20__

_____
CYNTHIA LEWIS

Sworn to before me this 28 day of April, 2011

_____
Notary Public

# EXHIBIT DD

**LAW OFFICE OF WILLIAM COUDERT RAND**
228 East 45th Street, 17th Floor
New York, New York 10017
(Phone) 212-286-1425; (Fax) 646-688-3078
email: wcrand@wcrand.com

BY HAND

March 18, 2011

Andrea O'Connor, Esq.
The City of New York Law Department
Labor and Employment Law Division
100 Church Street
New York, N.Y. 10007
Tel.: (212) 788-0879

## ENCLOSURE OF DEPOSITION TRANSCRIPTS FOR REVIEW AND SIGNING

Re:     *Edwards et al. v. City of New York*, 2008 Civ. 3134, (DLC) (GWG)

Dear Andrea:

I am hereby enclosing the transcripts of the deposition of Cynthia Lewis taken on February 28, 2011. Please have your client review the transcript, if necessary fill out an errata sheet, and then sign the transcripts before a notary and return it to me within 30 days pursuant to Rule 30 of the Federal Rules of Civil Procedure.

Sincerely,

William C. Rand

Enc.

# EXHIBIT EE



# THE NEW YORK CITY LAW DEPARTMENT
# WORK REQUEST



MESSENGER'S
Initials: _____

TIME/DATE STAMP
FRONT DESK INITIALS    TRACKING #: _____

| REQUESTOR'S NAME: Andrea O'Connor | ID #: | DIVISION: LE | ROOM #: 2-146 | PHONE #: |
|---|---|---|---|---|
| CASE NAME: Edwards | Matter #: | DOCUMENT TYPE: Lewis - Errata Sheet | | |

☐ **SERVE**

OUTSIDE DEADLINE: _____

NO. OF COPIES: _____

☐ PERSONAL SERVICE REQUIRED BY LAW

Nail & Mail   ☐ YES   ☐ NO

☐ SERVICE BY MAIL  ☐ OVERNIGHT MAIL

Affidavit of Service? ☐ YES   ☐ NO

☐ **FILE**

COURT FILING DEADLINE: _____

NO. OF
COPIES: _____

NO. OF SERVICES FOR THIS FILING: _____

☐ 2nd Circuit filing - PDF of Affidavit of service required

Receipt for Delivery? ☐ YES ☐ NO

☒ **DELIVER**

OUTSIDE DEADLINE: __3|18__

Description of Item(s) (letter, redwell, etc.)

Receipt for Delivery? ☒ YES   ☐ NO

**SPECIAL INSTRUCTIONS:**

**COMMENTS:**

**(PLEASE COMPLETE ALL INFORMATION REQUESTED)**

TO / FROM:

Name: William Rand        Telephone: _____

Firm/Agency: _____    Room: _____

Attorney for the

Address: 208 E. 45ᵗʰ St., 17ᵗʰ Fl

NM NY

**RECEIVED BY:**

Print Name: R. Malone        Date: _____

Signature: _____        Time: _____

**PROCESS & COURIER SERVICES SECTION (212) 788-1615** 2nd Circuit filing

# EXHIBIT FF



**Citywide Administrative Services**

# 2011

## JANUARY

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   |   |   | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 |   |   |   |   |   |

## FEBRUARY

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 |   |   |   |   |   |

## MARCH

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 |   |   |

## APRIL

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   |   | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |

## MAY

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 |   |   |   |   |

## JUNE

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   | 1 | 2 | 3 | 4 |
| 5 | 6 | 7 | 8 | 9 | 10 | 11 |
| 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 |
| 26 | 27 | 28 | 29 | 30 |   |   |

## JULY

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   |   | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 |   |   |   |   |   |   |

## AUGUST

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 |   |   |   |

## SEPTEMBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 |   |

## OCTOBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   |   |   | 1 |
| 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| 16 | 17 | 18 | 19 | 20 | 21 | 22 |
| 23 | 24 | 25 | 26 | 27 | 28 | 29 |
| 30 | 31 |   |   |   |   |   |

## NOVEMBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 |   |   |   |

## DECEMBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

## *HOLIDAYS*

**New Year's Day**
Friday, December 31st 2010
*Observed*

**M.L. King, Jr's Birthday**
Monday, January 17th

**Lincoln's Birthday**
Saturday, February 12th
*Designated as floating Holiday*

**President's Day**
Monday, February 21st

**Memorial Day**
Monday, May 30th

**Independence Day**
Monday, July 4th

**Labor Day**
Monday, September 5th

**Columbus Day**
Monday, October 10th

**Election Day**
Tuesday, November 8th

**Veterans Day**
Friday, November 11th

**Thanksgiving**
Thursday, November 24th

**Christmas**
Monday, December 26th
*Observed*

*When a holiday falls on a Saturday, it shall be observed on the preceding Friday. When a holiday falls on a Sunday, it shall be observed on the ensuing Monday.*

■ **PAYDAY**    **HOLIDAY**

# EXHIBIT GG



**THE CITY OF NEW YORK**
OFFICE OF THE MAYOR
NEW YORK, N.Y. 10007

**STANLEY BREZENOFF**
**First Deputy Mayor**

### ADMINISTRATIVE ORDER

TO:     Agency Heads and Administrative Heads
        of All Covered Organizations

FROM:   Stanley Brezenoff, First Deputy Mayor

RE:     COMPLIANCE WITH FEDERAL OVERTIME LAWS

DATE:   March 17, 1986

---------------------------------------------------------------------

    This Order shall be an interim Order covering important
provisions of the Fair Labor Standards Act ("FLSA") and
implementing preliminary changes in the City's overtime procedures
and practices.

    The 1974 Amendments to the FLSA for the first time fully
included public employers within the purview of the Act; however,
the constitutionality of the law was challenged and in the National
League of Cities v. Usury, the U.S. Supreme Court struck down the
application of the law to state and local governments.   In
February, 1985, the Supreme Court reversed its position and in San
Antonio Metropolitan Transit Authority v. Garcia found that the
application to state and local governments was constitutional.
Congress subsequently enacted the 1985 Amendments to the FLSA which
require the City to comply with the Act as of April 15, 1986.   A
copy of the 1985 Amendments is attached hereto as Appendix A.
Under the Act, employees are categorized as covered (nonexempt) or
not covered (exempt).

-2-

A Citywide FLSA Task Force consisting of the Director of the
Office of Municipal Labor Relations, the Corporation Counsel, the
City Personnel Director, the Director of Operations and the Budget
Director has reviewed, evaluated and made recommendations to the
Mayor on questions of policy regarding this Order.   Additionally,
an FLSA Unit has been established at OMLR to coordinate
implementation and compliance with the Act and this Order.

Each agency shall have an FLSA Coordinator who is responsible,
along with the Agency Head, for all record keeping, implementation
and compliance with the FLSA and this Order.   The Coordinators
will be working closely with the FLSA Unit of OMLR and the
Citywide Task Force.

Requests for further information should be directed to the
FLSA Unit of the Office of Municipal Labor Relations, at (212)
618-8266 or (212) 618-8403.

## COMPLIANCE ACTIONS

To achieve compliance with the FLSA the following steps shall
be taken immediately.

First, effective immediately, all voluntary and involuntary
overtime which requires an employee to work beyond forty (40)
hours in any City established 7 day work period shall be
eliminated for all employees covered by the Fair Labor Standards
Act unless such work is (1) an emergency relating to the
protection of life, limb or property of the citizens of New York,
(2) of significant fiscal impact on the City, or (3) is otherwise
authorized pursuant to the terms of this Order.   (This does not
apply to employees who are not eligible for overtime under the
Act, collective bargaining agreement or other pertinent City
directives).

Directives to work overtime must be issued pursuant to the
terms of Executive Order 82 (July 26, 1973), Section 7(j),
Executive Order 56 (April 2, 1976), Personnel Order 78/12 (January
13, 1978) and Mayoral Directive 78/12 (May 9, 1978) which require
written authorization by the Agency Head or person(s) designated
in writing by the Agency Head.   Copies of these are attached as
Appendix B.

