UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------- X
                                          :
ERIC EDWARDS, Individually and on Behalf  :
of All Other Persons Similarly Situated,  :
                       Plaintiffs,        :      08 Civ. 3134 (DLC)
                                          :
              -v-                         :      OPINION & ORDER
                                          :
THE CITY OF NEW YORK,                     :
                       Defendant.         :
                                          :
----------------------------------------- X

APPEARANCES:

For Plaintiffs:
William C. Rand
228 East 45th Street, 17th Floor
New York, NY 10017

Jeffrey M. Gottlieb
Dana L. Gottlieb
Gottlieb & Associates
150 East 18th Street, Suite PHR
New York, NY 10003

For Defendants:
Andrea O'Connor
Diana Goell Voigt
Megan Burrows Carpenter
Corporation Counsel of the City of New York
100 Church Street
New York, NY 10007

DENISE COTE, District Judge:

     Plaintiff Eric Edwards brings this suit on behalf of

himself, and approximately 900 Corrections Officers employed or

formerly employed by the New York City Department of Corrections

("DOC") who filed consents to join this action, alleging

violations of the Fair Labor Standards Act ("FLSA"), principally

for the failure to pay sufficient overtime.  The plaintiffs
assert:  (1) that time spent donning and doffing their duty
uniforms and equipment is compensable under the FLSA; (2) that
they were not paid for overtime while waiting for relief
officers to arrive; (3) that defendant failed to properly
calculate overtime;[1] and, (4) that their overtime checks were
delayed.  Both plaintiffs and defendant City of New York
("City") have moved for summary judgment pursuant to Rule 56,
Fed. R. Civ. P.  While the plaintiffs have moved for summary
judgment on each of these four claims, the defendant only seeks
(1) to bar FLSA claims accruing earlier than two years before a
plaintiff joined this lawsuit and, (2) summary judgment on the
donning and doffing claim.[2]  For the following reasons, the
plaintiffs' motion is denied and the defendant's motion is
granted.

---

[1] Plaintiffs allege three ways in which the defendant
miscalculated their overtime rate:  (1) failing to pay
plaintiffs overtime for the two hours they worked each week in
excess of forty hours, (2) failing to account for a biannual
"holiday bonus" when calculating the regular rate from which the
overtime rate is derived; and, (3) paying officers who worked
night shifts an overtime rate that did not account for the
"night shift differential."

[2] The defendant also moved to dismiss a claim that it had failed
to pay corrections officers for meal periods.  The plaintiffs
responded that they "do not contest that they were paid for meal
breaks."  Accordingly, the defendant's motion for summary
judgment on this issue is granted.

BACKGROUND

Unless otherwise noted, the following facts are undisputed. The majority of corrections officers employed by defendant work on a schedule of four days on and two days off.[3]  A regular tour is eight hours and thirty-one minutes.  While many of the plaintiffs work on Riker's Island, others are assigned to different facilities, including the Manhattan Detention Complex; 100 Centre Street, Central Booking; Bellevue Hospital Prison Ward; Brooklyn Detention Complex; Elmhurst Hospital Prison Ward; and, the Queens Detention Complex.

A. Time Spent Donning and Doffing Uniforms

Most officers change into their uniforms and equipment in the locker room of their assigned facility.[4]  The DOC "duty uniform" consists of a uniform shirt, to which DOC emblems and badge are attached; trousers; black socks; black military laced leather oxford or patent leather shoes; tie; and, tie clasp. DOC "duty uniform equipment" includes a bullet or slash

---

[3] A small number of corrections officers work a set Monday through Friday schedule with Saturday and Sunday off.

[4] Several plaintiffs testified that, at times, the locker room is crowded and officers must wait to gain access to their assigned locker.  Plaintiffs also testified that in addition to changing in and out of their duty uniform and equipment, while in the locker room, they use the restroom, wash their hands and face or shower.

resistant vest, a trouser belt, and an equipment or "utility"
belt to which are attached a handcuff case, duty knife and case,
flashlight, memo book, pen and pencil holder, and glove pouch.[5]
Eight plaintiffs testified that it takes them between four and
twenty minutes to put on or to take off both the duty uniform
and equipment, including the slash resistant vest.  Plaintiffs
testified that it takes between one and five minutes to put on
and between thirty seconds and three minutes to take off a slash
resistant vest.

