UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK
------------------------------------------------------------------------ x
ERIC EDWARDS, Individually and on Behalf of All
Other Persons Similarly Situated,

                                      Plaintiffs,

       -against-

THE CITY OF NEW YORK,

                                      Defendant.

**DEFENDANT'S LOCAL CIVIL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS**

08 Civ. 3134 (DLC)

------------------------------------------------------------------------ x

        Defendant City of New York, by its attorney, Michael A. Cardozo, Corporation Counsel of the City of New York, respectfully submits, pursuant to Rule 56.1 of the Local Rules of this Court, that the following material facts are undisputed:

**A.    Introduction and Procedural History**

        1.    Plaintiff Eric Edwards brings this suit on behalf of himself, and approximately 840 correction officers employed, or formerly employed, by the New York City Department of Correction ("DOC") who filed timely consents to join this action, alleging violations of the Fair Labor Standards Act ("FLSA"). See Complaint; Plaintiffs' Consents, Docket Sheet, entry nos. 25, 36-40, 42-72, 74.

        2.    On March 15, 2010, the Court so-ordered a stipulation between the parties which stated that "for purposes of discovery, summary judgment, and trial, the parties have selected a group of Test Plaintiffs from all opt-in plaintiffs which consist of agreed upon representative test plaintiffs from a majority of DOC facilities which are among the facilities subject to the instant action." Id. at entry no. 84. Further, the parties agreed that rulings on the test plaintiffs would be binding on all plaintiffs. Id.

3.      After the close of discovery, all parties moved for summary judgment. Id. at entry nos. 97-104, 107-118. On August 26, 2011, plaintiffs' motion for summary judgment was denied in its entirety, and defendant's motion for partial summary judgment was granted in its entirety. Id. at entry no. 120, Decision & Order.

4.      Plaintiffs' donning and doffing claim, by which plaintiffs sought compensation for the time they spent putting on their uniforms prior to their shifts and taking off their uniforms after their shifts, was dismissed in its entirety. Id. at 16-21. Further, the Court found that the appropriate statute of limitations for the FLSA claims asserted in the instant matter is two years. Id. at 11-16. Plaintiffs' complaint was filed on March 27, 2008. See Docket Sheet, entry no. 1. Therefore, plaintiffs' claims go back no further than March 27, 2006.

5.      Pursuant to a stipulation entered into between the parties on November 4, 2011, and so-ordered by the Court on November 8, 2011, the sole remaining claim in the instant collective action is plaintiffs' claim that they were not paid for overtime work allegedly performed after the end of their daily tour schedule. See Docket Sheet, entry no. 124.

**B.      How Correction Officers Are Paid**

6.      Assistant Director of Personnel Ira Kleinburd, who testified as a Rule 30(b)(6) witness on behalf of defendant, has been employed by DOC in its payroll and personnel division since 1979. See Exhibit A, Kleinburd Dep. at 6:6-12.

7.      Mr. Kleinburd testified that the most "common schedule" for a correction officer is an "8 hour 31 minute day working four days with two days off" ("four-and-two"). Id. at 6:13-18. In other words, "it's a six day schedule." Id.

8.      Correction officers employed by DOC are paid an annual salary. See Exhibit B, Collective Bargaining Agreement at Article VI, § 1.

9. The Collective Bargaining Agreement by and between the City of New York and the Correction Officer's Benevolent Association, for the period of May 1, 2005 through July 31, 2007, states that correction officers employed by DOC are paid overtime in excess of forty hours a week or, if a week's measurement is not appropriate, in excess of the hours required of an employee by reason of his regular duty chart. Id. at Article III, § 1.

10. Mr. Kleinburd testified that for correction officers, a week's measurement is not appropriate because officers may work a thirty-four hour a week (if they work four days during a particular pay period) or a forty-two hour week (if they work five days during a particular pay period). See Exhibit A, Kleinburd Dep. at 49:20-50:16.

11. Correction officers employed by DOC are paid overtime for time worked in excess of their normal tour. Id. at 50:5-16. Therefore, if an officer's normal tour is eight hours and thirty-one minutes and "if they work an hour and-a-half in excess of that day they get an hour and-a-half overtime regardless of what they do the rest of the week." Id. at 50:8-16.