Note:   The City's current methodology for calculating overtime
is different from the FLSA formula.   The overtime ("regular")
rate, as required by the Act, must include such benefits as night
shift differential, holiday pay, on-call pay, and under certain

circumstances traveling expenses, etc.   The inclusion of these
additional items will obviously increase the City's overtime cost
as the current Citywide formula does not include all of the above
benefits as part of the base pay on which  the overtime rate is
calculated.

   Second, pursuant to the Act once overtime is performed by ·
nonexempt (covered) employees, compensatory time should be granted
under the following circumstances:

## I.  FOR CIVILIAN EMPLOYEES NOT PERFORMING FIRE PROTECTION AND LAW ENFORCEMENT FUNCTIONS.

   A.   Up to 40 hours worked in an established 7 day period in
        accordance with the appropriate collective bargaining
        agreement or other pertinent City directive.

   B.   In excess of 40 hours actually worked in a City-
        established 7 day work period in accordance with the
        appropriate collective bargaining agreement or other
        pertinent City directive at the rate of time and one-half
        for hours actually worked.  Note, the FLSA permits the
        accrual of compensatory time up to 240 hours (160 hours
        of overtime at time and one half equals the 240 hour
        cap).  This cap is a rolling cap which begins on April
        15, 1986 and is maintained during the term of an
        individual employee's employment.

        Such compensatory time is only allowed by the FLSA if
        such benefit is provided by collective bargaining
        agreement, memorandum of understanding, other agreement
        between the City and a certified bargaining unit, or any
        prior understanding or agreement in place prior to the
        performance of the overtime performed.

## II. FOR EMPLOYEES PERFORMING FIRE PROTECTION AND LAW ENFORCEMENT FUNCTIONS.

   A.   Up to 171 hours for uniformed police and correction
        personnel and 212 hours for uniformed fire protection
        personnel in an established 28 calendar day period.  Such
        overtime compensation must be made in accordance with the
        appropriate collective bargaining agreement, or other
        City directive.

-4-

B.   Overtime in excess of 171 hours actually worked for
uniformed police and correction personnel and 212 hours
actually worked for uniformed fire protection personnel in
an established 28 day period. When such overtime is
performed it must be paid in accordance with the
appropriate collective bargaining agreement or other City
directive at the rate of time and one half for hours
performed. Note, the FLSA permits compensatory time up to
480 hours (320 hours at time and one-half equals the 480
hour cap). This cap is a rolling cap which begins April
15, 1986 and is maintained during the term of employment.

Such compensatory time is allowed by the FLSA if such
benefit is provided by collective bargaining agreement,
memorandum of understanding, other agreement between the
City and a certified bargaining unit, or any prior
understanding or agreement in place prior to the
performance of the overtime.

The 28 day calendar period for police, correction and fire
protection personnel will commence on April 15, 1986.

Agency Heads and their FLSA Coordinators should be aware that
the threshold for overtime payments under the FLSA is 40 hours of
actual work in a City established 7 day period. The Citywide
Agreement, as well as other collective bargaining agreements, uses
time in pay status (i.e., paid sick leave and annual leave) to
calculate overtime rather than hours actually worked.

Third, Agency Heads and their FLSA Coordinators will take
measures to see that employees are properly classified as exempt
(noncovered) or nonexempt (covered) under the terms of the FLSA as
outlined in this Order. Attached as Appendix C is a partial list
of job titles and classifications which are generally covered by
the FLSA and for which overtime pay must be given for hours worked
in excess of 40 hours of actual work in a City established 7 day
work week. Also attached is Appendix D, a partial list of job
titles and classifications which are generally exempt (noncovered)
from the FLSA. There will be further additions and/or deletions
to these lists of which you will be notified.