Officers bring their uniforms and slash resistant vests
home for laundering.  Although DOC regulations do not preclude
plaintiffs from wearing their duty uniforms while travelling to
and from work, only three plaintiffs report having arrived to
their assigned tour in at least part of their uniform.  Fourteen
plaintiffs, by contrast, testified that they have never reported
to a DOC facility in any part of their uniform.  In addition to
wanting to change into clean and comfortable clothing,
plaintiffs testified that they do not wear their uniforms to

_____

[5] Plaintiffs argue that the olin resin capsules (the "OR
Capsule") -- a kind of teargas or pepper spray -- that most
officers are required to carry during their tours are also a
component of the uniform.  Defendant disputes this point,
relying on the fact that OR Capsules are not referenced in the
DOC Uniform and Equipment Specifications and Regulations.  It is
undisputed that OR Capsules are not available to the general
public and that officers retrieve their OR Capsules after they
have already changed into the other elements of their uniform,
and have participated in roll call.

work to avoid being recognized as a corrections officer by a former inmate, and being mistaken for a police officer.

Regulations forbid off-duty officers from wearing "any distinguishable uniform item with civilian clothes except the authorized shield when required."  Deputy Warden Peter Panagi ("Panagi") testified that corrections officers are not permitted to wear their uniforms off duty if the purpose is "to be recognized as a correction officer," or "in order to speak as a spokesperson for the Department."

B. Late Relief Claim

The parties dispute whether on-duty officers were routinely relieved from their shifts late, and whether supervisors discouraged officers from requesting compensation for overtime caused by late relief.  Additionally, the parties dispute whether the defendant posted adequate notice of its employees' right to earn overtime compensation.[6]

DOC tracks plaintiffs' hours by requiring corrections officers to sign in and out of a log book at the "exact time" of their arrival and departure from their assigned facility.  To receive payment for overtime work, officers must submit overtime

---

[6] While one plaintiff recalls having seen such a notice, twelve did not.  Panagi testified that the officers' collective bargaining agreement, which included an overtime provision, was posted on employee bulletin boards.

slips accounting for any time beyond ten minutes that they worked in excess of their regularly scheduled tours.

At least four plaintiffs testified that they did not sign in and out of their facility's log book at the "exact time" of their arrival and departure, and instead signed in and out at the time corresponding to the start and end of their tour. Additionally, while all plaintiffs testified that they had received overtime at some point during their employment with DOC, a number of plaintiffs testified that they only filed overtime slips if they worked more than fifteen to sixty minutes beyond the end of their shift:  five only file overtime slips if they remain at their post for an additional fifteen minutes; and, nine only file for overtime if they work for an additional thirty to sixty minutes.  Several plaintiffs testified that on certain occasions they did not submit overtime slips because they did not want the officer scheduled to relieve them to be penalized for being late.  Several plaintiffs also testified that they believed that their supervisors would discard or refuse to sign-off on overtime slips for less than a certain amount of time.  The plaintiffs have not identified any admissible evidence to support such a belief.  For instance, the plaintiffs have not identified any supervisor who told them not to file overtime slips or any occasion on which they witnessed the destruction of an overtime slip.

C. Calculation of Overtime and Payroll Practices

Pursuant to a Collective Bargaining Agreement ("CBA") between the Correction Officer's Benevolent Association and the City for the period between May 1, 2005 and July 31, 2007, corrections officers are paid an annual salary plus "[a]ll ordered and/or authorized overtime in excess of forty (40) hours in any week or in excess of the hours required of an employee by reason of his regular duty chart if a week's measurement is not appropriate."  As defendant's Rule 30(b)(6) witness explained, since many officers work either a 34 or a 42 hour week, instead of paying overtime for all hours in excess of 40 hours per week, officers "are paid overtime in excess of their daily tour."  For instance, if an officer works a full eight and a half hour shift and then works an additional "hour-and-a-half in excess . . . they get an hour and-a-half overtime regardless of what they do the rest of the week[]."

The CBA further provides that officers are entitled to eleven paid holidays.  These holidays are days on which most City offices are closed.  Officers who are required to work on these holidays receive double pay for those days.