12. Mr. Kleinburd testified that correction officers receive a "recurring regular gross" payment, i.e. regular salary, every two weeks. Id. at 73:3-11. The only deductions that are ever taken from a correction officer's recurring regular gross payment are for the employee's voluntary deductions (such as pension contributions) and mandated deductions for taxes, deductions if the correction officer was "absent without leave" or on a disciplinary suspension or if there was an error (such as the payment for overtime that was not worked by the correction officer or an overpayment that would need to be recouped by DOC). Id. at 78:8-23; 85:11-17.

13. DOC tracks the hours that a correction officer works in two ways: 1) each correction officer is required to sign in and out of a log book at the "exact time" of his arrival and departure from his assigned facility; and 2) each correction officer is required to submit an

overtime slip accounting for the hours and/or minutes that he worked in excess of his regularly scheduled tour. See Exhibit C, Deposition of Deputy Warden Peter Panagi, at 66:21-67:10; Exhibit D, Deposition of Timekeeper Cynthia Lewis, at 11:12-14. Timekeepers assigned to each facility then review the log books and overtime slips to determine each officer's pay for a given week. See Exhibit D, at 24:21-25, 33:7-21.

14. All deposed plaintiffs testified that they requested and received overtime pay. See Exhibit E, Colon Dep. at 74:11-17, 83:21-24; Exhibit F, Washington Dep. at 88:24-25, 89:1-3; Exhibit G, Crivera Dep. at 37:14-16; Exhibit H, Allbright Dep. at 68:4-7; Exhibit I, Been Dep. at 90:15-20; Exhibit J, Miller Dep. at 40:11-16; Exhibit K, Ladson Dep. at 83:7-15; Exhibit L, Contreras Dep. at 49:11-15; Exhibit M, Sanders Dep. at 83:1, 89:8-16, 100:21-24; Exhibit N, Franco Dep. at 37:5-14; Exhibit O, Jackson-Gaspard Dep. at 45:2-4; Exhibit P, Gershonowitz Dep. at 50:18-21; Exhibit Q, Bass Dep. at 71:9-24; Exhibit R, Shaw Dep. at 69:7-8, 85:25-86:2; Exhibit S, Steele Dep. at 86:2-16; Exhibit T, Crespo Dep. at 59:20-25; 60:1-12; Exhibit U, Rivera Dep. at 60:18-23, 67:17-22; Exhibit V, Kinard Dep. at 58:9-13; Exhibit W, Monclova Dep. at 89:17-24, 95:11-12.

15. Though correction officers are required to sign in and out of the log book at the exact time of their departure from the facility, most deposed plaintiffs testified that they signed in and out using their tour start and end time. See Exhibit E, Colon Dep. at 50:4-51:19, 60:19-61:25; Exhibit G, Crivera Dep. at 32:1-3, 37:17-24; Exhibit H, Allbright Dep. at 33:21-25, 34:1-15, 62:19-21; Exhibit I, Been Dep. at 35:17-25, 37:1-11; Exhibit J, Miller Dep. at 39:5-10; Exhibit K, Ladson Dep. at 73:2-12; Exhibit L, Contreras Dep. at 46:20-47:2; Exhibit O, Jackson-Gaspard Dep. at 41:2-8; Exhibit P, Gershonowitz Dep. at 34:15-22; Exhibit S, Steele Dep. at

70:11-16; Exhibit T, Crespo Dep. at 53:2-54:20; Exhibit U, Rivera Dep. at 32:13-19; Exhibit V, Kinard Dep. at 39:14-17, 50:12-15, 65:14-66:4; Exhibit W, Monclova Dep. at 86:1-4, 91:9-15.

### C. Plaintiffs' Deposition Testimony Regarding Tour Relief and Overtime Slips

16. Reinaldo Colon, who worked a five-and-two tour from 8:00 a.m. to 4:31 p.m., testified that he got to the locker room around 4:35 or 4:40 p.m. each day. See Exhibit E, at 16:19-20, 17:10-11, 72:8-11. Officer Colon testified that he was once disciplined for arriving to work late on more than five occasions and was penalized two vacation days. Id. at 13:12-14:24. Officer Colon has been paid $197,225.83 in cash overtime from March 27, 2006 through December 31, 2011. See Exhibit Y, Erath Decl., at ¶ 4.