-5-

Fourth, working time of nonexempt (covered) employees must be carefully scheduled and monitored to avoid unpaid overtime claims. Nonexempt employees may not start work before the workday commences or continue work after the workday has terminated.  Agency Heads and their FLSA Coordinators must ensure that each nonexempt (covered) employee records his starting time at the beginning of the scheduled work day and at the authorized finishing time. Clerical staff must be given at least one-half hour for lunch or meal period, or a longer period if required by competent authority (e.g. collective bargaining agreement), uninterrupted by job duties and should be encouraged to leave their work stations to avoid incidental work such as answering telephones.  Employees directed to work during their lunch period must be so authorized in writing by the Agency Head or a representative of the Agency Head who has been delegated authority in writing by the Agency Head.  A copy of a model Lunch or Meal Period Work Authorization form is attached hereto as Appendix E.  Working time should be examined in accordance with the rules set forth in this Order to minimize unnecessary liability.

Fifth, there is an agency responsibility to keep adequate records on wages, hours, sex, occupation and other terms and conditions of employment.  The following information must be maintained for covered employees:

- Name, home address, and birth date for employees under 19 years of age;

- Social Security Number;

- Sex and occupation;

- Hour and day work period begins;

- Regular hourly rate for any week when overtime is worked;

- Total daily or weekly straight time earnings;

- Total overtime pay for the workweek;

- Deductions or additions to wages;

- Total wages paid each pay period; and

- Date of payment and pay period covered.

-6-

All records must be maintained for at least a three (3) year period.

Sixth, the creation of three different compensatory time banks must be established: 1) all pre-FLSA prior to April 15, 1986 compensatory time; 2) post-April 14, 1986 non-FLSA compensatory time earned under 40 hours of time actually worked per week; and 3) post-April 14, 1986 FLSA compensatory time earned after 40 hours of time actually worked per week.  This will be necessary to implement the Act and will also enable the City to control the granting of compensatory time and overtime costs associated therewith by isolating the more expensive post-April 14, 1986 FLSA overtime. For cost control purposes, a bank of cash overtime paid pursuant to the Act will also be maintained.

### EXEMPT, NONEXEMPT, AND NONCOVERED EMPLOYEES

The following guidelines are to be applied to determine the exempt (noncovered) or nonexempt covered status of employees under the FLSA.  Employees who are not exempt under the following guidelines are covered by the Act.

The FLSA generally requires overtime payment for all time worked in excess of 40 hours in a City established 7 day period for nonexempt employees covered by the Act.  Special rules outlined on page 3 hereto exist for law enforcement and fire protection personnel.

The following categories of workers are not covered by the FLSA and the City may maintain its current overtime practices:

- elected officials

- personal staff of elected officials who have daily contact  with such officials

- appointees of elected officials who serve on a policy-making level and have immediate and personal contact with such officials (i.e., Deputy Mayor, Commissioner, etc.)

- counsel to elected officials

- bona fide volunteers

- independent contractors

-7-

Other categories of employees who are exempt from the overtime provisions under the FLSA include:

- professional employees:  1) paid $250 or more per week on a salary basis; primarily performs work requiring advanced learning or work as a teacher in an activity of imparting knowledge, which requires the consistent exercise of discretion and judgment; or 2) artistic work that requires invention, imagination, or talent in a recognized field of artistic endeavor

- administrative employees:  paid $250 or more per week on a salary basis; 1) performs responsible office or nonmanual work directly related to management policies or general business operations or responsible work that is directly related to academic instruction or training carried on in the administration of a school system or educational establishment and such primary duty includes work requiring the exercise of discretion and independent judgment

- executive employees:  1) paid $250 or more per week on a salary basis; 2) duties primarily involve management of the agency or subdivision; 3) employee regularly directs the work of at least two or more employees

- recreational employees:  who are employed by a recreational establishment which does not operate for more than seven months in a calendar year or which has average receipts for any six month of the year not more than 33 1/3% of the average receipts for the remaining six months.  (This potentially includes municipal stadiums, amusement parks, tennis courts, golf courses, parks, gymnasiums, outdoor swimming pools, zoos, museums, camps, beaches, and other seasonal recreational programs).

- Other questions:  Consult with the FLSA Unit at OMLR.  See 29 CFR Part 541 attached hereto as Appendix F for the basic definitions for the exemptions.