The CBA establishes a ten percent night shift differential when more than one hour is worked between 4:00 p.m. and 8:00 a.m.  If an officer assigned to a tour that qualifies for the

night shift differential works overtime, overtime pay is based
on a rate that includes the night shift differential.[7]

The City uses the Payroll Management System to pay all of
its employees, including the plaintiffs.  DOC employees are paid
on a bi-weekly basis.  The pay period is referred to as the
Regular Gross Period (the "RGP"), and it begins on a Sunday and
ends on a Saturday two weeks later.  A paycheck is issued on the
Friday following the end of the RGP.  The payroll calculation
process is referred to as Pay Calculation ("PayCalc").  Time
sheets are submitted after a week of work.  Thus, the second
week of the RGP is known as the "anticipatory week" since the
City pays its employees their regular base salary for that week
because timekeepers do not yet have the timesheets for that
week.[8]  If the timesheets for the anticipatory week include
overtime hours, those hours are included in the next PayCalc
processing and paid at the end of the next RGP.  In short,
overtime earned during the first week of the RGP is included in

_____

[7] Cynthia Lewis ("Lewis"), a supervisor of timekeeping at a DOC
facility, mistakenly testified that when calculating the
overtime rate for officers who work a night shift, the night
shift differential was not taken into account.  During Lewis's
deposition, defense counsel objected to her being asked
questions regarding the calculation of overtime since she had
only been noticed as a Rule 30(b)(6) witness for timekeeping
procedures.  Following her deposition, Lewis timely executed an
errata sheet correcting the errors in her testimony.

[8] PayCalc is performed at midnight on Saturday at the end of the
RGP, but the timesheets for the anticipatory week are not
received until the following Monday.

the paycheck covering that RGP and overtime from the
anticipatory week is paid in the subsequent paycheck.


D. Procedural History

On March 27, 2008, Edwards filed this action.  By Order
dated August 7, all claims against DOC were dismissed.  On
September 5, the City filed its answer.  On November 3, the
Court approved a notice of pendency of a collective action to be
distributed to prospective plaintiffs.  On March 15, 2010, the
Court so-ordered a stipulation between the parties which stated
that:

>      For purposes of discovery, summary judgment, and trial, the
>      parties have selected a group of Test Plaintiffs from all
>      opt-in plaintiffs which consist of agreed upon
>      representative test plaintiffs from a majority of DOC
>      facilities which are among the facilities subject to the
>      instant action (the "Test Plaintiffs").

The parties agreed that rulings on the fifty Test Plaintiffs
would be binding on all plaintiffs.  Discovery closed on
February 28, 2011.  An Order of May 17 struck points three
through seven of the plaintiffs' memorandum of law in opposition
to the defendant's motion for partial summary judgment.  The
parties' cross-motions for summary judgment became fully
submitted on May 20.

<u>DISCUSSION</u>

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts "in the light most favorable" to the nonmoving party.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>see also</u> <u>Holcomb v. Iona Coll.</u>, 521 F.3d 130, 132 (2d Cir. 2008).

When the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot "rely merely on allegations or denials" contained in the pleadings.  Fed. R. Civ. P. 56(e); <u>see also</u> <u>Wright v. Goord</u>, 554 F.3d 225, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist."  <u>Hicks v. Baines</u>, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over material facts -- "facts that might affect the outcome of the suit under the governing law" -- will

10

properly preclude the entry of summary judgment.  Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also
Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475
U.S. 574, 586 (1986) (stating that the nonmoving party "must do
more than simply show that there is some metaphysical doubt as
to the material facts").

      Plaintiffs have moved for summary judgment on their claims
for:  (1) donning and doffing; (2) late relief; (3) calculation
of overtime; and, (4) delayed payment.  Defendant moves for
summary judgment on two issues:  (1) that the statute of
limitations bars claims which accrued more than two years before
the date a plaintiff filed a consent to join this action; and,
(2) that time spent donning and doffing is not compensable under
the FLSA.  The defendant's two motions will be addressed first.


I.   Statute of Limitations

      Defendant has moved for summary judgment against any claim
that accrued earlier than two years before a plaintiff filed a
consent to join this action.  Plaintiffs contend that a three-
year statute of limitations applies, and that in any event the
statute of limitations is equitably tolled for six years.
Defendant has demonstrated that plaintiffs are bound by a two-
year statute of limitations and are not entitled to equitable
tolling.

11

a. The FLSA Two-Year Statute of Limitations Applies.