17. Immanuel Washington testified that he held two positions over the relevant time period: a storehouse post (five-and-two, 6:00 a.m. to 2:31 p.m.) and a clinic post (four-and-two, 11:00 p.m. to 7:31 a.m.). See Exhibit F, at 22:24-26:18. The storehouse post did not require face-to-face relief, and Officer Washington testified that he left his post at 2:10 or 2:15 p.m., would arrive in the locker room at 2:20 or 2:25 p.m., and then waits there until it was time to sign out. Id. at 52:18-53:10. While working at the clinic, Officer Washington testified that he left his post, on average, at 7:35 a.m. and that it then took two to five minutes to return his olin capsule ("O/C") canister (i.e. tear gas). Id. at 78:10-13. Officer Washington testified that he submits overtime slips for as little as fifteen minutes. Id. at 88:24-89:3. Officer Washington was paid for $25,853.57 in cash overtime from March 27, 2006 through December 31, 2011. See Exhibit Y, Erath Decl., at ¶ 4.

18. Michael Crivera began his employment with DOC on February 28, 2008. See Exhibit G, at 8:5. Officer Crivera testified that he currently works a four-and-two, from 11:00 p.m. to 7:31 a.m., though he previously worked the 3:00 p.m. to 11:31 p.m. tour as well as the 7:00 a.m. to 3:31 p.m. tour. Id. at 9:4-25, 11:12-15. Officer Crivera testified that he typically

left his post "around 7:40, 7:45" a.m. and that it took another five to seven minutes to return to the control room, and another five minutes to return his O/C. Id. at 31:1-21, 53:1-19. Officer Crivera testified that he puts in overtime slips for forty minutes or more, though he noted that he works forty minutes or more of overtime "not very often." Id. at 32:3, 34:11-12. However, Officer Crivera was paid cash for thirty minutes of overtime worked on November 12, 2008. See Exhibit Y, Erath Decl., at ¶ 7. Noting that correction officers "come in late" "almost every day," Officer Crivera testified that, when leaving his post forty-five to fifty minutes after the end of his tour, he would only submit an overtime slip if the relieving officer "was also on OT" because that officer would be putting in a slip as well. Id. at 50:4-24. In other words, Officer Crivera would not submit an overtime slip "if the relieving officer was just late." Id. at 50:16-17. Officer Crivera was paid for $16,315.49 in cash overtime from February 28, 2008 through December 31, 2011. See Exhibit Y, at ¶ 4.

19. Theodore Allbright retired from DOC in December 2007. See Exhibit H, at 8:17-23. Officer Allbright testified that he worked a non-steady post, on a four-and-two schedule, from 11:00 p.m. to 7:31 a.m. Id. at 17:10-14, 17:25-18:5. Officer Allbright testified that he would leave his post at 7:45 or 7:50 a.m. Id. at 60:17-19. Officer Allbright testified that it took "a minute" to return his O/C. Id. at 61:8-10. Officer Allbright testified that the minimum amount of time for which he would submit an overtime slip is forty-five minutes. Id. at 63:18-21. However, Officer Allbright was paid cash for thirty minutes of overtime worked on July 28, 2006 and June 16, 2007. See Exhibit Y, Erath Decl., at ¶ 7. Officer Allbright was paid $62,920.71 in cash overtime from March 27, 2006 through the end of his employment. Id. at ¶ 4.

20. Derrick Been testified that he worked at two different posts during the relevant time period: a commissary post (five-and-two, 5:30 a.m. to 2:01 p.m.) and a control

6

room post (five-and-two, 7:00 a.m. 3:31 p.m.). See Exhibit I, at 17:2-18:10. Officer Been testified that his commissary post did not require face-to-face relief and that he usually left his post at 2:10 p.m. Id. at 40:3-24. Officer Been testified that each Friday he typically worked forty to sixty minutes beyond the end of his tour, for which he submitted overtime slips. Id. at 43:20-44:8. While working in the control room, Officer Been testified that he typically left his post at 3:45 p.m. and that it took him another twenty-five to thirty minutes to return his equipment. Id. at 85:4-86:13. Officer Bean testified that he put in overtime slips "almost every day." Id. at 88:20-23, 89:2-7. Officer Been earned $48,878.70 in cash overtime from March 27, 2006 through December 31, 2011. See Exhibit Y, Erath Decl., at ¶ 4.