-8-

For exempt (or noncovered) employees, the City is free to continue its present overtime and compensatory time policies. Consequently, all exempt (or noncovered) employees shall not be subject to the overtime provisions of this Order, but may be subject to the relevant overtime provisions in collective bargaining agreements and the like.

Agency Heads and the agency FLSA coordinators, in conjunction with OMLR and the Citywide Task Force, will be responsible for ensuring that individual worker's job duties are examined to determine whether he or she is an exempt or covered worker. Employees in the executive and managerial pay plans are exempt as are other professional, supervisory and administrative employees. However, the mere label or the personnel description attached to a job title does not make the employee exempt. Application of the exemption depends on the actual job duties of the worker.

Any questions regarding these exemptions should be directed to the FLSA Unit at OMLR. A final determination will be made by OMLR in consultation with the Citywide FLSA Task Force.

WORKING TIME

Employees must be paid at least the minimum wage of $3.35 an hour for all hours worked. Unless otherwise specified by the appropriate agency head, effective April 15, 1986, the work week for all employees, except fire protection and law enforcement personnel, is defined as the seven calendar days beginning at 12:00 Midnight Sunday and ending 12:00 Midnight the following Sunday (168 hour work week). Any deviation from this work week must be reported immediately to the FLSA Unit at OMLR.

Overtime compensation at time and one-half for all hours actually worked in excess of 40 hours in a City established 7 day work week is generally required for all covered, nonexempt employees (note, there are special rules for law enforcement and fire protection personnel). Overtime pay is not required when employees work more than 8 hours a day; it is only required when they actually work more than 40 hours in a City established 7 day week unless covered by a collective bargaining agreement or other pertinent City directive which provides a greater benefit.

It is the duty of management to exercise strict control of its employees and to see that work is not performed if management does not wish that it be performed. The mere promulgation of a rule against unauthorized work will not be sufficient. It is incumbent upon the Agency head and the agency FLSA Coordinator to ensure enforcement of the rule. The following discussion will help you determine what constitutes working time which requires payment of wages.

-9-

### a.   Waiting Time

Employees must be compensated for all waiting time while on duty unless (1) the employee is completely relieved from duty and allowed to leave the job, or (2) the employee is relieved until a definite specified time and the period is long enough for the employee to use as he or she sees fit.

### b.   On-Call or Standby Time

If employees must remain on the employer's premises or so near that they cannot use the time freely, this may be compensable working time. Time for those employees who can come and go, although required to leave a telephone number, usually would not be compensable work time. Employees whose work requires them to be regularly on-call or on standby should be provided with beeper equipment at City expense to avoid liability.

### c.   Rest Periods

Rest periods are counted as compensable working time if they last 20·minutes or less. Thus, coffee breaks and snack times are compensable. Rest periods in excess of 20 minutes may or may not be compensable depending on the freedom of employees to use the time as they please.

### d.   Meal Time

Meal times are compensable unless they: (1) generally are at least 30 minutes long; and (2) the employees are relieved of all duties including answering the telephone; and (3) employees are free to leave their duty posts. Meal periods of guards, firefighters, police, and other public safety employees on call more than 24 consecutive hours is working time unless excluded by express or implied agreement. Note, uniformed police, fire and correction personnel are already provided with a paid meal period as part of their work day. Henceforth, all employees except uniformed police, fire and correction personnel shall be encouraged to leave their work stations, and perform no work tasks during lunch time. Assigned lunch or meal periods for each employee should be conspicuously posted in the work location and adhered to strictly. Work during the assigned lunch or meal period must be authorized in accordance with the provisions of this Order.

### e.   Sleeping Time

If an employee's tour of duty is less than 24 hours, then the time he or she is allowed to sleep as part of that tour is still working time. If the tour of duty is 24 hours or longer, then

-10-

under some circumstances up to 8 hours may be excluded from
compensable working time if the employee is allowed to sleep.   Law
enforcement and fire protection personnel must work shifts in
excess of 24 hours before sleep time can be excluded from
compensable time.