Actions to enforce "any cause of action for unpaid minimum wages, unpaid overtime, or liquidated damages" under the FLSA must be "commenced within two years after the cause of action accrued" except for "a cause of action arising out of a willful violation which may be commenced within three years after the cause of action accrued."  29 U.S.C. § 255(a).  "[A] cause of action under the [FLSA] for unpaid minimum wages or unpaid overtime compensation . . . 'accrues' when the employer fails to pay the required compensation for any workweek at the regular pay day for the period in which the workweek ends."  29 C.F.R. § 790.21(b); see also Lee v. ABC Carpet & Home, 236 F.R.D. 193, 199 (S.D.N.Y. 2006).  The statute of limitations period runs until a plaintiff files with the court a written consent to join a collective action lawsuit.  29 U.S.C. § 256.

"An employer willfully violates the FLSA when it either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the Act."  Young v. Cooper Cameron Corp. 586 F.3d 201, 207 (2d Cir. 2009) (citation omitted).  The "burden is on the employee to show willfulness."  Id.  "Mere negligence is insufficient."  Id.  "[I]f an employer acts reasonably in determining its legal obligation, its action cannot be deemed willful.  If an employer acts unreasonably, but not recklessly, in determining its legal obligation, then it

12

should not be considered willful." <u>Porter v. N.Y. Univ. School of Law.</u>, 392 F.3d 530, 531 (2d Cir. 2004) (citation omitted) (<u>per curiam</u>).

To show willfulness, plaintiffs rely solely on the conclusory assertions in their complaint.  They have not identified any evidence that defendant had actual knowledge of or acted with reckless disregard for its obligations under the FLSA.  <u>Cf</u>. <u>Clarke v. JPMorgan Chase Bank, N.A.</u>, 08 Civ. 2400 (CM), 2010 WL 1379778, at *10-11 (S.D.N.Y. Mar. 26, 2010) (collecting cases where plaintiff failed to demonstrate defendant's conduct was willful).  <u>See also</u> <u>McLaughlin v. Richland Shoe Co.</u>, 486 U.S. 128, 132 (1988).  Accordingly, defendant's motion is granted and a plaintiff may only recover for claims that accrued no earlier than two years before the plaintiff joined this action by making the appropriate filing with the Court.

b. Equitable Tolling of the Statute of Limitations

The plaintiffs contend that any FLSA statute of limitations is tolled for six years because the City failed to post the notice of its overtime rules as required by the FLSA.  "Statutes of limitations are generally subject to equitable tolling where necessary to prevent unfairness to a plaintiff who is not at fault for her lateness in filing." <u>Gonzalez v. Hasty</u>, 07-1787-pr, --- F.3d ---, 2011 WL 2463562, at *4 (2d Cir. June 22, 2011)

(citation omitted).  It is, however, "a rare remedy to be
applied in unusual circumstances, not a cure-all for an entirely
common state of affairs."  Wallace v. Kato, 549 U.S. 384, 396
(2007).  Although the remedy is regularly granted where
defendants have engaged in fraudulent concealment, "the
application of the doctrine of equitable tolling is not limited
to such cases," and "it does not assume a wrongful -- or any --
effort by the defendant to prevent the plaintiff from suing."
Valdez ex rel. Donely v. United States, 518 F.3d 173, 182-83 (2d
Cir. 2008) (citation omitted).  "The relevant question is not
the intention underlying defendants' conduct, but rather whether
a reasonable plaintiff in the circumstances would have been
aware of" his rights.  Id. at 183 (citation omitted).

     Thus, even in those circumstances where a regulation gives
an employee a right to notice of appeal rights, actual knowledge
of those rights defeats a claim of equitable tolling.  While
such a regulation assumes that "a reasonable beneficiary would
not otherwise be aware of the existence of a cause of action"
and, therefore, that failure to comply with such requirements
"is the type of concealment that entitles plaintiff[s] to
equitable tolling," Veltri v. Building Serv. 23B-J Pension Fund,
393 F.3d 318, 324 (2d Cir. 2004) (failure to give notice of
right to file administrative appeal under Employee Retirement
Income Security Act), if a plaintiff has "actual knowledge of

[his] right to bring a judicial action," he "may not rely on equitable tolling notwithstanding inadequate notice" from his employer.  Id.  Similarly, "a plaintiff, who would otherwise be entitled to rely on equitable tolling on the basis of defective notice," may forfeit that right by failing to "exercise due diligence to the prejudice of the defendant."  Valdez, 518 F.3d at 183 (citation omitted).

Plaintiffs base their claim for equitable tolling exclusively on the defendant's alleged failure to conspicuously post notice regarding minimum wage and overtime rules, as it is required to do by Department of Labor ("DOL") regulations.  The DOL requires employers of employees covered by FLSA's minimum wage provisions to "post[] a notice explaining the Act . . . in conspicuous places in every establishment where such employees are employed so as to permit them to observe readily a copy." 29 C.F.R. § 516.4.