21. Alethea Miller retired from DOC in 2006. See Exhibit J, at 10:6-9. Officer Miller testified that she worked a four-and-two, from 7:00 a.m. to 3:31 p.m. Id. at 11:25-12:12. Officer Miller testified that her relief typically arrived at 3:25 p.m. and that she left her post at 3:40 p.m. Id. at 33:2-15, 36:7-10. Officer Miller testified that it took her eight to ten minutes to return her O/C. Id. at 36:20-22. Officer Miller testified that she did not submit overtime slips for anything less than one hour. Id. at 39:22-25. However, Officer Miller was paid cash for thirty minutes of overtime worked on July 21, 2006. See Exhibit Y, Erath Decl., at ¶ 7. Officer Miller was paid $10,040.99 in cash overtime from March 27, 2006 through the end of her employment. Id. at ¶ 4.

22. Vandorn Ladson had two different assignments during the relevant time period: the closed box post (where he distributed linens) and a non-steady post. See Exhibit K, at 21:1-22:25. Officer Ladson testified that with respect to the closed box post—a five-and-two from 6:00 a.m. to 2:31 p.m.—no face-to-face relief was required. Id. at 17:16-19. Officer Ladson testified that he typically left the facility no later than 3:00 p.m. Id. at 91:18-22. While

7

working the non-steady post—a five-and-two from 11:00 p.m. to 7:31 a.m.—Officer Ladson testified that his relief arrived at 7:45 a.m. three times per week. Id. at 76:10-24. Officer Ladson also testified that he left his post at 8:00 a.m. on occasion. Id. at 77:8-10. He testified that it takes him ten minutes to walk down the stairs and five minutes to return his O/C. Id. at 78:4-17. Officer Ladson at times chose not to submit overtime slips to avoid causing trouble for other officers. Id. at 89:15-18. Officer Ladson testified that he submitted an overtime slip for approximately thirty-minutes of overtime three times, and that those slips were paid. Id. at 89:6-25, 91:3-14. Officer Ladson has been on "medically monitored" status since November 2008, which means that he is not permitted to work overtime. Id. at 13:15-15:13. Officer Ladson has been paid $6,703.20 in cash overtime during the statute of limitations period. See Exhibit Y, Erath Decl., at ¶ 4.

23. Julio Contreras was only employed by DOC for a few months. See Exhibit L, at 9:1-17. For the first three months of his employment, Officer Contreras was in training at the academy, began working at a DOC facility in August 2006. Id. at 16:15-16, 18:18-24. Officer Contreras testified that he worked a non-steady post, a four-and-two from 7:00 a.m. to 3:31 p.m. Id. at 19:11-19. Officer Contreras testified that he exited the facility at 3:45 or 3:50 p.m., after changing out of his uniform. Id. at 45:16-46:6. Officer Contreras was paid $115.42 in cash overtime during his employment with DOC. See Exhibit Y, Erath Decl., at ¶ 4.

24. Darlene Sanders worked the kitchen control post during the relevant time period. See Exhibit M, at 33:14-17. This is a four-and-two, from 11:00 p.m. to 7:31 a.m. Id. at 27:10-20. Officer Sanders testified that she left her post at 7:35 or 7:40 a.m. and that she hands in her paperwork by 7:45 a.m. Id. at 78:1-4, 86:1-6. Officer Sanders earned $136,503.40 in cash overtime from March 27, 2006 through December 31, 2011. See Exhibit Y, Erath Decl., at ¶ 4.

25.     Joseph Franco went on sick leave in October 2005 and did not return to duty before he retired in December 2006. See Exhibit N, at 9:1-6. Officer Franco testified that after roll call and after he got his O/C, he would stop off at his mailbox and turn in paperwork to the timekeepers. Id. at 24:14-26:22. Officer Franco testified that other officers did this as well, as he noticed a "congregation" of officers by the mailboxes after roll call. Id. at 26:20-22. Therefore, he would arrive at his post up to twenty minutes after the time necessary for attending roll call, retrieving the O/C and walking to the post. Id. at 24:11-16. Officer Franco testified that the officer who typically relieved him would do the same thing. Id. at 31:15-25.