### f.   Training Time

No compensation is required for employees who attend training
programs and lectures if attendance is outside regular working
hours; and attendance is voluntary; and an employee does no
productive work while attending; and the program is not directly
related to the employee's job.  In addition, no compensation
accrues to trainees who are not already employees.  Such trainees
are not covered by the FLSA when they get vocational training for
their own benefit, do not displace regular employees, the employer
receives no immediate advantage, no wages are paid, and no job
entitlement has vested.

### g.   Travel Time

Whether travel time is compensable depends entirely on the kind
of travel involved.  The City generally is not responsible for time
spent by the employee in walking, riding, or otherwise traveling to
his or her principal activity.

As a general rule, home-to-work travel is not compensable, even
if an employee must travel from a town to an outlying site to get
to the employer's premise.  Generally, an employee is not at work
until he or she reaches the work site.  But if an employee is
required to report to a meeting place where he or she is to pick up
materials, equipment, or other employees, or to receive
instructions, compensable time starts at the time of the meeting.

Traveling by an employee from one job site to another site
during the workday is compensable work.  Traveling from an outlying
job at the end of the scheduled workday to the employer's premises
is compensable.

### Out-of-Town Travel

An employee who is sent out of town for one day need not be
paid for time spent in traveling from his or her home to the local
railroad, bus depot, or plane terminal, but he or she must be paid
for all other travel time (except any time spent in eating while
traveling).  Employees who drive overnight are considered working
all the time they are driving.

Where employees travel overnight on business (i.e., for more than one day), they must be paid for time spent in traveling (except for meal periods) during their normal working hours on their non-working days, such as Saturday, Sunday, and holidays, as well as on their regular working days. Travel time as a passenger on an airplane, train, boat, bus, or automobile outside of regular working hours is not considered worktime. Nighttime travel policies, with employees traveling in the evening, may prove to be more advantageous. Any actual work the employee does while traveling, however, remains worktime. Moreover, if an employee drives his or her car without being offered public conveyance, then this travel time is considered working time.

Employees are not entitled to compensation for home-to-work travel merely because their employer furnishes their transportation. An employee who chauffeurs other employees to work at the direction of his or her employer, however, is entitled to compensation. An employee who uses a government car is working while driving on business, but not while going to and from home.

h.  Starting and Quitting Time

Employees should be officially notified of the specific time prior to which they may not start work each day, and of the departure time beyond which they shall not be permitted to work. Employees must sign in and out and such records must be accurately maintained for at least three years. Preliminary (pre-workday) and postliminary (or post-workday) activities may be compensable and should be avoided wherever possible. Assignment of work to be done at home is to be avoided as time for such work is considered as working time and is subject to the overtime provisions of the Act.

i.  Compensatory Time

Any employee who has accrued FLSA compensatory time shall be permitted, by the agency to use such time within a reasonable period. However, the use of such compensatory time may be denied if its use unduly disrupts the operations of the agency.

-12-

An employee who has accrued FLSA compensatory time shall upon termination or separation of employment, be paid for the unused compensatory time at a rate of compensation not less than:

A)   the average regular rate received by such employee during the last 3 years of the employee's employment; or

B)   the final regular rate received by such employee, whichever is higher.

Agency Heads and their FLSA Coordinators shall regularly monitor the amount of FLSA compensatory time for each non exempt (covered) employee. Once an employee has reached the 240 hours or 480 hours (uniformed police, correction fire personnel) compensatory time rolling cap, cash overtime must be paid. Therefore, overtime should not be assigned to non exempt employees that have reached the FLSA compensatory time cap.

The Agency Head and or their FLSA Coordinators shall direct that accrued FLSA compensatory time be used prior to any other accrued compensatory time.

The Agency Head retains his authority to direct an employee to use compensatory time within the guidelines of the pertinent collective bargaining agreement or other City directives.

j.   Alternative Work Schedules

Alternative work schedules that provide for 40 hours or less of work in the City established 7 day work week may be continued as they do not conflict with the Act. Alternative work schedules that provide for more than 40 hours of work in the 7 day City established work week may not be continued without the approval of the FLSA Unit of OMLR and the Citywide FLSA Task Force.