The plaintiffs have not, however, shown that they were unaware of their entitlement to overtime pay.  The CBA specifically addresses issues of overtime compensation.  The City has a system for calculating overtime pay due corrections officers and regularly makes such payments.  And indeed, all of the Test Plaintiffs requested and received overtime during their DOC employment.  The plaintiffs have not identified any corrections officer who was unaware of his or her right to

15

overtime compensation.[9]  Thus, regardless of whether the

defendant properly posted notice pursuant to § 516.4, the

officers were aware of their right to overtime compensation.

The defendant's motion striking a claim to equitably toll the

statute of limitations is granted.


II. Donning and Doffing Claim

     Both parties have moved for summary judgment on the

plaintiffs' claim for compensation for the time spent donning

and doffing their duty uniforms and equipment.   "The FLSA

guarantees compensation for all work or employment engaged in by

employees covered by the Act."   Singh v. City of N.Y., 524 F.3d

361, 367 (2d Cir. 2008) (citation omitted).   The Portal-to-

Portal Act "narrowed the coverage of the FLSA by excepting two

activities that had been treated as compensable" under Supreme

Court precedent:  (1) "walking on the employer's premises to and

from the actual place of performance of the principal activity

of the employee"; and, (2) "activities that are 'preliminary or

postliminary' to that principal activity."   IBP, Inc. v.

Alvarez, 546 U.S. 21, 27 (2005); 29 U.S.C. § 254(a).

Specifically,

---

[9] Plaintiffs rely primarily on Baba v. Grand Cent. P'ship, 99
Civ. 5818 (TPG), 2000 WL 1808971 (S.D.N.Y. Dec. 8, 2000), but in
Baba, there was no indication that the plaintiffs who sought
equitable tolling had ever been paid overtime.   Id. at *1.

> Subsection (2) of the Portal-to-Portal Act undid the [Supreme Court's] holding that required compensation for putting on aprons and overalls, and thus was intended to relieve employers from liability for preliminaries, most of them relatively effortless, that were thought to fall outside the conventional expectations and customs of compensation.

Gorman v. Consolidated Edison Corp., 488 F.3d 586, 590 (2d Cir. 2007) (citation omitted).

A "substantial case law" discusses the distinction between "preliminary and postliminary activities," and the "principal activities of employment." Id. Nevertheless, the "distinction remains elusive in application." Id.

> [A]ctivities performed either before or after the regular work shift are compensable under the portal-to-portal provisions of the [FLSA] if those activities are an integral and indispensable part of the principal activities for which covered workmen are employed and are not specifically excluded by subsection 1 of the Portal-to-Portal Act.

Id. (citing Steiner v. Mitchell, 350 U.S. 247, 256 (1956)). "Indispensable is not synonymous with integral." Id. at 592. "Indispensable means necessary," while "[i]ntegral means, inter alia, essential to completeness; organically joined or linked; composed of constituent parts making a whole." Id. (citation omitted). For instance, "[s]harpening the knife is integral to carving a carcass" and "powering up and testing an x-ray machine is integral to taking x-rays." Id. An act, however, is "not rendered integral" simply because it is "required by the employer or by government regulation." Id. at 594.

Applying this standard in <u>Gorman</u>, the Second Circuit held that

> when work is done in a lethal atmosphere, the
> measures that allow entry and immersion into the
> destructive element may be integral to all work done
> there, just as a diver's donning of wetsuit, oxygen
> tank and mouthpiece may be integral to the work even
> though it is not the (underwater) task that the
> employer wishes done.

<u>Id</u>. at 593.  By contrast, "a helmet, safety glasses, and steel-toed boots," may be indispensable to the principal activities of nuclear power station employees, but they are not "integral." <u>Id</u>. at 594.  "The donning and doffing of such generic protective gear is not different in kind from changing clothes and showering under normal conditions, which . . . are not covered by the FLSA."  <u>Id</u>. (citation omitted).

FLSA regulations similarly provide that

> [a]mong the activities included as an integral part
> of a principal activity are those closely related
> activities which are indispensable to its
> performance.  If an employee in a chemical plant, for
> example, cannot perform his principal activities
> without putting on certain clothes, changing clothes
> on the employer's premises would be an integral part
> of the employee's principal activity.  On the other
> hand, if changing clothes is merely a convenience to
> the employee and not directly related to his
> principal activities, it would be considered as a
> 'preliminary' or 'postliminary' activity rather than
> a principal part of the activity.  However,
> activities such as checking in and out and waiting in
> line to do so would not ordinarily be regarded as
> integral parts of the principal activity or
> activities.