26.     Trina Jackson-Gaspard's post during the relevant time period was in the clinic waiting area. See Exhibit O, at 16:22-25. Officer Jackson-Gaspard's post was a four-and-two, from 7:00 a.m. to 3:31 p.m. Id. at 16:19-21, 17:3-6. Officer Jackson-Gaspard testified that she "walks out" of the facility at 4:00 p.m., and that it takes her ten minutes to change out of her uniform. Id. at 49:14-50:4. Officer Jackson-Gaspard testified that she was brought up on charges in 2010 for her "latenesses" in 2009 and 2010 and that as a result she lost two comp time days. Id. at 11:4-12:17. Officer Jackson-Gaspard testified that she submits overtime slips for thirty minutes or more, and that she chooses not to submit slips for less time because she does not want her relieving officer to receive a late slip. Id. at 44:24-45:1, 45:5-12. However, Officer Jackson Gaspard was paid in comp time for fifteen minutes of overtime worked on March 28, 2011. See Exhibit Y, Erath Decl., at ¶ 7. Officer Jackson-Gaspard was paid $16,271.84 in cash overtime from March 27, 2006 through December 31, 2011. Id. at ¶ 4.

27.     Noel Gershonowitz had three different assignments during the relevant time period: a control room post (five-and-two, 7:00 a.m. to 3:31 p.m.), a security post (five-and-two, 7:00 a.m. to 3:31 p.m.), and a non-steady post (four-and-two, 3 p.m. to 11:31 p.m.). See

9

Exhibit P, at 13:4-22, 14:2-23. In his control room post, Officer Gershonowitz testified that he "typically" left his post at 3:40 p.m. and that it took five to ten minutes to return his O/C. Id. at 31:20-21, 33:2-25. In his security post, because no face-to-face relief was necessary, and Officer Gershonowitz did not have to return any equipment before leaving, he testified that he was "typically out the door on [his] way home" at 3:30 or 3:40 p.m.—i.e. from one minute before the end of his shift to nine minutes after the end of his shift. Id. at 37:10-19, 39:18-21. In his non-steady post, Officer Gershonowitz testified that he "typically" left his post at 11:35 p.m. and that he typically "left the facility at "11:50, 11:55," which included the five to ten minutes he needed to change out of uniform. Id. at 48:24-49:2, 52:5-9. Officer Gershonowitz testified that he would not put in an overtime slip for a few minutes of overtime because then the officer relieving him "would have to get a late slip" and Officer Gershonowitz did not want to be seen as a "snitch or a rat" or "screw" a fellow officer. Id. at 34:22-35:7, 36:14-17. Officer Gershonowitz also testified that reliving officers have often asked him not to submit an overtime slip. Id. at 35:8-10. Officer Gershonowitz testified that, for him, being relieved late by one hour crossed the line; he would submit an overtime slip because at that point, "it goes from 'things happen' to 'plain old you don't care' about the next person." Id. at 35:19-23. This has only happened a few times, though, because Officer Gershonowitz testified that he is "not an overtime person." Id. at 36:1-2. No one has ever told Officer Gershonowitz not to submit an overtime slip for less than a certain amount of time. Id. at 36:14-17, 51:9-12. Officer Gershonowitz was paid for thirty minutes of overtime worked on December 21, 2011. See Exhibit Y, Erath Decl., at ¶ 7. Officer Gershonowitz was paid $26,975.89 in cash overtime from March 27, 2006 through December 31, 2011. Id. at ¶ 4.

28. Harry Bass testified that during the relevant time period, he did not have a steady post, but worked a four-and-two, from 11:00 pm. to 7:31 a.m. See Exhibit Q, at 18:23-19:17, 35:8-18. Officer Bass testified that he stopped reporting to a facility in October 2008 and retired from DOC in January 2009. Id. at 11:23-12:5. Officer Bass was on "medically monitored" status for a period of time before he went on leave. Id. at 13:8-16, 21-25 generally. Twenty percent of the time, Officer Bass worked at the shooting range and was not relieved late. Id. at 26:8-12, 81:15-23. The other eighty percent of the time, when he wasn't working at the range, Officer Bass testified he left his post at 8:40 a.m. half the time, and at 7:45 to 8:00 a.m. the other half. Id. at 68:2-14. Officer Bass testified that he would submit overtime slips for as little as fifteen minutes. Id. at 71:9-72:13. Officer Bass was paid $11,051.32 in cash overtime from March 27, 2006 through the end of his employment. See Exhibit Y, Erath Decl., at ¶ 4.