29 C.F.R. § 790.8(c) (footnotes omitted).  Further, "where the changing of clothes on the employer's premises is required by law, by rules of the employer, or by nature of the work," the activity may be considered integral and indispensable to the principal activities.  <u>Id</u>. n. 65.

The City's motion for summary judgment on the donning and doffing claim is granted.  There is no basis to distinguish between the "helmet, safety glasses, and steel-toed boots" found to be "generic protective gear" in <u>Gorman</u>, 488 F.3d 594, and the uniform, utility belt, and slash resistant vest at issue in this action.  While the evidence indicates that many (but not all) of the plaintiffs chose to change into their uniform and equipment in the DOC facility locker rooms, they did so for a variety of reasons ranging from personal convenience to fear of being recognized by a former inmate or mistaken for a police officer while commuting to work.  Thus, while the uniform and equipment may be indispensable to the performance of an officer's principal activity, they are not integral to it.  Therefore, the time spent donning and doffing them is not compensable.

Plaintiffs make principally two arguments in favor of a finding that the officers' donning and doffing of their uniforms and equipment is compensable conduct.  Plaintiffs first contend that the Second Circuit's decision in <u>Gorman</u> is distinguishable on the basis that the protective equipment at issue here is

unavailable to the general public.  This argument is unavailing.

Plaintiffs do not cite any case recognizing this distinction.

Moreover, even if the existence of a public market for a

component of the uniform were a legitimate basis on which to

decide whether donning and doffing the component was integral to

an employee's principal activity, the only piece of equipment

that is unavailable to the general public is the OR Capsule that

officers are provided for certain tours.  But, the OR Capsule is

retrieved and returned by the officers <u>during</u> their shift.

Thus, it is conduct for which the officers are compensated.[10]

Next, plaintiffs point to two district court opinions from

the Ninth Circuit, which held that the donning of police

officers' uniforms and equipment is integral and indispensable

to the officers' principal activities.  See <u>Nolan v. City of</u>

<u>L.A.</u>, CV 03-2190 (GAF), 2009 U.S. Dist. LEXIS 70764, at *55

---

[10] The only other component of the officers' uniform that is
arguably designed for the unique hazards of the prison
environment is the bullet/slash resistant vest.  Even if donning
and doffing vests is integral to the officers' principal
activity, the plaintiffs have failed to establish that the time
spent completing this task is more than <u>de</u> <u>minimis</u>.  <u>Singh</u>, 524
F.3d at 370 ("The <u>de</u> <u>minimis</u> doctrine permits employers to
disregard, for the purposes of the FLSA, otherwise compensable
work when the matter in issue concerns only a few seconds or
minutes of work beyond the scheduled working hours." (citation
omitted)).

(C.D. Cal. May 5, 2009); <u>Lemmon v. City of San Leandro</u>, 538 F. Supp. 2d 1200, 1209 (N.D. Cal. 2007).  More recently, however, in <u>Bamonte v. City of Mesa</u>, 598 F.3d 1217 (9th Cir. 2010), the Ninth Circuit held that the time police officers spend donning and doffing their uniforms is not compensable under the FLSA when the officers are not required to change at work.  <u>Id</u>. at 1232-33.  Thus, prevailing Ninth Circuit authority supports this Court's conclusion that the plaintiffs are not entitled to compensation for time spent donning and doffing their duty uniforms.

III. Late Relief Claim

     Plaintiffs have moved for summary judgment on their claim that officers were "regularly relieved late from their posts" and then "pressured" not to file overtime slips for the additional time worked.  This motion must be denied.

     There are disputed issues of fact whether officers' were in fact regularly relieved late from their posts.  Ordinarily a corrections officer's shift ends thirty-one minutes after the start of the replacement officer's shift.  During that time, the replacement officer attends roll call, retrieves the OR Capsule, goes to the post, conducts a "count," inventories equipment, and reviews a log book.  The parties dispute whether these tasks are customarily completed within thirty-one minutes.