29. John Shaw testified that his tour is from 11:00 p.m. to 7:31 a.m. See Exhibit R, at 15:11-14. Officer Shaw testified that half the time he is relieved between 7:00 and 7:31 a.m. and that the other half of the time he is relieved at 7:40 or 7:45 a.m. Id. at 71:12-19. Officer Shaw testified that he took an additional ten to twenty minutes coordinating with his relief. Id. at 72:1-17. Officer Shaw also testified that an overtime slip could be put in for as little as fifteen minutes. Id. at 80:2-22. Officer Shaw earned $60,985.74 in cash overtime from March 27, 2006 through December 31, 2011. See Exhibit Y, Erath Decl., at ¶ 4.

30. Marilyn Steele testified that she left her post six to eleven minutes early. See Exhibit S, at 68:10-14. Officer Steele also testified that it could take "two to five minutes" or up to fifteen minutes to return her equipment. Id. at 68:21-69:10. Officer Steele testified that sometimes she chose not to submit an overtime slip because she knew that the relieving officer was running late or "having issues" and he would make it up to her later. Id. at 76:3-16. The

least amount of time for which she would submit an overtime slip was ten minutes. Id. at 81:4-6. Officer Steele also testified that there were times when she would not submit an overtime slip, like "if it's a short time period . . . then [she] would just let it go." Id. at 86:17-25. Officer Steele testified that sometimes she chose not to submit an overtime slip because she knew that the relieving officer was running late or having issues and he would make it up to her later. Id. at 76:3-16. Officer Steele retired from DOC on July 13, 2010. Id. at 8:1. Officer Steele earned $26,927.12 in cash overtime from March 27, 2006 through the end of her employment. See Exhibit Y, Erath Decl., at ¶ 4.

31. Rafael Crespo worked a driver escort post during the relevant time period. See Exhibit T, at 17:9-13. This post, a five-and-two, was scheduled from 5:00 a.m. to 1:31 p.m. Id. at 16:23-18:6. Officer Crespo testified that his relief usually arrived at 1:15 or 1:20 p.m. and that he was in the locker room by 1:35 p.m. Id. at 47:11-15, 51:1-8. Officer Crespo was placed on "terminal leave" in June 2009, and did not report to a facility for work again before he retired in January 2010. Id. at 14:2-18. Officer Crespo was paid $60,325.26 in cash overtime from March 27, 2006 through the end of his employment. See Exhibit Y, Erath Decl., at ¶ 4.

32. Augustin Rivera worked a four-and-two, from 3:00 p.m. to 11:31 p.m., during the relevant time period. See Exhibit U, at 17:17-18, 18:2-4. Officer Rivera testified that he was relieved late two days of four and that relief could be fifteen to twenty minutes late. Id. at 72:6-9. Officer Rivera testified that he submits overtime slips for "anything over an hour," explaining that he would not "be crazy about like ten, fifteen minutes because, you know, it happens." Id. at 64:14-18. Officer Rivera testified that had previously been counseled for being late in 2008 or 2009. Id. at 14:14-15:8. Officer Rivera has been paid cash for instances of thirty, forty-five and sixty minutes of overtime worked numerous times previously. See Exhibit Y,

Erath Decl., at ¶ 7. Officer Rivera earned $159,299.91 in cash overtime from March 27, 2006 through December 31, 2011. Id. at ¶ 4.