Even if the plaintiffs can establish at trial that relief officers are routinely or frequently late, however, the plaintiffs have also failed to offer any admissible evidence that DOC or any DOC supervisor discouraged officers from filing overtime slips for any period of time beyond ten minutes.  For instance, the plaintiffs' briefs repeatedly assert that "[w]hen correction officers complain to timekeepers about not receiving overtime, sometimes it is discovered that no overtime slip was sent by the captain to the timekeeper."  In support of this statement, plaintiffs rely solely on Lewis's testimony.  But Lewis stated only that if an officer complains that he has not received overtime, the timekeeper will "look through those slips of the day or the month or the year in question, if it's not there, then the burden of proof is then on the officer."  This testimony does not show that any captain chose not to submit overtime slips to timekeepers.

Similarly, plaintiffs contend that corrections officers "were pressured not to put in future overtime slips for short periods of overtime."  Again, however, the plaintiffs do not identify evidence that supports this assertion.  In fact, plaintiff Michael Crivera admitted that "[n]o supervisor or boss has ever physically told [him]" not to put in overtime for less than a certain number of minutes.

Finally, many of the statements to which the plaintiffs' briefs point to support their assertions lack specificity. For instance, plaintiff Immanuel Washington testified that officers could be removed from "preferred command[s]" if they "cry[ed] about overtime." But, Washington did not identify any officer who had this experience.

In sum, when all of the deposition testimony on which the plaintiffs rely in their brief is examined, the plaintiffs have not identified any evidence that a supervisor discouraged an officer from filing an overtime slip. Instead, the plaintiffs rely solely on the "perception" or "understanding" by a few of the Test Plaintiffs that that had occurred. Conclusory, vague assertions are insufficient to establish the misconduct alleged here. See Ridinger v. Dow Jones & Co., --- F.3d ---, 2011 WL 2675921, at *8 (2d Cir. July 11, 2011).

Finally, it is undisputed that each of the Test Plaintiffs actually filed overtime slips. Thus, the only reasonable conclusion to be drawn is that corrections officers were aware of their right to overtime pay and sought compensation for overtime work. That some officers may have chosen on occasion not to request overtime for minutes of extra work they deemed de minimis does not entitle the plaintiffs to summary judgment on the "late relief" claim.

23

IV. Overtime Calculation Claims

Plaintiffs move for summary judgment on their three claims concerning the calculation of overtime: (1) that plaintiffs did not receive overtime pay for the two hours that they worked each week in excess of forty hours; (2) that the overtime rate paid to plaintiffs was too low since it did not account for the officers' "holiday bonus"; and, (3) that their overtime pay failed to account for the night shift differential. These arguments will be considered in turn.

The FLSA generally requires employers to provide overtime compensation to employees who work more than forty hours a week. See 29 U.S.C. § 207(a)(1) (employees who work more than forty hours per week "must receive compensation for. . . employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he was employed"). The defendant relies on an exception to this rule that is available to law enforcement agencies. Section 207(k)(1)(B) provides an exception for employees of "public agenc[ies]" engaged in "law enforcement activities (including personnel in correctional institutions)." 29 U.S.C. § 207(k)(1)(B). For such employees, overtime commences after 171 hours of work in a twenty-eight day period, instead of after forty hours of work in a seven day period. Id.; 29 C.F.R. § 553.201 (171 hours for law enforcement personnel). "[A]n employer bears the burden of

proving that its employees fall within an exemption in the

FLSA." <u>Coke v. Long Island Care at Home, Ltd.</u>, 376 F.3d 118,

123 (2d Cir. 2004).

Plaintiffs principally argue that the City did not adopt a

twenty-eight-day work period, and therefore that the defendant

is not entitled to benefit from the law enforcement exception.[11]

There is, however, significant evidence that the plaintiffs

operated on a twenty-eight-day work period.  It is undisputed

that the majority of officers work a schedule comprised of four

tours of eight hours and thirty one minutes followed by two days

off.  Whenever the twenty-eight-day cycle begins, whether it is

on a day off or one of the four workdays, over the twenty-eight-

day period officers work a maximum of twenty days of work, for a

total of 170 hours and twenty minutes.  And, if the twenty-eight

day cycle begins on a work day, regardless of whether it is the

officer's first, second, third, or fourth day of work, the

officer will complete twenty days of work, for a total of

precisely 170 hours and twenty minutes.  This is just forty

---

[11] Plaintiffs also assert that the law enforcement exception in
the FLSA is inapplicable to corrections officers, but fail to
cite any reason to disregard the plain language of the
regulation.  The sole case cited by plaintiffs, <u>Solis v. Dep't
of Corr.</u>, No. 08-5362RJB, 2009 WL 2855441, at *5 (W.D. Wash.
2009), merely found that "based on the allegations provided," it
was "uncertain . . . whether the law enforcement exception
applies" to the corrections officers' complaint in that case.
<u>Id</u>.