33. Philip Kinard worked in a law library during the relevant time period. See Exhibit V, at 20:4-12. At that post, Officer Kinard worked a five-and-two, from 11:00 p.m. to 7:31 a.m. Id. Officer Kinard testified that he left his post at 7:40 or 7:45 a.m. and that he left the facility by 8:10 a.m. Id. at 49:23-50:24, 53:13-16. This included the "ten to fifteen minutes" it took him to change out of his uniform and the time he needed for a shower. Id. at 50:2-24. Officer Kinard testified that he preferred not to submit overtime slips for the few minutes he worked beyond the end of his scheduled tour because he did not want his friends to receive late slips. Id. at 57:12-22. Some officers might be as late as two hours to work, but would call and ask Officer Kinard not to put in a late slip in exchange as a favor. Id. at 57:8-11, 58:8. According to Officer Kinard, overtime slips were "discouraged" by other correction officers, who applied "a kind of pressure," so that they would not receive late slips. Id. at 57:17-22. However, Officer Kinard testified that he put in overtime slips for as little as fifteen minutes. Id. at 58:14-16. Officer Kinard testified that he stopped reporting to a facility for work in December 2006 and retired from DOC in January 2008. Id. at 9:3-10:5. Officer Kinard was paid $496.11 in cash overtime during the statute of limitations period. See Exhibit Y, Erath Decl., at ¶ 4.

34. Celestino Monclova has worked numerous posts during the relevant time period, all on the 3:00 p.m. to 11:31 p.m. tour. See Exhibit W, at 27:4-28:9, 32:12-25. At his post in the security division, Officer Monclova testified that he was relieved at 11:15 or 11:20 p.m. and that he was "free to go" at that point. Id. at 79:18-25, 80:19-23. Officer Monclova testified that at his non-steady posts, his relief would still arrive at 11:15 or 11:20 p.m. but that he would have to spend another ten to fifteen minutes counting inmates. Id. at 81:17-24. Officer

Monclova testified that he submitted overtime slips for as little as ten to fifteen minutes. Id. at 92:4-25. Officer Monclova was paid $33,704.94 in cash overtime from March 27, 2006 through December 31, 2011. See Exhibit Y, Erath Decl., at ¶ 4.

35. Some plaintiffs testified that it is their practice to not submit overtime slips for occasions on which they allegedly remained at their post after their tour was scheduled to end, unless they remained at their post for an arbitrary number of minutes that met that particular officer's personal threshold. See Exhibit E, Colon Dep. 78:4-8 (thirty minutes); Exhibit G, Crivera Dep. at 32:2-3 (forty minutes); Exhibit H, Allbright Dep. at 63:18-21 (forty-five minutes); Exhibit I, Been Dep. at 90:7-9 (forty minutes); Exhibit J, Miller Dep. at 39:22-25 (one hour); Exhibit K, Ladson Dep. at 92:17-21 (thirty minutes); Exhibit L, Contreras Dep. at 47:18-22 (forty-five minutes); Exhibit M, Sanders Dep. at 93:13-21 (forty-five minutes); Exhibit O, Jackson-Gaspard Dep. at 44:24-45:1 (thirty minutes); Exhibit P, Gershonowitz Dep. at 50:22-51:1 ("an hour or more"); Exhibit T, Crespo Dep. at 56:11-14 (thirty minutes); Exhibit U, Rivera Dep. at 62:17-21 ("about an hour").

36. However, other plaintiffs testified that overtime slips could be submitted for fifteen minutes of extra work. See Exhibit Q, Bass Dep. at 71:17-21; Exhibit V, Kinard Dep. at 58:14-16; Exhibit R, Shaw Dep. at 81:3-4; Exhibit F, Washington Dep. at 88:24-89:3. Still other plaintiffs testified that overtime slips could be submitted for just ten minutes of work beyond the end of their tours. See Exhibit S, Steele Dep., at 81:4-6; Exhibit W, Monclova Dep., at 92:45.

**D.     Defendant's Expert Report and the Analysis of Time**

37. The FLSA generally requires that employers provide overtime compensation for any work beyond forty hours in a single workweek. 29 U.S.C. § 207(a)(1).

However, for public employees engaged in law enforcement activities, overtime commences after 171 hours of work in a twenty-eight day work period. § 207(k)(1)(B); 29 C.F.R. § 553.201.

38. This exception is applicable to correction officers. 29 C.F.R. § 553.211(f).

39. Defendant adopted a twenty-eight day work period, pursuant to the federal regulation. See Exhibit Z, Administrative Order, dated March 17, 1986.