minutes shy of the 171 hour cut-off described in Section 207(k)(1)(B).  In contrast, a schedule of four days on and two days off does not result in a consistent number of hours worked over a seven-day period.  Finally, those few officers who work a Monday through Friday schedule work twenty days in a twenty-eight day period, for a total of 170 hours and twenty minutes. Thus, there is substantial evidence that DOC adopted the twenty-eight day period permitted by Section 207(k)(1)(B), and plaintiffs' motion for summary judgment on this claim is denied.

Next, plaintiffs contend that the overtime rate they are paid does not properly account for their biannual "holiday bonus."  The plaintiffs rely on 25 C.F.R. § 778.209, which provides that "the overtime rate for a salaried employee who receives guaranteed bonuses is required to include such bonuses as part of his salary."

Defendant does not dispute that it must take bonuses into account when calculating the officers' overtime rate, but it argues that the eleven paid holidays that officers receive pursuant to the CBA do not constitute a bonus.  According to the City, they are "payments made for occasional periods when no work is performed due to . . . holiday."  29 U.S.C. § 207(e)(2). Since the FLSA expressly excludes payments for holidays when determining the regular rate of pay upon which the overtime rate

is based, the City is correct.  Accordingly, plaintiffs' motion
for summary judgment with respect to this issue is denied.

Finally, plaintiffs claim that officers who work night
shifts are paid for overtime worked during the day based on the
lower daytime rate, rather than a combination of the night and
day rates.  The only evidence the plaintiffs offer in support of
this claim is Lewis's deposition testimony.  As explained above,
Lewis corrected her testimony.  That corrected testimony is
corroborated by both other testimony and documentary evidence.
As significantly, plaintiffs have not identified any corrections
officer whose regularly scheduled tour entitled him to a night
premium and whose overtime compensation did not take into
account the night shift differential.  In sum, plaintiffs have
failed to provide any evidence to support this claim and the
plaintiffs' motion for summary judgment on this claim is denied.


V. Delayed Payment Claim

Plaintiffs move for summary judgment on their claim that
defendant failed to promptly pay them their earned overtime.
Although the FLSA is silent as to when overtime compensation
must be paid, "courts have long interpreted the statute to
include a prompt payment requirement." Rogers v. City of Troy,
148 F.3d 52, 55 (2d Cir. 1998) (citation omitted).  It is also
appropriate to consider the DOL's views regarding when overtime

should be paid.  Id. at 57.  Pursuant to a DOL interpretive
bulletin,

> [t]he general rule is that overtime compensation
> earned in a particular workweek must be paid on the
> regular pay day for the period in which such workweek
> ends.  When the correct amount of overtime
> compensation cannot be determined until some time
> after the regular pay period, however, the
> requirements of the [FLSA] will be satisfied if the
> employer pays the excess overtime compensation as
> soon after the regular pay period as is practicable.
> Payment may not be delayed for a period longer than
> is reasonably necessary for the employer to compute
> and arrange for payment of the amount due and in no
> event may payment be delayed beyond the next payday
> after such computation can be made.

29 C.F.R. § 778.106 (emphasis supplied).

Plaintiffs argue that officers are paid overtime thirteen
days after the end of the two-week period during which it was
earned.  The record, however, demonstrates that overtime worked
during the first week of the RGP is paid at the end of that two-
week period, and overtime worked during the "anticipatory week"
is delayed until the conclusion of the next pay cycle.  Since
PayCalc is run before timesheets from the anticipatory week have
been processed, overtime from the anticipatory week cannot be
included in the check covering the RGP in which it was earned.

Plaintiffs offer no evidence to suggest that defendant
fails to pay them overtime as soon as is practicable, or that
payment is delayed longer than is reasonably necessary.  Thus,
plaintiffs' motion for summary judgment is denied.

CONCLUSION

Plaintiffs' March 28, 2011 motion for summary judgment is denied. Defendant's March 28, 2011 motion for summary judgment is granted. A scheduling order shall control subsequent pre-trial proceedings in this case.

SO ORDERED:

Dated:    New York, New York
          August 26, 2011

                                    _____
                                      DENISE COTE
                              United States District Judge