40. This Court rejected the argument, asserted in plaintiffs' motion for summary judgment, that defendant did not adopt a twenty-eight day work period and was therefore required to calculate plaintiffs' overtime on a weekly basis, holding that "there is substantial evidence that DOC adopted the twenty-eight day period permitted by Section 207(k)(1)(B)." See Docket Sheet, entry no. 120, at 24-26.

41. Plaintiffs have since withdrawn, with prejudice, any claim they may have had that they were not paid in compliance with the FLSA. See Docket Sheet, entry no. 124.

42. Therefore, the instant matter is a "chart claim" and as such, pursuant to the FLSA, possible damages are available for hours over 171 in a twenty-eight day period, and for such hours payment is due at one-and-a-half times the regular rate of pay. 29 U.S.C. § 207(k)(1)(B); 29 C.F.R. § 553.201.

43. Defendant retained BLDS, LLC, a consulting firm specializing in the analysis of labor market outcomes, as its expert. See Exhibit X, Defendants' Expert Report, at 1. Dr. Christopher Erath, a director at BLDS who holds a Ph.D. in mathematics and who has served as an expert witness in numerous matters involving damages in wage and hour claims, prepared an expert report, which defendant served on plaintiffs on January 13, 2012. Id. Dr. Erath reviewed electronic records kept by the New York City Financial Information Services Agency ("FISA") for the period from March 27, 2006 through December 31, 2011, deposition testimony

from the plaintiffs about their allegedly unpaid work time, and information about the City's time-keeping systems. Id. at 1-2.

    44.  To the extent that plaintiffs alleged that they worked various minutes for which they were not paid and which were beyond their tour schedules, if plaintiffs did not submit overtime slips for their time worked, those minutes would not appear in FISA. Id. At 2. To overcome this gap in data, Dr. Erath stated in his report that he relied upon deposition testimony given by the nineteen deposed test plaintiffs to provide an estimate of time worked by the plaintiffs that would not appear in FISA. Id. From that testimony, Dr. Erath stated in his report that he extracted estimates of how many additional minutes each plaintiff worked beyond his scheduled shift for which he could potentially claim additional compensation owed. Id. Where the testimony was imprecise (such as where the deponent gave a range of possible values), Dr. Earth computed "high" and "low" estimates and ultimately obtained two damage figures. Id. The individual estimates were used for the nineteen deposed plaintiffs, and then Dr. Erath averaged the high and low figures for these nineteen to use for all remaining test plaintiffs. Id. Across the nineteen deposed plaintiffs, Dr. Erath stated in his report that the low figure averaged 9.0 minutes per day and the high figure 10.8 minutes per day. Id.

45. The remainder of Dr. Erath's report calculated the maximum amount of possible damages plaintiffs could have sustained. Those damages worked out to be approximately three to four cents per day over a five-year period, for all approximately 840 plaintiffs. Id. at 3-5.

Dated: New York, New York
March 16, 2012

                                              MICHAEL A. CARDOZO
                                              Corporation Counsel of the
                                                City of New York
                                              Attorney for Defendant
                                              100 Church Street, Room 2-102
                                              New York, New York 10007
                                              (212) 788-0903
                                              mcarpent@law.nyc.gov

By: _____
        Megan Burrows Carpenter
        Assistant Corporation Counsel

08 Civ. 3134 (DLC)

| |
|---|
| UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF NEW YORK |
| ERIC EDWARDS, Individually and on Behalf of All Other Persons Similarly Situated,<br><br>                                        Plaintiffs,<br><br>              -against-<br><br>THE CITY OF NEW YORK,<br><br>                                        Defendant. |
| **DEFENDANT'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS** |
| *MICHAEL A. CARDOZO*<br>*Corporation Counsel of the City of New York*<br>*Attorney for Defendant*<br>*100 Church Street*<br>*New York, N.Y. 10007*<br><br>*Of Counsel:  Megan Burrows Carpenter*<br>*Tel:  (212) 788-0903*<br>*File No. 2008-014682* |
| *Due and timely service is hereby admitted.*<br><br>*New York, N.Y.  ......................., 2011......*<br><br>*............................................................Esq.*<br><br>*Attorney for ............................................* |